Man:        A second panel be called up. Ingrid Johnson and Tiamba Lammy with the New Jersey Coalition Against Human Trafficking as well as Melanie Gorlick, Director of Community Relations by the Jewish Federation of Greater Metro West.

Scutari:    And while they're taking their seat I just have a question for the sponsor on the transportation aspect of the bill which is a little concerning to me that, and I understand that there's probably instances in which a transportation aspect should be inquired about, but I concern myself with the cab driver who's driving someone who he doesn't have a, doesn't have direct knowledge that is a victim of this human trafficking scheme. And then he gets, this new bill is going to scoop him up and have him indicted under human trafficking laws. And I just, I'm concerned that the language in the bill is too broad to scoop up an unknowing transporter of victims. I mean I understand that that in some instances that's, that transportation is part of the entire structure of the illegal activity but in others you got a guy who gets a call from Yellow Cab to pick somebody up and the next thing you know because they're watching the situation he's arrested. I mean I think we have to be a little careful on some of these areas.

Pou:        I, sure. No. That's a very, that's very good point Chairman. And let me try to respond to your concern by providing you with a couple of examples that may help to clarify that particular section a little better. For example, let's say that if a driver, if a driver picks up a girl who identifies herself to the driver as a victim, okay? And he or she does nothing. That, that particular cab driver does absolutely nothing with that information and continues to drive that victim to the intended destination, then that's when he would be held liable, let's say. Another example is for instance in many many cases drivers consistently pick up girls from the same pimp. And what they end up doing is they are receiving a kickback if you will from the pimp and he or she would be either, would be the then guilty of reckless, under the reckless standard. That would really be what, what. So we're really only dealing with, pardon me, I'm sorry Mr. Chairman. We're only dealing with those particular cab drivers that absolutely is aware of what's going on and is continuing to go ahead and in agreement with that, and providing the transportation. Let me give you an example, another example. In April early in the year in Manhattan, a Manhattan prosecutor charged a father and son with running a sex trafficking ring. With their livery cab drivers, cab drivers transporting prostitutes and arranging meetings with their clients. The father and son who pleaded guilty in this particular case were accused of threatening violence against the women for being late or failing to meet certain quotas. One of the biggest information or one of the biggest, well, one of the biggest problems that we have are that advocates that are that more and more about this situation, are highlighting that the problems of liveried drivers aid in the sex trafficking. So in your example, if I'm a driver, a cab driver and I know nothing about this and I'm just going to drop that young girl or young boy to that particular, and I say it in those terms because that's really what we're talking about. We're talking about young boys and girls that are impacted or affected. If they know that every single time I'm delivering that girl or boy to the very same location and they know that that is only being done for the purpose of performing some kind of sex exchange,

7

that's when the cab driver then becomes liable. If the cab driver is just someone for the first time picking it up, that's not what this law is intended to. It's not.

Scutari:    And I understand that. But I don't think that's, that's not spelled out that carefully in there in terms of a pattern and practice. So I think that's something that you're going to want to look at.

Pou:    Absolutely. I'd be happy to do that.

Scutari:    Because in terms of the first example you gave where somebody who, you know,

Pou:    Knowing

Scutari:    some cab drivers don't always, English is not always their first language, perhaps, and like you said, maybe are turning a blind eye

Pou:    Yeah

Scutari:    and shouldn't be doing that, but in a pattern and practice I completely understand the transportation mode being a part of the scheme. But when it's an isolated incident and you're talking about someone who is a, essentially a transporter or bystander, and even if they should have done something and didn't on this one particular occasion, I think it's somewhat difficult to put them into this as a violator because they didn't do something they should have done as a bystander, a negligent bystander rather than a perpetrator of the crime. So I think that's something you want to consider in terms of specifics on the transportation aspect of the bill.

Pou:    Sure.

Scutari:    When they're perpetrators of it, and they're receiving some portion of money, or it's a regular occurrence, absolutely. But when it, even if it is someone who did it for one time and maybe overheard a conversation or didn't identify someone particularly or maybe should have and didn't want to get involved and I'm not saying they're right about that, but to drag them in under this act is a bit maybe a stretch, but that's just my thought on it at this point. Why don't we get to the panel.

Pou:    Sure. Thank you.

Scutari:    We'll talk further. Go ahead. Ladies.

Johnson:    Good afternoon. My name is Ingrid Johnson and the third party Tiamba Lammy is not here. That is my daughter who is a survivor of human trafficking. Unfortunately she had to leave. So I am here with Melanie and I will go first. First of all, we'd like to thank all of the judiciary senate body for allowing us to come before you today to testify on behalf of this bill which is very important. And I could, Senator, answer a lot of those questions being a mother of a survivor

8

since I had to rescue my own child out of New York City. And I have a lot of thoughts on this whole issue and I do believe it's important for cab drivers and people who facilitate the transport of minors like my daughter to be prosecuted and have the threat that they should not do that when they are well aware of what's going on.

I'll read my brief testimony. I am Ingrid Johnson. I am a registered nurse representing Overlook Medical Center, a member of Atlantic Health System on the New Jersey Coalition Against Human Trafficking. I am testifying today on behalf of all the voiceless victims of human trafficking of which, at one time, was my then-teenage daughter who is now a survivor. My family and the voiceless victims within our state and around the world appreciate your willingness to hear how you can make a difference in the lives of human trafficking victims and survivors. In 2004, I will be brief, my oldest of three children and only daughter was a habitual runaway. Like lots of teens, she pushed the limits and gave into peer pressure as she sought acceptance from others. She was an honor roll student at the top of her class, played the violin and attended one of the best public and elementary and private middle schools in our area. My daughter ran away from our home which, at the time, was located in Irvington, New Jersey and was missing for 11 months. Upon her return, she was said to have been the only missing child during the 11 month period who returned home alive. As all of her incidents had been reported to local authorities, I contacted and worked very closely with local law enforcement, the national center for exploited and missing children and I walked the streets of Irvington and Newark posting fliers and called community service organizations to see if anyone had seen my child. Initially my efforts seemed hopeless until one day while I was working as a night nurse at University Hospital in Newark my cell phone rang at the end of my shift. I missed the call and began to play the voicemail message as I walked down the hallway on my way home. It was my daughter crying "mommy I miss you" and "mommy I love you." Little did I know that at that time she had snuck away to hide in a gas station bathroom fearing for her life to call home. My body became lifeless and someone helped me return to my nursing unit to gain my composure. You see, I had kept this issue a secret the entire time due to the shame and stigma placed on a good parent dealing with a heartbreaking issue. I immediately went to the Irvington police station to report the call. They followed up and requested a subpoena of my phone records. I unfortunately had to return home empty handed with no answers. Then one day while on vacation I was working with a state police officer and we received a break in the case. My daughter's call had been traced to a phone tower in New York. Immediately my family and I packed up from vacation and I made my way to a New York police precinct in the vicinity of the call to post fliers. It was there that I learned that my daughter had been prostituting and had even been arrested for prostitution.

It took several trips to New York and cold calls to johns and pimps whose numbers were traced to the cell phone used to by my daughter to call home. With support from the New York Police Department, and after hours of waiting outside a New York train station with police in unmarked cars, I recovered her.

Underneath a wig and with mental as well as physical scars, was my 14, soon to be 15, year old little girl. She has been home ever since and well on her road to recovery. She is a junior in college at this point. I credit God and my training as a nurse for our success for had I not had faith, been a nurse, been employed, and had financial resources, I would not be sitting before you today. Our journey was lonely, full of doubt, near death experiences, but thank God we made it. And as I close, for this reason, I sit before you as evidence that human trafficking is occurring in New Jersey and to thank you on behalf of all of the voiceless victims hiding in dark places. The passage of S2239, the Human Trafficking Protection, Prevention and Treatment Act, as well as all the other resolutions tied to this bill will bring hope to the hopeless and send a message to New Jersey's victims of human trafficking that freedom is in the air and that help that will lead them to a brighter future is on the way. Thank you.

Gorlick:   I want to thank the Senate Judiciary Committee, Chairman Scutari and its members for giving us the opportunity to testify today. I'm speaking to you on behalf of the recently formed New Jersey Coalition Against Human Trafficking. Before I begin my remarks I want to thank the prime sponsors of the Senate bill, Senators Nellie Pou, Joseph Vitale and Nia Gill. We appreciate your leadership in helping to end modern day slavery. The New Jersey Coalition Against Human Trafficking is made up of a diverse group of citizens, over 25 organizations, including faith-based, nonprofits, local government agencies, law enforcement and direct service providers based in New Jersey who have come together with the mission of ending human trafficking in our state, country and the world through education advocacy and assistance to survivors. Through our partnership, we work to serve as the hub of the state and community efforts to increase coordination and visibility of New Jersey's commitment to end human trafficking. We believe New Jersey is a major hub for human traffickers, as we have a huge port, we have a huge bus station, three airports and we are the beginning of 95. And we must take responsibility and be engaged in the human trafficking concern. It's happening right here.

Human trafficking is a form of modern day slavery. We define human trafficking into three categories: sex trafficking, labor trafficking, and minors. More than 50% of the victims worldwide are estimated to be under the age of 18. Under U.S. law, any person under 18 involved in the commercial sex industry is considered a human trafficking victim. As part of our coalition's effort, we are advocating for local, state and national policies directed towards protecting survivors and abolishing trafficking. We believe that the Human Trafficking Prevention Act is imperative to ensure strong action against slavery in New Jersey. We think the time for this legislation to be enacted is now because in less than two years New Jersey will be hosting the Super Bowl, which you heard about before.

In addition to supporting state-wide legislation and resolutions, we have secured proclamations from townships throughout Essex, Morris, Union and Sussex designating January 11th as Human Trafficking Awareness Day. We have

already received approximately 30 so far. By presenting these proclamations publicly at the local level and having it reported to the local papers, we are educating thousands of local citizens statewide. The President of the League of Municipalities has joined our efforts. The Human Trafficking Prevention Protection and Treatment Act will make New Jersey one of the leading states nationally implementing strong human trafficking measures. We want those who benefit or who use trafficking services provided by victims to be punished. We strongly recommend that the State of New Jersey use the National Human Trafficking Resource Center Hotline which is a federally funded hotline. This will ensure that it is a well-oiled machine meaning that the people working on the hotline are linked to national and local efforts and know how to help the person who is risking his or her life to make the call or send the text. We know that it can make the difference between life and death for some trafficking victims.

We also applaud the Attorney General's increased efforts to ensure law enforcement makes this concern a priority. We are organizing a Human Trafficking Awareness Day Program in Trenton that will bring grassroots advocates from all over the state to speak out against this horrible crime on the steps of the New Jersey State House. We hope you will pass this legislation and stand with us at 11:00 a.m. on January 11th, Human Trafficking Awareness Day. We will be emailing each of you rally fliers. We have also launched a website called www.newjerseyhumantrafficking.org and we have asked synagogues, churches, mosques and other local groups to engage in local Human Trafficking Awareness Day programs the weekend of January 11-13. New Jersey has a strong history of protecting the fundamental freedoms and rights of all persons. We are proud to be citizens of the great state and working with you on this important concern. Thank you and you can see the number of names of the people of our coalition.

Scutari:        Thank you very much. We have another – the final panel, we have Patricia Devine Harms representing the Junior Leagues of New Jersey, Jennifer Nicks the New Jersey Coalition against Sexual Assault, as well as John Tomicki, the League of American Families. As with the previous panels, all indicating support for the bill.

Harms:          Good afternoon Chairman Scutari and distinguished members of the Senate Judiciary Committee. As a member of the Junior Leagues of New Jersey, State Public Affairs Committee representing 3,000 women volunteers in this state, we really appreciate you addressing the urgent need to effectively combat human trafficking within New Jersey.

                I am Chair. My name is Patricia Devine Harms and I'm Chair of the Junior Leagues of New Jersey, State Public Affairs Committee. In human trafficking we often hear about the three Ps: prevention, protection and prosecution. As Junior League members, we really advocate for the four Ps, including partnerships. We partner with state agencies, law enforcement, faith-based groups and nonprofits. We also work on survivor protection through collaboration with Polaris Project,

11

ECPAT USA, and Homeland Securities Investigations. We work on prevention measures through mentoring and skill building programs for vulnerable youth and finally prosecution. Since 2010 we've been advocating for the creation of comprehensive legislation that will hold perpetrators more accountable, while providing adequate and comprehensive survivor services. S2239, the Human Trafficking Prevention Protection and Treatment Act dovetails a draft bill that we worked on with the New Jersey Statewide Human Trafficking Taskforce which is within the Department of Law and Public Safety. And we fully support this bill. We obviously have a moral obligation to stop the purchase and enslavement of people. We have a moral obligation to empower the survivors.

Junior League is part of the Association of Junior Leagues International, AJLI. It is comprised of 293 Leagues in four countries representing over 155,000 women volunteers. Since 2005 our group SPAC has been working to raise awareness on an international level through AJLI conferences and League based-initiatives. Within New Jersey, we've hosted or cosponsored four training events, including the first New Jersey Center Conference in 2009 which was entitled Human Trafficking in New Jersey Hiding in Plain Sight, because as we know, it is hiding in plain sight. In 2011, Junior Leagues were honored by the United Nations Association of New York for our ongoing efforts in our commitment to eradicating human trafficking. And SPAC is very proud to collaborate with like-minded individuals through membership in the New Jersey Coalition against Human Trafficking and we are collaborating on planning this coming January 11, 2013 Human Trafficking Awareness Day. It will be our third time collaborating. As Melanie mentioned, you can have your constituents register at www.njhumantrafficking.org.

We understand that S2239 has a number of moving parts but we believe that each component is vitally important, including increased usage and promotion of the National Hotline which is 888-3737-888. We want to thank the primary sponsors, Senators Pou, Gill and Vitale and reiterate that the Junior Leagues of New Jersey Public Affairs Committee and the New Jersey Coalition against Human Trafficking strongly support S2239. This is a key component in combating human trafficking in our state. Thank you.

Nicks:       Hi. My name is Jennifer Nicks. I'm from the New Jersey Coalition against Sexual Assault. We represent the 22 sexual violence programs in New Jersey as well as countless survivors of sexual violence throughout the state. We support this bill. Just a few things to point out, as you all have heard, this is an incredibly comprehensive bill that will improve services to survivors of trafficking, take steps to prevent trafficking and hold perpetrators accountable. Of particular interest to NJ CASA is the creation of the Commission on Human Trafficking and the Human Trafficking Survivors Fund. This bill would create these john schools, it would increase fines and the funding would be directed towards creating services and otherwise implementing the bill. Sexual violence programs and domestic violence programs already serve some of these survivors and are stretched thin as it is. By funding and creating additional specialized services for

survivors of trafficking would help alleviate some of the stress on sexual and domestic violence programs who are already feeling the pinch. We support this bill wholeheartedly and we look forward to seeing it move forward. Thank you.

Scutari:        Thank you. Mr. Tomicki.

Tomicki:        Good evening Mr. Chairman. Thank you so much for calling us up to testify. We're going to be very brief and concise. We haven't had a chance to go through all of the amendments that are being proposed at this time. We had a good session with the Assembly sponsor because we have worked closely on the group called Renewal Forum which is actively involved on the federal level and also it has been involved out in Kansas City with a special project. My request here, I know it's late and I know you've got amendments but we just heard something from these two ladies saying something very specific. It's got to be aimed at, in this bill, and aimed at helping that victim. And I think it should be in the Commission that you're establishing and I'm sorry Senator that we didn't get a chance to get with you because when we sat with the Assemblywoman she said she was going to reach out to you and I didn't think it was going to move that fast over here but I think that the Commission either should be expanded or you amend the language so that it minimally there are two people who will serve on my Commission who will have been former victims. They will have the best insight and also will probably help better in some of the training and what's needed in some of the john schools or other information that's good in the training. So we would hope that that would be seen as a potential amendment maybe even on the floor. I don't think you'll be dealing with it today.

Mr. Chairman, there are other aspects about the bill, technically speaking and even you began to raise concerning about on the prosecution. Everybody wants to go in this direction. I was not here the day…. We testified briefly when you change the law correctly so that underage minor would not be prosecuted, we want to help them. And that's the whole purpose of part of why the bill is now let's get the person that's perpetrating. Get the person that is victimizing and protect and educate the victim so that we see that in the training required, 90 days may not be enough to train everybody that's going to have to be trained quickly to train the trainers. So there's a lot of work that has to be done on curriculum. Renewal Forum is willing to stand forward to help on that training and we'll try to get in touch with Polaris [inaudible] has it. But everybody is going in the right direction on this bill and there is sort of a time sequence but also, as you know better than I do since you are dealing with it, New Jersey tragically is a crossroads and some of the ministries that we're somewhat connected with, we get the after effects of some of the kids who we can get out of the lifestyle and some other reasons. So Mr. Chairman thank you so much and I'm sure that the bill will be moved but I would really seriously think about making sure that there is a directive in the bill that at least two members of that Commission be people who were former victims who have been rehabilitated. They will have the best insight. And I thank you so much for your time and we'll be looking forward if we could work with you Senator on making that change.

13

| | |
|---|---|
| Senator: | Before anyone misconstrues this, I favor the bill. I was speaking with the sponsor before the meeting and there are a couple of small concerns. One, there is a section on advertising that I – we did not discuss, which I have been told the state of Washington passed about an identical, an almost identical, which a federal district court has ruled unfavorably on and I wonder if there is any information with respect to that. And I'm losing my voice. |
| Pou: | Senator, I'm sorry. I know. I barely heard – I only heard something about that was in the federal court so if you don't mind |
| Senator: | The section on advertising. |
| Pou: | On advertising? |
| Senator: | Yes. |
| Pou: | Okay. |
| Senator: | I've been informed that the state of Washington, and I think it says right in the bill that the state of Washington and Connecticut both passed similar sections. |
| Pou: | Right. |
| Senator: | I've been informed that the state of Washington was in court and the federal district court ruled against that section. How do we look at that as the sponsor? |
| Pou: | Okay. Thank you for the question Senator. I am aware of that and my understanding, and I know that the Polaris Project folks may know a little bit more about this. However, this is what I'm aware of. I'm aware that that occurred. My understanding is that that decision has been appealed and it's now before their State Supreme Court and it has not been decided upon, so it is a decision that we do not know at the present time what the final outcome of that appeal is at the moment. |
| Senator: | Okay, fair. And we did discuss before the meeting what the – some of our notes somewhere indicate that the Attorney General has some reservations about the bill. I know that you've attempted in amendments to deal with some of those technical reservations. |
| Pou: | Right. |
| Senator: | Are there still others that are still outstanding? |
| Pou: | I'm not aware of – this is my understanding. There has been a number of discussions from major stakeholders, as well as a, I know for a fact that there was a conference – there was an actual meeting with various members of, representing the Office of the AG, the Attorney General as well as Office of the Administration of the Court who were present, along with members of the Office |

14

of Legislative Services and our mutual staff, both from Senate as well as the
Assembly. This meeting took place in Assemblywoman Huttle's office. There
were other major stakeholders at that meeting as well. I was on the call for a short
time. But many of those concerns that were raised at the time by the AG's office
or that of the AOC, it is my understanding they had a couple of recommendations.
Most of the amendments that you see presented to you today are reflected in the
actual bill today as a result of those amendments. We included some of the things
that were absolutely important to the AG, such as wiretapping and a number of
different areas. There were a couple of technical recommendations that they had.
They also included a very large section in the bill that was important to the AG's
office. My understanding is that there is the issue that may still be in place is
what you and I talked about. You heard today of the National Hotline number
that is being used and advocated and referred to in this particular bill. One of the
concerns that I've been made aware of is that the AG's office wants us to consider
using exclusively the New Jersey Tip Line, is my understanding, but there was
some questions with regards to just exclusively using that hot line because we're
not talking about individuals that are exclusively trained in human trafficking
information. It's my understanding is that it's given to a particular trooper or
investigator who, if you call that number there is a cell phone that is answered by
someone from the state, and if there's someone here from the AG's office that can
give us a different explanation or information with regards to that, I'm happy to
hear that explanation. I know that I see Mr. Finkle who's here so I don't know if
he wants to come forward and speak about that specifically but we can talk about
the national, the difference between the national hotline and that of what the AG's
office is proposing. Those are my comments or information that I was given. All
in all I believe that all of the recommendations and changes and amendments that
were talked about has for the most part satisfied the two offices that I've
mentioned, unless I am representing something that is vastly different.

Scutari:        Since we have Finkle, come on up. Even though you didn't sign up a slip I want,
                since I see you here. Do you want to clarify some of the positions that you have
                on it?

Finkle:         Thank you Senator. I'd be happy to. I think to correctly characterize our position
                specifically on the hotline, we are not looking to be the exclusive recipient. What
                this bill does as currently drafted is it would preclude from actually having the
                hotline in New Jersey. The bill would, right now, require any calls we get on the
                – it mandates that we have a hotline and promote a hotline but then it provides
                that we must automatically and directly, any calls we get would bypass us and be
                redirected to the national hotline. So any crime tips we get, any contacts that are
                directed to our human trafficking unit, which is by the way a priority of the
                Attorney General, we would not get. So this essentially would say you cannot
                have a state hotline that the state law enforcement officer can use. So that's
                what's objectionable. We don't want to be the exclusive and we want to work
                and coordinate with the national hotline but not to the exclusion of our own ability
                to intake these calls. And we met while this committee was going on with Polaris
                and the Assembly sponsor and I think we are going to meet in January and sit

15

down and try work out compromise language that serves their interests in directing calls as appropriate for services and for their resources without taking away our ability to actually intake this information. There's also other, a lot of other suggestions that have been be made that I think we still have to reach closure on. This is a comprehensive bill. There's a lot of good things in here. But there's a lot of things, and Senator Cardinale raised a couple of them that bear a little careful consideration to make sure we get it right because at the end of the day we all want to be in the same place on this issue, which is leading the country in eradicating this practice. So we're committed to work with you and with the Assembly sponsor and with the stakeholders to get to the right place.

Scutari:    Thank you for that. And I've also addressed Senator Pou and others about some of the particular concerns that you suggested and others about the bill. Just to make it work and have it the way we want it to work. The constitutional issues, the unintended consequences that could because it's a very, very comprehensive bill, well intended, but when you have something as thorough as that you have lots and lots of loose ends. And so I said I was willing to list the bill today. In fact I'm even willing to release it but I know I have your word to continue to work with my office and the AG to try and tie up these loose ends so that at the end of the day we all get to the place that we want to be which is a very effective bill and it makes law enforcement more effective but also doesn't have unintended consequences, nonconstitutional clauses that would eradicate the bill completely so I think we all know that there's more work that needs to be done on it.

Pou:       Thank you Mr. Chairman. I appreciate your remarks. I am hearing, quite honestly I had not heard any major concerns from the AG's office prior to this very moment until earlier or even just prior to today's meeting. I was aware of some of the concerns that I've made reference to in my remarks and response to the Senator. I'm more than happy to work with the AG's office and certainly through you Mr. Chairman as the Chair of this committee to make sure that we get the type of bill that we need with the language and addressing the concerns that's been shared here. I will, however, through you, Mr. Chairman, ask that any of the concerns that you are referring to of that of the AG's office, if you would please make sure that I'm aware of because I'm hearing now, I certainly knew about the hotline. I'm not aware of any of the other concerns that you generally talked about so I would be interested in knowing what other areas, other than what Senator Cardinale and Senator Scutari has identified and addressed to me, I was not aware of any other ones from you. Thank you.

Scutari:    Senator I'm happy to work with you on coordinating and deal with you on all these issues. We did, in the meeting we had at Assemblywoman Huttle's office, we went through a whole litany and I know you were on the phone for part of that and I know the phone cut out quite a bit as well.

16

Pou:        So this particular bill didn't address those – the major part of that discussion and those recommendations? My understanding was that they were all addressed in this particular bill with the exception of the hotline issue.

Scutari:    That would not be the case. There's a way to go.

Pou:        Okay. I appreciate that. Okay. Very well. Thank you very much.

Scutari:    Senator Cardinale.

Cardinale:  On page 7, item 2, there is language that I'd like to call your attention to, which I think is particularly good.

Pou:        Page 7 of the bill or of the amendment?

Cardinale:  Amendments.

Pou:        Okay.

Cardinale:  I don't know which section of this, which set. I think there's more than one set but I think it's the latest set. And there is language there that – the particular language I'm interested in, I guess you have to read the whole thing. Procures or attempts to procure a person to engage in sexual activity is defined in paragraph 2 or to provide labor or services whether for himself or another person knowing that the person provided or to be provided for was a victim. It's knowing that the person was provided a victim of human trafficking or under circumstances in which a reasonable – and this is the language I'm hoping we can adopt in other sections – a reasonable person would conclude that there was a substantial likelihood that the person was a victim of human trafficking. We are looking at a reasonable person's standard to be applied to an offender or a potential offender, someone who is potentially guilty. Now, you and I discussed the strict standard, the strict liability standard that is supplied in a couple of other sections. Now I realize that's not part of your bill.

Pou:        I was going to say. The strict liability does not apply to the human trafficking bill.

Cardinale:  Well it's in the existing law which we are repeating. We are going to be

Pou:        Yes. It's part of the current law right now.

Cardinale:  Right. It's part of the current law. And it has always occurred to me throughout my legislative career, whatever subject we're dealing with, that when we attempt to find someone guilty of something that they could not have known they were doing that was wrong, even if it's just more wrong because and that's in both of those sections, what they are doing is wrong to begin with but then in identifying an age, the example I gave you was if somebody provides a driver's license saying that they are 25 when they are really 14 they still will be violating the

section. While we're at this, I don't know if you have the stomach for dealing with the issue and it's a tough issue to deal with because we're dealing with trying to ameliorate the penalty to someone who is doing something wrong already and I don't condone what they're doing but it seems to me that we shouldn't do things like this and when we run across them we should correct them. Now, I am going to vote for your bill and I'm not – this is a small consideration but I would hope that you would give some consideration to applying a reasonable person's standard in place of the strict liability standard.

Pou:   Senator, I would be happy to take a look at that once again. Let me just make sure that I understand. What my understanding of the way that particular section reads is that anyone who is committing a sexual – is involved in a sexual trafficking or sexual activity with someone who is under age in this particular case, they would be, this bill does not refer to the strict liability but they would still be in violation of law because that would be statutory rape that they would be subject to.

Cardinale:   But there are defenses in other areas of the law except the way it is stated prosecution under this – it shall be no defense to a prosecution under this paragraph that the actor mistakenly believed that the child was 18 years of age or older even if such mistaken belief was reasonable. So we have a standard here that is the opposite of reasonable standards. And that is something that I don't think should ever be in any laws that we pass. While we're at this we could correct it, and it's in another section as well, it's in two sections.

Pou:   If you are referring to the commercial section, and the commercial end of that, I don't have that particular section in front of me so let me just paraphrase what I believe you might be referring to is, and I think it's attributed to the example of the backpage.com advertisement that they actually receive advertisement for sexual type of --

Cardinale:   It's for pornographers.

Pou:   Yes.

Cardinale:   It's for pornographers who are utilizing…

Pou:   What page are you on?

Cardinale:   You know I don't like pornographers doing stuff with 21 year olds alright, to start with.

Pou:   Let me, let me –

Cardinale:   But we're creating an additional penalty for them if the person is under 18 and we're changing that from 16 to 18 in this bill. But it says 18 years or older even if such a mistaken belief was reasonable.

18

Pou:        Well, what I'm saying is that the burden of proof should be imposed upon that particular advertising company to ensure that the person that is in front of them that they are indeed 18 years or older and they can do so by simply providing some type of document, be that a birth certificate, some kind of legal document that shows the actual date of birth of that individual. In doing so they have maintained and provided the necessary supporting documentation that releases them from that responsibility but the very fact to say "well, she looked her age" or "she looked 18" is not a reasonable defense for someone to just absolutely take a different approach. And that was really the intent of it.

Cardinale:  The language says, it goes further than that. It says that even if the expectation was a reasonable one, too bad. Even if they had a driver's license that said you were of age, and you have this reasonable expectation.

Pou:        That's a separate section. There is one section that – the section we were just talking about was the commercial end of it. Are you referring to the section previous to that Senator? Yes. We were talking about the commercial one.

Cardinale:  Well, I've got on page 22 of the amendments, there is another section that repeats that same problem. And I think there is still one more section which has language similar to what you have just indicated. The language that you have just indicated I think should be transposed in these other two sections and I think that then we would be doing something better.

Pou:        Okay. I'm happy to take a look at it and make the necessary – and have the necessary discussion and look at amending the bill that makes it better and makes it certainly a lot more clear, if that's what we want to do, so that it doesn't present, provide some unintended consequences as it was indicated by the Chairman. Certainly that is not my intent. Our intent by both the Assemblywoman and myself is making sure that we have laws, a law that is really going to help to really provide the kind of prevention, the protection and absolutely the prosecution of those particular predators out there that certainly needs it and I know that you gentlemen want the same thing so I know that you are supportive in that. We'll come up with the appropriate language that hopefully will spell that out.

Cardinale:  And two points I would like to just finish with. I'll make it brief. I believe that Senator Scutari's comments about the cab driver could be dealt with in a similar way by putting some by crafting some language appropriate to that section that would put a reasonable person standard in there with respect to the cab driver. The last thing is I know that the bill does make a mention of helping the victims but I took this picture in my head, if we pass this bill and it's law and we find ourselves better able to control the problem. Law enforcement is better. We've got more tools and they can get the trafficking and they catch the trafficker and now the traffickee. In some instances the traffickee is going to be back with a family or something and is going to be in better shape. But in many instances that traffickee is out in the wilderness. What happens to them? They're going to be

19

|          |                                                                                                                                                                                                                                                                                                                                                                                                          |
|----------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|          | revictimized.  They're going to be revictimized unless something is put in place that gets them on their feet.  That gets them with the opportunity to have some transient, at least, shelter and support and the pattern.  I don't know if you are. . .                                                                                                                                                     |
| Pou:     | You are absolutely right.                                                                                                                                                                                                                                                                                                                                                                                 |
| Cardinale: | In Passaic County - you are probably familiar with Shelter Our Sisters.  I've worked with them for a long, long time.  Save Our Sisters.                                                                                                                                                                                                                                                                 |
| Pou:     | Yes.                                                                                                                                                                                                                                                                                                                                                                                                      |
| Cardinale: | And they provide an opportunity for victims of battering to get their lives back together to be able to support themselves, to take care of their day to day needs.                                                                                                                                                                                                                                     |
| Pou:     | The human trafficking survivor assistance fund that is spelled out in this particular bill will do exactly that.  It will help to ensure that the types of services that are needed to help to provide the necessary protections that you very well talked about are the ones that are helpful, pardon me, that are put in place to provide the kind of services to these young women and men who are affected so that they can try to get their lives back in order.  That's exactly the kind of service we're talking about that is appropriate for this particular survivor fund, a survivor assistance fund to provide.  So it runs very much along those very lines Senator. |
| Cardinale: | Thank you.                                                                                                                                                                                                                                                                                                                                                                                               |
| Pou:     | Thank you.  Thank you so much for your questions.                                                                                                                                                                                                                                                                                                                                                         |
| Senator[?]: | And as we go forward and look at the issues raised by Senator Cardinale, we have to be very mindful that we don't include language, and I know we will, that then undermines the other statutes because the language that he's asking to – for us to look at is language that is in the existing statutes for endangering the welfare of the child so that as we go forward we cannot even if the bill, the position, as articulated that we cannot undermine the existing statutes by referencing statutes and then changing the language in this particular bill.  So appreciating your position and understanding that this bill is not a standalone because this bill also references other existing statutes that we don't want to undermine is something that I know we'll take into consideration moving forward. |
| Scutari: | Seeing that there's so many loose ends, I mean, I'm going to call for a vote with the understanding that we'll work together and I know it is going to be second referenced and before it goes to the floor if we could have that continued dialogue just to ensure that the Attorney General's concerns and the concerns that were brought up in the committee have been addressed at least to some degree regarding those issues with that agreement I'll call the vote. |
| Pou:     | Thank you Senator.  Thank you Mr. Chairman.                                                                                                                                                                                                                                                                                                                                                               |

20

| | |
|---|---|
| Chair: | Okay.  Motion on the bill to release?  Moved by Senator Cardinale.  I need a second.  Seconded by Senator Pou.  On the Bill S2239 with the committee amendments presented Senators O'Toole and Kyrillos have both indicated yes. |

Senator Cardinale:  Yes

Senators Bateman, Weinberg, Stack, Smith and Sarlo have all indicated yes votes.

Senator Pou:   Yes

Senator Lesniak has indicated an abstention.

Senator Gill:   [inaudible]

Senator Scutari:  Yes

The bill is released.  Congratulations.

| | |
|---|---|
| Pou: | Thank you Senator.  Thank you Chairman. |
| Chair: | Thank you very much Senator Pou.  Thank you everyone. |

# EXHIBIT Y

First Amendment Concerns Curtail Escort Ad Bill; One of Several Measures to Clear Judi...   Page 1 of 8




# Capitol Watch | Hartford Courant
## CT Politics

CONNECTICUT    WASHINGTON    NEWTOWN    HARTFORD COURANT    COURANT POLITIC

AB(

Public Safety Commissioner Bradford: No Intent To Implement Quotas

Attorney For State Employees Caught in D-SNAP Subpoenas Gov. Malloy, Top Aides; Malloy Has
Little Comment

# First Amendment Concerns Curtail Escort Ad Bill; One of Several Measures to Clear Judiciary Committee Monday

by DANIELA ALTIMARI on APRIL 2, 2012 · 2 COMMENTS

A bill aimed at stopping escort services from sexually exploiting minors unanimously cleared the legislature's judiciary committee Monday after constitutional issues were laid to rest.

As initially drafted, House Bill 5504 would have held the publishers and employees of newspapers and websites criminally liable if they published escort service ads that sexually exploit minors.

Th(
pro
Co

But First Amendment concerns prompted lawmakers to strip that requirement from the bill before the vote.

What remains is a requirement for the owners of the escort agencies to stipulate that the people featured in their ads are not minors.

" The use of minors for sexual exploitation throughout the state of Connecticut is certainly running rampant," said Rep. Jeffrey Berger, a Democrat from Waterbury and a former city police officer. "We look at situation that exists on the Berlin Turnpike and other areas and we are shocked...and...the General Assembly should be shocked."

Berger said he hopes the measure will prompt of a conversation on the social costs of child exploitation. "There were many concerns that came to us about First Amendment rights... and we can agree to disagree on that," he said. "While it does not go all the way...it does starts the process that we [hope] to build on through continued legislation."

Last week in Washington state, Gov. Christine Gregoire signed the first-in-the-nation anti-trafficking bill to prevent minors from being exploited through online escort service ads.

The committee also passed a bill that would provide a new revenue stream for legal services for the poor. As currently structured, legal services are funded through interest earned on lawyers trustee accounts, But low interest rates, coupled with the prolonged dip in the housing market, has sharply curtailed the amount of money legal services receives.

House Bill 5388 would increase certain court filing fees and allocate sixty per cent of the money to legal services to the poor. The remaining funds would used to pay for technology projects within the Judicial Branch. The measure passed, 44 to 1.

Also approved by the committee was a bill that would make it a penalty for the parent or legal guardian of a child 12 and younger to fail to report a missing child within 24 hours. The Caylee Anthony case in Florida provided the impetus for the bill.

Before any of the bills become law, they must receive the approval of both the full House and Senate, as well as the signature of Gov. Dannel P. Malloy.

Among the bills that did not win approval were a pair of controversial criminal justice measures. One, championed by committee Co-Chairman Sen. Eric Coleman, would

have reduced stricter penalties for those caught possessing or selling drugs within a certain distance of a school or daycare center.

The measure would have restricted enhanced penalties for drug possession or sale near schools and day care centers to only the times such facilities are in session. It would have also reduced the distance of the drug-free zone from 1,500-feet to 200-feet of a school in towns with populations for 60,000 people or more.

Supporters say its a matter of fairness: there are far more schools and daycare centers in densely populated communities than in more rural ones.

But state Rep. Rob Sampson, R-Wolcott, said he fears changing the law would spur more crime near schools and daycare centers, citing the testimony of Hartford police at a public hearing on the bill.

Lawmakers also rejected a bill that would have barred anyone convicted of causing the death of another person from participating in a program that offers early release credits to prisoners who meet certain requirements. The early release credit program was passed by lawmakers during the 2011 session but it remain controversial.

"I think most of us in the building believe in rehabilitation and second chances, I certainly do," said Rep. Themis Klarides, a Republican from Derby. "But there are certain things that are so heinous and so bad that, in my opinion, if somebody gets a sentence, whatever that sentence is, it should be served."

One matter that did not come up for a vote on Monday was a proposal to reopen last year's controversy over the public's use of municipal open space. During the 2011 session, lawmakers lawmakers approved a bill that grants limited legal immunity to municipalities that open their undeveloped land to the public.

But last week, the judiciary committee revisited the issue, holding a hearing on a new bill that would add numerous exclusions to the law, including public beaches, boardwalks, designated spectator areas and structures, and paved sidewalks that are open to the public for pedestrian use.
While the committee did not vote on the bill, it could still come up in the form of an amendment on the floor of the Senate.

# EXHIBIT Z

**53a-196i Section text**
**1 of 1 document(s) retrieved**

Sec. 53a-196i. Commercial sexual exploitation of a minor: Class C felony. (a) For the purposes of this section:

(1) "Advertisement for a commercial sex act" or "advertisement" means any advertisement or offer in electronic or print media which includes an explicit or implicit offer for a commercial sex act to occur in this state;

(2) "Commercial sex act" means any act of sexual contact, as defined in section 53a-65, or sexual intercourse, as defined in section 53a-65, for which something of value is given to or received by any person;

(3) "Depiction" means any photograph, film, videotape, visual material or printed material; and

(4) "Person" has the meaning provided in section 53a-3, but does not include a government or a governmental instrumentality.

(b) A person is guilty of commercial sexual exploitation of a minor when such person knowingly purchases advertising space for an advertisement for a commercial sex act that includes a depiction of a minor.

(c) (1) In any prosecution for an offense under this section, it shall not be a defense that the defendant (A) did not know the age of the person depicted in the advertisement, (B) relied on an oral or written representation of the age of the person depicted in the advertisement, or (C) relied on the apparent age of the person depicted in the advertisement.

(2) In any prosecution for an offense under this section, it shall be an affirmative defense that the defendant, prior to purchasing advertising space for the advertisement, made a reasonable bona fide attempt to ascertain the true age of the person depicted in the advertisement by requiring the person depicted in the advertisement to produce a driver's license, marriage license, birth certificate or other government-issued or school-issued identity card that identifies the age of the person, provided the defendant retains and produces a copy or other record of the license, certificate or identity card used to ascertain the age of the person depicted in the advertisement.

(d) Commercial sexual exploitation of a minor is a class C felony.

# EXHIBIT AA

## 10/15/12 - ASSEMBLY JUDICIARY COMMITTEE
## HEARING TRANSCRIPT

| | |
|---|---|
| Assemblyman Barnes (Chair): | Everybody take their seats.  Roll call please. |
| Assemblywoman Schepisi: | Here. |
| Assemblyman Carroll: | Here. |
| Assemblyman McKeon: | Yes. |
| Assemblyman Johnson: | Here. |
| Assemblyman Caputo: | Here. |
| Assemblywoman Quijano: | Present. |
| Assemblyman Barnes: | Here. |

Woman:  You have a quorum.

Barnes:  Thank you.  I'd like to announce our first bill.  We're going to go slightly out of order.  We're going to take A3352.  We're going to announce that bill plus amendments please.

Woman:  A3352 revises and expands the state's human trafficking law.  It creates a new human trafficking commission, criminalizes additional activities related to human trafficking, increases protections for victims, and provides for increased training and public awareness.  There are several proposed amendments. Among other provisions the amendments replace all references to criminal negligence as a standard for new human trafficking crimes and they replace that with criminal recklessness.

Barnes:  Thank you.  I'd like to invite the sponsor up.  Assemblywoman Vainieri Huttle.

Vainieri Huttle:  Thank you Chairman Barnes and to the members of the Judiciary Committee for posting this bill this morning.  And I also want to thank you Assemblyman Barnes for being a prime on the bill with me along with my colleagues on both sides of the aisle.  You know I just want to start off that combatting human trafficking is not, you know, a Democratic or Republican issue.  It's a human rights issue that affects over 20 million people world-wide.  And to be honest with you human trafficking is modern day slavery.  You may think that it only happens in developing nations or places of war, but it happens right here in New Jersey and across the United States.  Recently there was an article in the New York Times about a young woman who stayed at a house of an acquaintance for the night, thinking she would go home in the morning and resolve the fight she

had with her mother. Instead she woke up to a life as a forced prostitute, whose services were sold on backpage.com. She was only 12 years old and living in New York City. Only moments away from my legislative district in Bergen County. And unfortunately this tragic story takes place more so than we think. In the United States it takes only 72 hours for a trafficker to pick up a run away child and in New Jersey I was astonished, the average age of trafficking of children is 12 years old. From January to June the National Human Trafficking Resource Center received 155 calls from New Jersey alone. And the callers included those in crisis, at risk, and seeking referrals from towns all over the state. The State Department estimates that 100,000 victims who are usually women and children are in the country when they are enslaved. And another 50,000 women and men and children are trafficked in the United States each year making it the number one destination for trafficking. You know, the statistics may be low but however experts estimate there's really thousands more, because it should be no surprise, victims are afraid to come forward. And when they finally have a chance to regain their freedom they are prosecuted for the crimes that they were forced to commit, while the real perpetrators remain untouched. So for many victims there's really is no hope and hopefully we can change that by passing this legislation. And this bill and I'm very honored that a lot of the stakeholders are here today. I'm really touched by the Academy of the Benedictine Academy is here as well. We've been working together with experts and advocates, the Polaris Project which is a national anti-trafficking organization as well HEAAT, Helping to Educating and Advocate About Trafficking based near Atlantic City which is really a hub of trafficking in New Jersey as well. The Coalition Against Human Trafficking includes the Junior League; The New Jersey Catholic Conference; The League of Women Voters; the New Jersey State Association of Jewish Federations; and we've also worked with a member of the Attorney General's Task Force on Human Trafficking. So this legislation builds on the New Jersey law from 2005 which made human trafficking a first degree crime. But in the past seven years they have continued to prey on young women and children and recently as I mentioned Backpage, new technology such as these websites have become more prevalent, giving traffickers more opportunities and incentives to coerce. So not only is it timely because the Super Bowl is also coming in 2014 and we all know that based on statistics from previous games and high venues like that, there is a sharp increase. So along with that, you have the bill comments, but just briefly, if I can just give you an idea of what's in the bill, it establishes a human trafficking commission. It creates a John School for Solicitors of Prostitution and establishes the Human Trafficking Survivors Assistance Fund. It's aimed to protect minors by requiring reporting to Division of Child Protective Services. It protects adult victims by providing an affirmative defense to charges of prostitution which allows the courts to vacate convictions if trafficking is proven. So to prevent human trafficking the law enforcement training will also be provided to law enforcement officials. And it also has several provisions for catching and punishing the perpetrators. Again, I think that it requires a work of a vast network of participants and bystanders and I want to thank everyone for

2

contributing to this legislation. But it will also allow us to break down this network and give survivors a second chance at life. It will also help us prevent future trafficking and I think by passing this bill, we will let current and potential perpetrators know that New Jersey, right here in our own state of New Jersey, will not tolerate human trafficking. So we have to again be progressive and, and make us proud and be excited about the Super Bowl and the same time making sure that we are protecting the victims of human trafficking. So with that I thank you for the time to allow me to elaborate on the bill, but it is such an important issue and we have people here that you will hear from their own firsthand experience. Thank you Mr. Chairman.

Barnes:          Thank you Assemblywoman. First are there any questions of this sponsor? Mr. Carroll, go.

Carroll:         [inaudible] I'll defer to my colleague.

Chairman:        Okay. Ms. Schepisi.

Schepisi:        Hi Valerie. First off, I think the bill is incredibly well intentioned and I'm supportive of it from that perspective. Has OLS been able to provide any sort of guidance with regard to some of the potential constitutional issues particularly with the Backpage case that's taking place in Washington right now?

Vainieri Huttle: Yes they have and there are amendments on that part, on that section. As far as the Backpage, the publisher has to have a bona - make a bona fide attempt to make sure that those people that are soliciting - only on the adult services section of the Backpage by the way, that they are of age and that obviously it's a legitimate um, identification for those women or children.

Schepisi:        And this is the only portion that I uh, you know, um, I just took a look at the amendment -

Vainieri Huttle: Let me find the section with that, but go ahead.

Schepisi:        And essentially it says that it, it shall not be a defense that the defendant claims to know the age of the person depicted unless there's appropriate proof of age obtained and produced. And it seems that in the Backpage case that, that was a requirement as well. And I'm - just from a pragmatic perspective -

Vainieri Huttle: Right.

Schepisi:        And you know it's, it's something that you know, I think knowing you, that you'd be willing to work on to ensure that it, it does remain a constitutional bill. It just seems like a, a huge burden for whether or not it's an online site, whether or not it's a you know, true publication to be affirmatively responsible for getting driver's licenses of people who are depicted in pictures and -

Vainieri Huttle: Assemblywoman I know you remember craigslist when they shut down …

3

| | |
|---|---|
| Schepisi: | Right. |

Vainieri Huttle: ... because of how the person that was going to meet these women and then you know murdered these women. I think obviously the publisher of the website, of the adult services section of the Backpage, quite frankly I'd like to shut down the adult services completely, but obviously that is not constitutional, but for those of you that may be familiar with Backpage and the adult services, the publisher must ask for identification, that these women are over 18 and if that's a burden, so be it quite frankly and if OLS will give us the, the constitutional I guess muster, or constitutional wording to make sure that it is appropriate but they will be responsible to ask for the ID.

Barnes: Alright. I'm going to have the OLS read some of the amendments with your permission.

OLS [?]: I'm going to read some of the language that's under discussion. At Section 11 of the bill: A person commits the offense of advertising commercial sexual abuse of a minor if the person knowingly publishes, disseminates or displays, or causes directly or indirectly to be published, disseminated or displayed any advertisement for a commercial sex act which is take place in the state and which includes the depiction of a minor, or the person knowingly purchases advertising in the state for a commercial sex act which includes the depiction of a minor. And under the amendments that's adding language to subsection f. It shall not be a defense to a violation of this section that the defendant did not know the age of the minor depicted in the advertisement, or claims to know the age of a person depicted unless there's appropriate proof of age obtained and produced in accordance with this section.

Carroll: Assemblywoman, I want to thank you for responding to my memorandum on this subject. I do have some substantial concern with the bill even as it's been presently amended. I haven't had a chance to read all through the amendments but this section still strikes me as being constitutionally problematic. I'm concerned about the unfunded mandates with respect to police officers, there's a Sixth Amendment confrontation clause, section, I think the idea is excellent. I like the way the amendments have been worked on and I would appreciate your response to the, to the memorandum I sent you because many of the concerns can be addressed. For example, maybe I'm being too grammatically correct here, but right now the way works out is the word "knowingly" describes publication rather than knowingly publishing something which you know contains a particular thing. And again I don't know from Backpage, I never heard of it until today, but I know about Craigslist and that was an open forum. So I mean they would just, you could put stuff on there and the publisher would never know what was there. And so it strikes me that especially with respect to the net, if you have a bulletin board, or something along those lines where someone sticks one of these things, you know that you published that site, and this is on it. And so at least as I read the law, if I'm a judge interpreting it literally the fact that you know it's published, even if you don't know what is

published, is a crime. And that's, that's a little bit troubling. Again I haven't had a chance to read - I'm going to abstain on the bill today simply because I've got some constitutional concerns. I have every confidence that you'll work through them but it's just - it's a very heavy bill. It's, it's got a lot of stuff in it, I spent a considerable amount of time. I know you did obviously and you took the time to respond to my concerns which I really appreciate. But I think it's got some work that needs to be done whether through these amendments or through floor amendments. And I think we need some guidance from OLS or from people who are a lot smarter than me on the constitution as to what could be done to make sure that this language does not run us afoul. I mean we did that with the bullying bill. You know we rushed it through in a sense and we ran into a mandate problem. And you know that, that got us, what six months, eight months delay. Let's do it right the first time.

Vainieri Huttle:   If I may just respond quickly. The training for the law enforcement will be provided free. Most of the county prosecutors are on board for training. There will be, there's also the tourism conferences that they have in the hotels right now, in the Hilton they have best practices and guidelines. So most of this training can be provided free and as far as the modifier in that section I know if we just change the word knowingly we will correct that and we will revisit some - I, we understand and I think we are working on that as well. But again, the publisher of the website, it is the burden on that publisher that's making tons of money on these sites to make sure that they are legitimate and they've done their due diligence and as you would agree, that they - we don't want to see minors on these Backpages without proper identification.

Carroll:   I did take the - there's an old case on Soldier of Fortune magazine which had some similar problems like this many years ago where they were advertising people who would do anything for money. And some of these people were hit men. And the magazine was in fact sanctioned for the failure to police its advertisement. The difficult with the web, Craigslist I understand is free. I don't know that the guy made any money on that. And if such you got bulletin boards or things along those lines - I understand where you're coming from but I mean the idea, that, that I just think it's - you're running a very close constitutional question on trying to punish people who provide the medium which other people then abuse.

Vainieri Huttle:   Just for the chair and it's only this section on adult services, thank you.

Barnes:   Any other questions from members? Okay we'll go through the list of people who have signed up not to testify first: Sister Donna Rapetti, Benedictine Academy in favor, no need to testify. Mike Jones, Benedictine, in favor, no need to testify. Linda Michelski, Benedictine, in favor, no need to testify. Plus there's several students whose names I want to mention who are here today: Carina Costa, Quizien Mendoza, Marina Mary Palmer, Kayla Roch, Eva Kawalchick, Eva Kawalchich Santiago, I believe. Sidney Segay, Chatta Yurbo, and Eileen Konvery either Konvery or Konaughty. All in favor, no need to

5

testify. Jacob Deporick, New Jersey State Association of Jewish Federations, in favor, no need to testify. Sheri Weiner, Women's Political Caucus of New Jersey, in favor. New Jersey Sabbath, National Association of Social Workers in favor, no need to testify. Cathy Chin, YWCA of New Jersey, in favor, no need to testify. I'd like to call a Mrs. Johnson who I believe is here, who'd like to testify.

Johnson:      Good morning. Thank you, Assemblyman Barnes and the Judiciary Assembly for allowing me to come before you this morning. I am Ingrid Johnson, I'm a registered nurse, representing Overlook Medical Center. I'm a member of Atlantic Health System and I'm on the New Jersey Coalition Against Human Trafficking. I am testifying today on behalf of all the voiceless victims of human trafficking of which at one time included my then teenage daughter who is now a survivor. Before I begin my remarks I would just like to thank the sponsors of S2239, the Human Trafficking Prevention, Protection and Treatment Act. My family and the voiceless victims within our state appreciate your allowing my testimony to be presented before you today. I'll be brief. In 2004 my oldest of three children and only daughter was a habitual run away. Like lots of teens she pushed the limits and gave into peer pressure as she sought acceptance from others. She was an honor roll student at the top of her class, played the violin, and attended one of the best public elementary and private schools in our area. My daughter ran away from our home which was located in Irvington, New Jersey, and was missing for eleven months. Upon her return, she was said to have been the only missing child during the eleven month period of time who returned home alive. As all of her incidents had been reported to local authorities, I contacted and worked closely with local law enforcement, National Center for Missing and Exploited Children, walked the streets of Irvington and Newark, posting fliers and called community service organizations to see if anyone had seen my child. Initially my efforts seemed hopeless until one day while I was working as a night nurse at UMDJ Newark campus, my cell phone rang and at the end of my shift. I missed the call and began to play the voicemail message as I walked down the hallway on my way home. It was my daughter crying, Mommy, I miss you and Mommy, I love you. Little did I know that at that time she had snuck away to hide in a gas station bathroom until fearing for her life in her attempt to call home. My body became lifeless and someone helped me return to my nursing unit to regain my composure. You see I had kept this issue a secret the entire time due the shame and stigma placed on a good parent dealing with a heartbreaking issue. I immediately went to the Irvington police station to report the call. They followed up and requested a subpoena for my phone records. I unfortunately had to return home empty handed with no answers. Then one day while on vacation I was working with the state police officer and received a break in the case. My daughter's call had been traced to a phone tower in New York. Immediately my family and I picked up from, packed up from vacation and I made my way to the New York police precinct in the vicinity of the call to post fliers. It was there that I learned that my daughter, my child, had been prostituting and had even been arrested for prostitution. It took several trips to

6

New York and cold calls to johns and pimps whose numbers were traced to the cell phone used by my daughter to call home. With support from the New York police department and after hours waiting outside a New York train station with police and unmarked cars, I recovered her. Underneath a wig, and with mental as well as physical scars, was my 14, soon to be 15 year old little girl. She has been home ever since and well on her road to recovery. She's now a junior in college. I credit God with my training as a nurse for a success for had I not had faith, been a nurse, been employed, and had financial resources, I would not be sitting before you today. Our journey was lonely, full of doubt, near death experiences, but thank God we made it. For this reason, I am here before you as evidence that human trafficking is occurring in New Jersey. The passage of the Human Trafficking Prevention, Protection and Treatment Act will bring hope to the hopeless and send a message to New Jersey's victims of human trafficking that freedom, true freedom is in the air and that help in the name of victim services and treatment that will lead them to a brighter future is on the way. In the case of my daughter, I immediately recognized that I held my daughter's opportunity for personal success in the palm of my hands. I could either be stuck on the negative aspects of her experience or deal with my personal stereotypes and run to her side. I chose her over me, life over death, education over ignorance, peace over war and created a plan for her success and worked the plan. I ask that you join me in supporting this bill so that today's victims can have the same, if not better opportunities that I was able to provide for my child. On behalf of all the voiceless victims in New Jersey hiding in dark places, I thank you for this opportunity to come before you.

Barnes:        Ms. Johnson, thank you so much. Thanks for coming today. Ava Schlessinger and Melanie Gorlick, Coalition Against Human Trafficking.

Schlessinger:  Hi my name is Ava Schlessinger and I would like to thank the assembly, judicial committee and its members for giving us the opportunity to testify today. I am testifying on behalf of the New Jersey Coalition Against Human Trafficking. I would like to thank the prime sponsors and co-sponsors of the Human Trafficking Prevention, Protection and Treatment Act. We truly, truly appreciate your leadership. The New Jersey Coalition Against Human Trafficking is made up of a diverse group of people and over 25 different organizations including faith based nonprofits, local government agencies, law enforcement and direct service providers all based in New Jersey. Our mission is simple, we want to end human trafficking in our state. And we want to do that through education, advocacy and assistance to survivors. Our particular coalition is working to serve as the hub of state and community affairs towards this end. I am personally a clinical social worker who has spent my entire career working with victims of sexual violence. Sexual violence is but one of the horrific human rights violations that occur due human trafficking. I am a living witness that these types of human rights violations simply destroy lives. Sex trafficking and labor trafficking victims may be children, teenagers and adults. They are often lured by false promises into prostitution, and/or trapped into forced labor situations. Victims frequently find themselves in an endless

7

cycle of sexual violence and other violence, involuntary servitude, debt bondage, and slavery and they do not at the moment have a way out. It is estimated that more than 50% of the people worldwide involved as or who are modern day slaves are children. So we really are talking about our children in the state of New Jersey. Our coalition is advocating for local, state and national policies toward protecting survivors and abolishing trafficking. We believe that this legislation will inspire community and government action against slavery in our state. As you've heard the time for this legislation to be passed is now because we are sponsoring or we are hosting the 2014 Super Bowl. We know historically that trafficking will increase in our state due to this sort of event. As part of our advocacy we are seeking proclamations from townships throughout Essex, Morris, Union, Sussex, Bergen and parts of Somerset counties designating January 11 as human trafficking awareness day. Our expectations, expectations that these proclamations will be made public and will receive press in local papers. The president of the League of Municipalities has joined our efforts and we already have a number of mayors and town councils on board with us. We must eradicate this crime and make sure that no one turns a blind eye to modern day slavery in New Jersey. We want community members to be aware of what trafficking looks like and be able to find a way to help without putting themselves in harm's way. We are dedicated to making sure there are an adequate number of beds and services for victims who it is that we find.

Barnes:      Excuse me. If you don't mind we have a lot other speakers. I say it with, respectfully, if you don't read your testimony will you just give us the sum and substance of what you want us to know, I would appreciate that.

Schlessinger:   Okay. The sum and substance is that from my own personal experience that is a devastating human rights violation and that we really need to work together as a coalition in this state to eradicate the crime.

Barnes:      Patricia Devine Harms, New Jersey Junior Leagues.

Harms:       Yes sir, thank you. Thank you Chairman Barnes and distinguished members of the Judiciary Committee. My name as has been mentioned is Patricia Devine Harms. I'm chair of the Junior Leagues of New Jersey, State Public Affairs Committee. We represent over 3,000 women volunteers in the state of New Jersey. And we've been working on human trafficking initiatives, awareness and legislation since 2005. Through enactment, excuse me, through our contributions to eradicating human trafficking and my Master's in Child Advocacy, we know fully well the horrors of human trafficking. We have a moral obligation to stop the purchase and enslavement of people. We have a moral obligation to empower survivors. Junior Leagues of New Jersey, State Public Affairs Committee is proud to collaborate with like-minded individuals both nonprofits, law enforcement, prosecutors office and also we sit on both the state wide human trafficking task force as well as the New Jersey Coalition Against Human Trafficking. As I mention we oppose slavery in all its forms.

8

We understand that assembly bill 3352 has a number of moving parts but we believe each component is vitally important and we know that we as partners will be able to work through your concerns. The Human Trafficking Prevention, Protection and Treatment Act is a key component in combating human trafficking. And the Junior Leagues fully support the bill along with the New Jersey Coalition Against Human Trafficking. And finally as Ingrid so eloquently indicated human trafficking knows no boundaries. I show you two pictures of two little girls. One is the assistant chair of the committee that I am proud to serve on. The other pictured here at about three years old was trafficked in New Jersey at approximately age 13. We cannot let the hearts and minds of trafficking victims and survivors calcify. Thank you very much.

Barnes:          Thank you very much. John Tomicki, League of American Families.

Tomicki:         Thank you Mr. Chairman. My name is John Tomicki, Executive Director of the League of American Families. It's a good bill and a long time in coming but there is some possible errors in it. I think we were all delighted a few years ago when we moved in the law to change so that the children that are trapped by human trafficking were sometimes considered to be the criminal, and in fact they were victims. So the whole thrust of this is going in the right direction, increasing penalties, and creating this, this fund, that's one good thing that's being done. We have a couple of suggestions and when our group testified on the other bill I just mentioned, one of the people that we worked with in our organization is an affiliate member is a nationally known expert on human trafficking. His name is Steven Waggoner. We didn't get a chance to completely review the bill, there are some as we said in the notes, that amendments that are necessary and speaking with Assemblyman Carroll earlier, these I know he's gone, he said he had, he was trapped on a time problem, but I think you may have some unfunded mandate issues that have to be dealt with. We would also like to see in one of the sections in addition where you're going through a lot of the history of how much human trafficking is in the United States, it would be good to add into the bill, what our experience is as far as the number of children that are actually caught in this area as far as human trafficking. And we're hearing from the federal figures it is close to 10,000 in New Jersey so it would be good as another educational piece. Relative to education I think you're providing some funds but from the state to educate, there are a lot of non for profits that are already doing that, so that might not be necessary. What we're trying, what you should try to do within that fund as far as Mr. Waggoner's review of it and he could not be here on short notice was that the fund should be really a - there to help the individual, help them rehabilitate, get all kinds of necessary counseling. I don't think you provided in the bill for allowing for that fund to also get private donations if as such. I think we should look into that. I haven't checked it carefully but I think you should see that. And also for the administration, these are like technical things that we look forward to working with you and the assemblywoman in any way that we could so set up a meeting to, to clear up some of the technical difficulties that may be in it on the unfunded mandate part alone. And we, you know it is a

good thing to do because this particular issue of human trafficking is a despicable, criminal enterprise and anything that we can do to stop it and help that victim should be done.

Barnes:      John the speaker's right over your right shoulder.  So I'm sure she'd be willing to really sit down with you.  Some of things have been addressed before Mr. Carroll raised some of those same, same concerns before -

Tomicki:    In all candor, we didn't have enough time to go over it and a lot of work's been going on, that's why I applaud the efforts.  I read the publicity, but there's a lot of technical things and where we stand ready to do whatever we can to help. And I thank you because we were stuck elsewhere.

Barnes:      No problem, thank you sir.

Tomicki:    Thank you and have a blessed day.

Barnes:      Thank you now, you too.  Jennifer Nick, New Jersey Coalition Against Sexual Assault.

Nick:        Good afternoon, good morning I guess committee.  Thank you to Chairman Barnes for hearing this bill and to Assemblywoman Vanier Huttle for her leadership on this issue.  The New Jersey Coalition Against Sexual Assault supports A3352, the Human Trafficking Prevention, Protection and Treatment Act.  As representatives of survivors of sexual violence throughout New Jersey and the 22 sexual violence programs that serve them, our programs work with trafficking survivors and are very concerned with providing the best possible services for what can be a very challenging population.  We believe that this bill will improve services for survivors of trafficking.  We're especially supportive of a few aspects of the bill, particularly the commission the commission on human trafficking and the human trafficking survivors' assistance fund to be created which will direct funding for human, for trafficking survivors.  We are especially pleased with the idea of including service providers on that commission because we feel strongly that the voice of the service providers and people on the ground will help to best direct funding and services to those places that are especially - where it is especially needed.  We're also very supportive of the idea of john schools.  And Jay Costas is heavily involved with preventing sexual violence and one of the big aspects to prevention, towards the prevention of sexual violence in general and we include human trafficking within the definition of sexual violence is creating empathy in perpetrators.  So john schools have been, can be very a very effective way of encouraging johns to understand how their actions in soliciting paid sex can actually affect the people that they're soliciting it from.  We as you probably know, we will not end trafficking until we address the demand for paid sex.  Finally on training and Jay Costas has long supported the idea of training for all aspects of the criminal justice system and we are, we've been working with law enforcement over the years to, to provide training to address the barriers for survivors of

sexual violence within the criminal justice system. We think similar training on trafficking would also do that. Just as a note too, we have provided free training for law enforcement on sexual violence and we would certainly be interested in being and being involved in further training. Again, thank you so much for hearing this bill and we urge you to pass it out of committee.

Barnes:
Carol Pierre, Benedictine Academy and also Vanessa Rajackamo. Why don't you both come up from Benedictine Academy. And I would say the same thing, you do not read your statements because we're much more interested in hearing what you have to say on your own without reading if that's okay. So Carol will start. We'll start with Carol.

Peer:
Okay good morning, my name is Carol Pierre and

Rajackamo:
And my name is Vanessa Rajackamo. We're both students at Benedictine Academy in Elizabeth, New Jersey. And we're here to talk about what we know about human trafficking especially kids of our age and we believe we can make a difference.

Pierre:
My family comes from Haiti, a country ravaged by sexual exploitation and bondage. But I have learned it is a terribly crime that leaves no country untouched, including the United States. There is a frightening statistic that states every 8-10 minutes a woman or child is trafficked into the United States for forced labor. Sexual trafficking in particular is a growing problem here in the United States, especially in New Jersey. Traffickers meet them at bus stops and on the internet. They will offer young people the things they desire, expensive clothing, attention, wealth, fame, or even just food and shelter. Ultimately victims have very little self-worth and do not feel that they are worth saving. We need to warn young children and teens about the signs and dangers of human trafficking. You can't stop something you don't know about. You can't protect your family or friends who are in the dark about the perpetrators lurking in hair salons, hotels, landscaping industries or even at our Super Bowl games with the tourism festivities. We believe we can do something and we must do something to stop this gross injustice. Last January the president of the United States issued a proclamation stating that raising awareness through education is one of the most effective tools for protecting our young children at risk. Yet so many of our friends in other schools are in the dark about the dangers of human trafficking.

Rajackamo:
We have joined forced with the Frederick Douglass Family Foundation to help educate other young people about the various forms of human trafficking. And while we can may to do our communities a safer place. While our school, Benedictine Academy, has a school wide human trafficking curriculum, other schools in the public and private sector do not have any such curriculum. We try to speak at youth conferences and with our friends but alone it is so hard. We need the government's help. Assemblywoman Vainier Huttle in the Human Trafficking Prevention, Protection and Treatment Act has called for awareness,

11

training to law enforcement and help the survivors of these crimes. We are grateful that the state of New Jersey is making an effort to introduce human trafficking legislation that will help bring justice and relief to the victims of this crime. Traffickers are targeting us and our friends. We hope that New Jersey becomes the groundbreaker for the rest of our country in bringing this crusade to greater heights in protecting our brother and sister at risk. We need you to say yes to help us. Thank you.

Barnes:       Dan Phillips AOC.

Phillips:     Good morning, Dan Phillips from the Administrative Office of Courts. Thank you for calling me to testify. The Administrative Office of Courts is neutral on the, any of the substantive provisions in the bill that enhance or expand the statute of human trafficking. And please don't let any of my comments diminish any of the statements by the assemblywoman or any of the witnesses on this very important issue. I just want to start by giving you a little background on the convictions since the Human Trafficking statute was enacted in 2005. It may enlighten you that some of these offenses are actually underreported. In the six years since the statute was enacted from 2006 through last Friday, there have been 33 defendants charged with the offense of human trafficking. Now what often happens is this offense is charged with multiple counts. They can be charged with ten counts of other statutes and very often the defendant pleads to one or more of those other counts. So it should be of no surprise to you that over those six years there have been no convictions to the first degree offense of human trafficking because most people have pled to other lessor offenses that they've been charged with or the, the charges have been dismissed. So over six years we've had 33 defendants charged, and we've had no convictions. Although there have been convictions to lesser included offenses. In addition the bill deals a lot with prostitution offenses, so we also ran some numbers to enlighten you on what goes on in our state with prostitution and as far as the indictable prostitution offenses there are seven different offenses within our prostitution statute. The most common, by the way, is engaging in prostitution which could be a prostitute or a person using the services of a prostitute, commonly known as a john, that is our most common offense. As far as indictable offenses go last year, there were 125 convictions but probably total all indictable offenses for prostitution which would include things like promoting prostitution, promoting prostitution under 18, engaging or soliciting prostitution under 18, those offenses you're probably looking about 200 convictions a year in New Jersey. Most prostitution offenses for engaging in prostitution and, again the john or the prostitute, are disorderly persons offenses and therefore go through our municipal courts. In 2011, there were 745 convictions of engaging in prostitution, and of course that include again the john or the prostitute. There were 324 guilties which is about 43%, 415 cases were dismissed which were, was 56%. The average fine amount was $416, about half the people got a jail term, and that jail term is about 14 days. Again, could've been the prostitute or the john, our statutes don't delineate, it's the B1 statute and it encompasses both types of offenses. So I just want to give

a little background on those. We do have three concerns with the bill and we're certainly helping to work with the sponsors on, on reconciling some of our differences. Our differences have to do mostly with court procedures, not the substantive developments of the bill. As I said we're neutral on those. But just briefly and again, we're hoping to work on these things as the bill moves forward. One of our issues has to do with the review of prostitution convictions based on human trafficking victimization. The bill provides that a person who is engaging in prostitution under paragraph 1 of B1 which is again, engaging may move the court to have the sentence reviewed in court. Our court rules already provide for post-conviction relief once a conviction has been entered and the appeals have been exhausted. They're very expansive rules, they're backed by years of case law, we would like to find a way to reconcile our rules on post-conviction relief in both the municipal courts and superior court with this bill. This bill has a very broad form of post-conviction relief which conflicts with the post-conviction reliefs that are allowed in court. The main issue being that if the person had an affirmative defense and failed to assert that affirmative defense at the trial and reasonably could have done so, then they are barred from post-conviction relief under our rules. Under this, under the bill anybody at any time could come back and apply for post-conviction relief even though it might have been denied or they could've reasonably asserted it and they failed to do so. So we'd like to try in this, on this issue, to try to reconcile it. We know what you want to do, to the sponsors and we want to try to reconcile that issue as the bill, bill moves forward. Our other issue is the john school diversion program, it requires that the AOC set up and run this program. The courts do not run any remedial programs. We can order people to attend those programs, we supervise those people and ensure they do and if they don't attend those programs, they're violated from their probation and can be held in contempt, but we don't run the remedial programs. And what we suggest that some of the money in the Human Trafficking Victims Assistance Act be used to set up community or law enforcement programs that we could refer these people to. We do see some potential conflicts in advising defendants that may be still pending appeal or motions advising them on their legal rights and consequences of their acts. And so that's another issue we'd like to discuss as we move forward. And finally is the issue of judicial and judicial staff training. The provision in the bill is very onerous. As you know we are under quite a bit of pressure in the courts. We have 50 judicial vacancies. We have backlogs all over our court system. We want a well-trained judiciary. We are certainly willing to provide training as we do for many issues. We've been working with Jennifer trying to provide sexual violence training. The judges we do domestic violence training, but there's only so much we can do. We have 500 judges, we have 9,000 staff, 1,500 people working in the municipal courts. To move all those people into a one day training program, or actually let me say if we just take the 500 superior court judges off the bench for one day is the equivalent of losing two full judges for a year. We have to balance our training needs against our ability to move cases. And we would certainly like again to talk to the sponsor about how we can provide those trainings within our routine system of

13

training judges and staff. So thank you very much. Only one other comment, the bill provides for a number of increased fines. I think, I believe there's a $25,000 fine up to for the first degree and for the fourth degree up to $25,000 and then it provides of course for that money to go into the human trafficking business assistance fund. And I just want to make you aware that kind of money is collected over many, many years. The first degree crime, those persons are probably going to get a prison term. That means that whatever they earn in prison, that's what will go into the fund. If the people are placed on probation for a fourth degree offense, we will collect that money. But under 2C46-4.1, there is a long list of priority of collections. Twelve different items that get collected, the last thing on that list that gets collected is the fine. So I make, I just want to make you aware that if there are plans to use this money for various item - for various issues, it may be a long time before there's money in that fund. So thank you very much.

Barnes:           Thank you very much. May I have a motion and a second please?

[background]   I'll move. Second.

Barnes:           Any, anybody wish to speak.

Schepisi:        · Mr. Chairman, I would.

Barnes:           Yes, go ahead.

Schepisi:        Once again, I, I think this is a very well intentioned bill. I think that you know, unfortunately I, I did receive the amendments literally as we sat down so I haven't had an opportunity to see whether or not the - and I've been trying to read it as I'm listening to testimony. I think there are two provisions of the bill that go a little bit further than may, may be warranted and there may be some unintended consequences regarding constitutionality, regarding even for, and I'll just give one example. On the amendment that I read, there's a new section whereby it may support the ___ crime for somebody who recklessly participated as an operator and for a first conviction the court is mandated to revoke any licenses or permits or certificates or anything that that person had. So by way of example if you have a, you know liquor license, the liquor license goes away. If you had a casino gaming license, that goes away, and I don't know if that's what is, you know if that makes sense, if that doesn't make sense. So I today and you know, it's very difficult as a female in particular to say I'm going to abstain from something that has such an incredibly good intent. And Valerie I, I personally will sit - I, I want to be a sponsor of this bill if we can ensure that it will you know, it'll withstand any sort of challenges and everything else. So -

Barnes:           Are you going to vote no, or you going to abstain?

Schepisi:        I'm going to abstain.

Barnes:           Okay.

14

| Schepisi: | Okay. |
|---|---|
| Barnes: | Anyone else? |
| Man: | Just one I hope Mr. Chair. |
| Barnes: | [in background] |
| Man: | Wait a minute, just want to ask a question. This bill the sponsor has not passed the Senate, there's no senate sponsor is there? |
| ?: | There is a senate sponsor. |
| Man: | Did it pass the Senate? |
| ?: | No it was just introduced last week. |
| Man: | Pardon me? |
| ?: | It was introduced last week [hard to hear, talking in background without microphone.] |
| Man: | Alright. Just to bolster your, your effort I think you know there'll be time to amend when it gets to the Senate. So I, I don't think there's any reason to hold this up. It's, the bill is very worthy of our discussion and passage so, any concerns constitutionality or whatever, we have time to work that out. |
| Woman: | This is on the bill with the amendments. Assemblyman Carroll has indicated that he's abstaining. Assemblyman McKeon? |
| McKeon: | Just very brief comments. First and foremost congratulations to the sponsor who was very thoughtful in putting this together and continues to be in the amendments. I think some of those very good questions or issues that were raised by the AOC and certainly my colleagues will be addressed and as Ralph had pointed out as the sides will still go through even if we move this on Thursday, the process on the Senate side, a lot of those logistics can be worked through. And I just compliment the students that are here. I thought I saw the color come from your face when the chairman said you couldn't read from your testimony, but and I appreciate the chairman in doing that for the most part, but I appreciate your involvement in the process and note that, it's a lifelong commitment. There was a young lady at a different stage of life in the junior league who represents a consortium of individuals that continue to advocate throughout their lifetimes for important issues. And along those lines on coalition I'm so proud of the coalition that seems to be coming together with a variety of different religious concerns has everyone had gotten together as they did with the Iran Divestiture Act you know along with a real good group that bipartisan and stands for the right things. So I'm very proud to vote yes and compliment all those involved today. |

Woman:          Assemblyman Johnson?

Johnson:        Yes we've heard a lot of testimony here on this bill.  I've contacted sponsor about some concerns I had about this bill.  This bill should be released from committee, but it does need some tweaking or some amendments, more amendments, more amendments I feel are needed for this.  My colleague from the 37th District, Valerie Vainier Huttle, has worked hard on this, she's had the passion for this, so this bill does, the concept addresses a problem, it's just a bit far reaching in with some points in the bill.  So I vote yes, the vote out of committee.

Woman:          Assemblyman Caputo?

Caputo:         Yes.

Woman:          Assemblyman Barnes?

Barnes:         Yes I'm happy to be one of the sponsors, I appreciate the prime letting me join her on this very important bill.  Yes.

Woman:          I'm sorry one more, Assemblywoman Quijano indicated in the affirmative. Bill's released.

16

# EXHIBIT BB



**Everything Jersey**

# N.J. bill would increase penalties for human sex trafficking

By MaryAnn Spoto/The Star-Ledger

on October 15, 2012 at 2:19 PM, updated March 22, 2013 at 1:14 PM

TRENTON — An Assembly committee today approved a measure that would broaden the laws and stiffen the penalties for those found guilty of human trafficking in the sex trade.

The bill (A3352), which proposes expanding a law passed in 2005, would create a 15-member commission as well as add offenses, upgrade penalties, increase protection for victims, require training for law-enforcement officers and broaden public awareness of the issue.

"Until recently, human trafficking has remained largely in the shadows of society," Assemblywoman Valerie Vainieri Huttle (D-Bergen), the sponsor of the measure, said. "Victims are often children and vulnerable women who are too afraid and dependent on traffickers to break their silence and seek help."

Ingrid Johnson of Newark told the committee how her daughter, who was 14 at the time, became a victim of human trafficking after running away from home in 2004.

She said her daughter, who is now a junior in college, suffered mental and physical scars as a result of her experience and is one of many "voiceless victims in New Jersey."

The bill, which cleared the Assembly Judiciary Committee 4-0 with two abstentions, comes on the heels of state Attorney General Jeffrey Chiesa's creation of a human trafficking unit this summer.

Chiesa also called for new standards in how law enforcement agencies identify and rescue victims and potential victims of human trafficking.



**STAY CONNECTED 24/7** Download our free NJ.com mobile and tablet apps to keep up with the latest New Jersey news, sports and entertainment.

The two committee members who abstained, Assemblyman Michael Patrick Carroll (R-Morris) and Assemblywoman Holly Schepisi (R-Bergen), the only two Republicans on the committee, said the bill needed more work to guard against violating constitutional rights and protect others unknowingly connected to a potential crime.

Schepisi called the measure a "well-intentioned bill."

She and Carroll, who cited a Washington State law on which the New Jersey bill was modeled, said that legislation was delayed because it can hold publishers of advertisements for adult entertainment criminally liable.

The measure has the support of such groups as the New Jersey Coalition Against Human Trafficking, the Junior League, the New Jersey Catholic Conference, the League of Women Voters and the New Jersey State Association of Jewish Federations.

The state Division of Criminal Justice has reported 179 cases of sex and labor trafficking in New Jersey in the past seven years, but experts say the number is in the thousands since the crime often goes unreported.

Follow @starledger



**Star-Ledger Politics**

Like  2,375

**More Statehouse news**

© NJ.com. All rights reserved.

**EXHIBIT CC**

Go to home page

Sign in

278K

Like  175k

RSS
Updates

Enter search term          search

THURSDAY, MAY 24, 2012 08:24 AM PDT

# Sex ads: It isn't just Backpage.com

**From Facebook to Twitter and once again on Craigslist, a new study shows adult advertising permeates the Web**

BY TRACY CLARK-FLORY     Follow   588

Recommend  48        36        8        0        3

more

TOPICS: LOVE AND SEX, EDITOR'S PICKS, LIFE NEWS

Like



(Credit: Advanced Interactive Media Group)

A new report could defend the besieged Backpage.com — and it comes from the same research organization that has been used in the campaign against the classified-ad site.

Activists calling for the site to shutter its adult classifieds section on the grounds that it promotes sex trafficking — like New York Times columnist Nicholas Kristof — have seized on research from Advanced Interactive Media Group (AIM) showing that across a handful of sites carrying prostitution ads, 70 percent come from Backpage. Another significant finding from the organization is that the site's parent company, Village Voice Media, makes $22 million from such ads. Again and again, critics of the site trot out these, and similar, statistics drawn from AIM research — but the organization's latest study highlights just how far online prostitution spans beyond Backpage.

In fact, the first lines of the report return to the supposedly resolved issue of sex ads on Craigslist: "Prostitution ads are back on Craigslist. If they ever left in the first place." As the report explains, shortly after the adult section was shuttered, AIM reviewed the classified site and found that "there were few if any blatant ads for prostitution." But now, AIM has found that "ads that appear to be for paid sex work are posted regularly" on Craigslist. Granted, the numbers are much lower than they were before the site closed its "adult services" section — and specific stats weren't available ahead of this writing — but "some [ads] were as blatant as they were" before the closure, and a subset included terms like "barely legal" (which is often used to signal the opposite: underage girls).

In addition, AIM found sex ads on mainstream sites like Facebook, Tumblr and Twitter. Mostly, these ads come in the form of Facebook pages, blog posts or tweets advertising an

escort service or individual sex workers. Researchers also found such ads on YP.com and About.com (interestingly, the latter is owned by the New York Times Co., which employs Kristof, arguably the most vocal critic of Backpage).





The release lays out the financial benefit to hosting such ads: "Whether free or paid, listings and ads for escort services and similar adult content frequently serve a business purpose for sites like About.com and YP.com," the report explains. "They drive traffic and page-views; they deliver legitimate results for seemingly (or pseudo-) legitimate businesses; and they provide search results with adjacent paid or pay-per-click ads, which can generate revenue as they are served."

The volume of these ads is nowhere near that on Backpage, but AIM's finding shows how easily sex ads proliferate online, even in "legitimate" online venues. Keeping these ads from popping up online is like trying to keep frogs in a bucket.

Asked to comment on whether this latest research poses a challenge to the effort to shut down Backpage's adult section, Peter M. Zollman, founding principal of AIM, said, "Ads for prostitution are in hundreds or thousands of places online, and anyone looking for them can find them. Backpage and Craigslist are just two sites, and both have taken pretty aggressive steps to eliminate ads involving trafficking in children." The AIM report doesn't look specifically at the existence of trafficking ads, as opposed to general sex ads, but as anti-trafficking activists have told me, they see the two as inseparable.

**Update:** A publicist from About.com tells me the site is "in the process of removing any pages from About.com that include links to escort services" and says "they represent a very small percentage of overall pages on About.com."



👍 Like

# EXHIBIT DD

- Join CNET
- Sign in with

CNET News

# Study: Facebook replacing Craigslist for prostitutes

A Columbia University professor says 83 percent of prostitutes have a Facebook page and that, by the end of 2011, Facebook will be their No. 1 online medium of recruitment.

by Chris Matyszczyk February 7, 2011 10:37 PM PST      

When Craigslist withdrew from the adult services business last year, some wondered whether the prostitution business would be driven to less obvious and, perhaps, more dangerous places.

However, a Columbia University professor is suggesting that the business might have gravitated to somewhere even more obvious: Facebook.

Sociology professor Sudhir Venkatesh published the results of his work among New York prostitutes on Wired. And it makes for a stimulating insight into how technology is influencing the prostitution business.

Technology seems to have made men's behavior suddenly sophisticated.

"No self-respecting cosmopolitan man looking for an evening of companionship is going to lean out his car window and call out to a woman at a traffic light," Venkatesh said.



Is Facebook a new, discreet red light district?

(Credit: CC Pink Moose/Flickr)

Instead, Venkatesh estimates that 83 percent of prostitutes have a Facebook page. Moreover, he believes that by the end of 2011, Facebook "will be the leading online recruitment space." Indeed, he says, even before Craigslist beat its retreat, Facebook was becoming a happy home for many prostitutes.

With more discreet and personal access offered through cell phones, the web and Facebook in particular, he believes that prostitutes "can control their image, set their prices, and sidestep some of the pimps, madams, and other intermediaries who once took a share of the revenue."

Even in 2008, he estimates that 25 percent of prostitutes' regular clients came through Facebook (compared with only 3 percent through Craigslist).

Perhaps it seems obvious. If every other form of relationship is made through Facebook, why wouldn't the more professional kind?

While the professor doesn't go into details about how connections are made with prostitutes on Facebook, some might assume that they might follow the same pattern as any other friending. But perhaps it might be more complicated, with a little more inside code employed to keep things discreet.

Still, if everything is becoming more personalized, as well as more social, why should anyone be surprised that Facebook might be the obvious place for a chance encounter or an adult service?

One can only imagine that prostitutes are, unlike some, very well versed in the Facebook privacy settings.



### Chris Matyszczyk

Chris Matyszczyk is an award-winning creative director who advises major corporations on content creation and marketing. He brings an irreverent, sarcastic, and sometimes ironic voice to the tech world.

**Don't Miss**



Samsung goes big with Windows 8-powered Ativ line
CNET



Facebook looking to partner with Samsung?
CNET



Best Internet Radio Apps for iOS and Android
corporatetechdecisions.com



The 5 Fastest Cars of the Year 2013
Insider Car News

about these links

# Member Comments

0 Comments  /  1 person following

Log in

Newest / Oldest / Top Comments

Commenting FAQs / Guidelines

# EXHIBIT EE

Backpage Takes Heat, But Prostitution Ads Are Everywhere - Forbes






**Daniel Fisher**, Forbes Staff
I cover finance, the law, and how the two interact.

Subscribe  4.3k

BUSINESS | 1/26/2012 @ 10:25AM | 133,582 views

# Backpage Takes Heat, But Prostitution Ads Are Everywhere

Nicholas Kristof of the New York
Times has a heartrending story
today about underage prostitutes
who are pimped out on
Backpage.com, a website with roots
in the swinging personal ads that
have appeared at the back of the
Village Voice since the 1960s.



Home of nasty ads for decades. Image via Wikipedia

Backpage Takes Heat, But Prostitution Ads Are Everywhere - Forbes

Kristof describes how a 13-year-old he calls Baby Face was advertised on Backpage and repeatedly raped by older johns. He quotes Brooklyn prosecutor Lynn Hersh as saying "Backpage is a great vehicle for pimps trying to sell girls." He notes that Craigslist got out of the business after public protests and pressure from state attorneys general.

It's all true — except Craigslist hasn't really gotten out of the business and Backpage isn't the best place to run an illegal enterprise, at least if you want to keep your business secret from the cops. The company, a unit of Village Voice Media, says it takes credit card numbers for all ads, including free personals, and responds to subpoenas within hours.

It is true Craigslist got rid of its "Adult Services" advertising category in September 2010, but that doesn't mean prostitutes and pimps aren't still using the site. Type in this Google search if you're curious: site:craigslist.org inurl:cas roses. "Roses" is code for "dollars" in the world of Internet prostitution, and you get more than 20,000 listings by people who seem to be talking about sex and money in Craigslist personals. Want to find more professionals quick? Search for "Asian massage" on Google, or "site:facebook.com escorts new york." I'm not saying they're all prostitutes, but chances are there are more than few among the legitimate escort agencies and massage parlors that advertise online.

Kristof notes that attorneys general of 48 states sent a letter to Backpage last August accusing the company of being a "hub" for child sex trafficking activity. Investigators identified hundreds of prostitution ads and reported that "nearly naked persons in provocative positions are pictured in nearly every adult services advertisement." As opposed to Craigslist personals like this one and this one (warning: explicit).

It's curious that the AGs are targeting Backpage, which they say earns some $22.7 million a year from adult personals. Yes, Backpage makes money from randy ads — parent Village Voice been doing that for decades — but it's also the online equivalent of a European red-light district, contained and easily monitored by the police. A Backpage executive who spoke on condition of anonymity told me the company has 123 moderators reviewing the content of ads to try and identify ads for underage prostitution.

Backpage Takes Heat, But Prostitution Ads Are Everywhere - Forbes

Since posters also supply credit-card numbers, it isn't hard in most cases for police to track down who places those ads. (The advertiser in the Kristof case wrote a plain-vanilla personal ad for "labor day weekend fun" with a 21-year-old, but his credit card number allowed him to be quickly identified, Backpage says.) The Backpage executive said the company responds to about 100 subpoenas a month, and dispatched an employee to testify before a grand jury called by the Brooklyn prosecutor Hersh as recently as September.

Backpage has taken a defiant tone with the AGs and prosecutors who accuse it of aiding prostitution. The company was recently blamed for prostitute killings in Detroit but Backpage showed that the victims had advertised on at least 15 other sites and there was no evidence the killer had relied on Backpage to find the victims. Its executives are quick to supply the links and Internet code words that show just how ubiquitous Internet prostitution really is. (Try searching for "BBBJ" or "talent gigs" and lots more action pops up.) While Craigslist and other sites have discouraged the use of phone numbers, advertisers simply spell them out or place them in photographs; Google the numbers and you'll see they are often for dubious-looking escort services. Many of those even have explicit Google reviews.

Kristof acknowledges "there's some risk that pimps will migrate to new Web sites," but it seems obvious they never left. So when the AGs declared victory over Craigslist in 2008, it may have been a little premature.

I'm not saying there's anything wrong with trying to shut down the vigorous market for human flesh. It's equivalent to targeting child pornography: Eliminate the producers of this ghastly product and the exploitation will diminish.

But the choice of targets is curious. Especially when one of the leaders of the effort is Washington Attorney General Rob McKenna. Not only is Washington home to Microsoft, whose Bing search engine and software helps power the Internet prostitution business. McKenna's s official bio also notes  he practiced business and regulatory law at Perkins Coie from 1988 to 1996. Among the law firm's many clients is Craigslist, which it successfully defended in a 2009 case by the Cook County Sheriff accusing Craigslist of facilitating prostitution.

***Attorney General McKenna had this to say about the story above:***

Backpage Takes Heat, But Prostitution Ads Are Everywhere - Forbes

Attorney General McKenna and the vast majority of state attorneys general raised concerns about Backpage.com because the site is, according to independent industry analyses, the largest Internet hub for prostitution ads. There is a huge and obvious difference between prostitution ads that appear in Internet searches and a business that actively solicits advertisements for prostitutes in every major city in America, along with many smaller cities. The claim that Backpage.com is the online equivalent to a red-light district, "contained and easily monitored by police" ignores that police directly involved in rescuing women and girls from pimps are overwhelmingly opposed to such sites. Finally, the choice of targets is clearly not "curious." We have seen arrests of those involved in the trafficking of minors through Backpage.com in cities throughout the United States. That's why non-governmental organizations, religious and secular leaders, police, mayors, state legislators and others throughout the country focus particularly, but not exclusively, on Backpage.com.

## Backpage issued this response to McKenna's comments on Feb. 17:

" Taking down Backpage ads would have zero impact on the trafficking Mr. McKenna says he is eager to stop. As *Forbes* shows, his claim that Craigslist has "eradicate[d]" such advertising is not true. Anyone can see erotic ads on Craigslist today. And arrests linked to Craigslist ads have continued all over the country, showing censorship doesn't work.

A Columbia professor reported this month that 61% of prostitutes advertise on Craigslist, with Facebook gaining fast. These ads are on thousands of web sites, where users use search engines to find them. Unlike Backpage, the largest search engines even let users instantly locate the closest teen escorts, watch explicit videos and read escort reviews. Searches for "teen escort" produces tens of millions of postings including every city in America. Against these numbers, Backpage is a rounding error.

The idea that Backpage is the largest such site is ludicrous. Mr. McKenna's "industry analyses" actually come from a single source that admits its reports are financed by secret money from activists with hidden agendas. In contrast, both Microsoft and USC have recently published independent studies showing the effective solution is to leverage web technology to capture predators and rescue kids.

That's exactly what Backpage does. We monitor 24/7, cooperate with police, operate lawfully, and use strategies that work. Mr. McKenna's strategy, while it might make good news copy and political rhetoric, won't rescue anyone.

Backpage Takes Heat, But Prostitution Ads Are Everywhere - Forbes

---

**This article is available online at:**
http://www.forbes.com/sites/danielfisher/2012/01/26/backpages-takes-heat-for-prostitution
-ads-that-are-everywhere/

# EXHIBIT FF

Sex Trafficking In California: State And Tech Companies Build Alliances To Combat Crime



June 26, 2012



HUFF POST SAN FRANCISCO
THE INTERNET NEWSPAPER NEWS BLOGS VIDEO COMMUNITY

# Sex Trafficking In California: State And Tech Companies Build Alliances To Combat Crime



| Posted: 05/18/2012 8:03 pm   Updated: 05/18/2012 8:11 pm

*This article comes to us courtesy of California Watch.*

**By Shoshana Walter**

Last year, California Attorney General Kamala Harris joined attorneys general across the country in declaring war against Backpage.com, a free classified website run by Village Voice Media. The officials threatened legal action if the site didn't stop running ads for adult services, some of which have been linked to underage sex trafficking.

But while Harris took a confrontational tone with Backpage - which has since balked at shutting down its adult pages - a more cooperative dynamic has emerged this year between the attorney general and online companies.

Harris recently announced an agreement with mobile and tech companies that requires their apps to better display their privacy policies. While Harris said she will not rule out legal action against sites such as Backpage, her office has begun to build more alliances with online firms. And as companies such as Facebook have matured, they have become more willing to cooperate with government leaders and law enforcement.

This week, representatives from Facebook and Microsoft will be among 50 law enforcement and nonprofit leaders who are meeting as part of a new Department of Justice task force on human trafficking in the state. By the end of the summer, the government task force plans to issue a report containing best-practice guidelines for law enforcement, tech companies and service providers combating human trafficking locally and online.

"Having everyone at the table, it makes them more vested in being part of the process and finding solutions," said former special assistant attorney general Suzy Loftus, who organized the meetings. "These public-private partnerships are one tool at our disposal."

Sex Trafficking In California: State And Tech Companies Build Alliances To Combat Crime

Sponsored Links


**New Policy in Washington**
2012 - Drivers w/ no DUIs are eligible for up to
50% off car insurance...
SmartLifeWeekly.com


**5 Diet Pills that Work**
2012's Top 5 Weight Loss Pills. Updated
Consumer Ratings. Free Report.
www.DietRatings.org


**Truth About Annuities***
Don't Buy Any Annuity Until You Watch This
Special Video Report!
SeniorAnnuityAlert.com

Buy a link here

But industry observers say tech companies' increasing cooperation with government leaders and law enforcement is less a sign of goodwill than of self-preservation. As online companies come to dominate the marketplace, they'll look for ways to keep the upper hand. And many say the cooperation could lead to problems for consumers.

"This is very basic economics. If you're a company and you're trying to undermine your competition, you look for the best return on your investment. And sometimes that means working with the government," said Eric Goldman, an associate professor at the Santa Clara University School of Law and director of the High Tech Law Institute.

"If the industry and the government are getting cozy together, the industry might get a seat at the table that's helping to shape regulation. Why wouldn't they want to be a part of that?"

Some privacy advocates say partnerships between tech companies and governmental agencies threaten the rights of Internet users. Civil rights attorneys have criticized Facebook and other companies for signing on in support of CISPA, a bill that would allow private companies to share with the government any user information that constitutes a homeland security or cyber threat.

"It's a civil liberties nightmare," said Rainey Reitman, director of activism for the Electronic Frontier Foundation. "It's under the guise of something everybody wants to get behind - internet security - but the actual implication of this bill would be to undo decades of privacy law."

Facebook already shares personal account information with law enforcement agencies upon subpoena, court order and sometimes request, and runs every single photograph uploaded onto the site through a federal child pornography database run by the National Center for Missing and Exploited Children. The social networking company advertises a national hotline for sex trafficking victims on the site, and lists information about help for victims in its FAQ.

At least one issue the task force has discussed is whether Facebook has the right to screen users' search terms for words that might identify them as potential victims of human or sexual trafficking. The websites could then show the user ads for helpful organizations or a national trafficking hotline, something that Google, for example, already does when users enter "suicide" into the search bar. A suicide hotline appears at the top of the list.

"I haven't got much problem with that, because at that point you don't have much data going outside of Google," said Reitman. "I think you get into a different situation when you have data going from users to the government, without them understanding what's happening."

While many websites have joined in efforts to clamp down on the distribution of child pornography, trafficking is a newer issue. In a span of just a few years, the Internet has quickly entered the forefront in conversations about combating human trafficking.

In 2007, two years after California lawmakers made human trafficking a felony, the attorney general's office convened a similar task force and released a report on trafficking in the state. The Internet was not mentioned.

Then in 2010, the State Department called together a meeting with researchers in Washington, D.C., to discuss the intersection of trafficking and technology.

Facebook and other tech companies attended the discussion, and Mark Latonero, director of research at the USC Annenberg Center on Communication Leadership & Policy, and his colleagues decided to study the issue. They released a report, "Human Trafficking Online," in 2011.

Previously, state leaders weren't "really thinking about technology as a tool to help," said Latonero, a member of the task force.

Attorneys general have also put pressure on Craigslist, Tagged and Myspace to alter policies and services. "We know technology can be used for good and bad," Latonero said. "We also want to understand how technology can be used not only to facilitate trafficking but also monitor and combat it."

Sex Trafficking In California: State And Tech Companies Build Alliances To Combat Crime

In February, Attorney General Harris decided to follow suit, inviting many of the same organizations and tech companies to the first task force meeting in close to five years. Google, with which Microsoft is at war over everything from monopolizing the market to search engine algorithms, was invited to participate in the second task force meeting last month, but declined.

Microsoft, which helped develop the PhotoDNA technology used by Facebook and other websites to identify known child pornography images, recently awarded grants to researchers on the topic of sex trafficking and technology. They are helping to build a searchable database of information mined from known and publicly accessible sex-trade websites for law enforcement agencies across the country. Researchers plan to analyze patterns in the data to understand how human traffickers operate online.

Samantha Doerr, a member of the task force and Microsoft's digital crimes unit, said researchers are not violating privacy protections because the data they are looking at is publicly available online. She said companies can build technology, such as PhotoDNA, that is more "exact" and that allows companies to detect illegal activity or images without impinging on users' privacy rights.

"A lot of information out there is extremely publicly available and visible," she said. "And these crimes we're talking about are really tremendously awful."

*Shoshana Walter is an investigative reporter for California Watch, a project of the nonprofit Center for Investigative Reporting. Find more California Watch stories here.*