# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

BACKPAGE.COM, LLC,

        Plaintiff,

v.

JOHN JAY HOFFMAN, Acting Attorney General of the State of New Jersey; JOHN L. MOLINELLI, Bergen County Prosecutor, *et al.*;

        Defendants, in their official capacities.

CIVIL ACTION NO. _____

---

## PLAINTIFF BACKPAGE.COM LLC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

DAVIS WRIGHT TREMAINE LLP
1633 Broadway, 27th Floor
New York, NY  10019-6708
Telephone:  (212) 489-8230

On the Brief:
Robert Balin
James C. Grant
Eric M. Stahl
Ambika K. Doran

DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA  98101
Telephone:  (206) 622-3150

McCUSKER, ANSELMI, ROSEN & CARVELLI, P.C.
210 Park Ave., Suite 301
Florham Park, N.J. 07932
Telephone: (973) 635-6300

Dated:  June 26, 2013

*Attorneys for Plaintiff Backpage.com, LLC*

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION.................................................................2

II.   BACKGROUND.................................................................5

   A.   State AGs' Crusade Against Adult-Oriented Internet Advertising. ............... 5

   B.   Backpage.com's Efforts to Police and Prevent Misuse of Its Website.......... 6

   C.   Washington Passed the First State Law Targeting Adult-Oriented
      Online Ads, and the Statute Was Permanently Enjoined................................ 7

   D.   Tennessee Passed A Similar Law, Which Also Was Enjoined. ..................... 9

   E.   The New Jersey Act Mirrors the Invalidated Washington and Tennessee
      Laws. ................................................................................................. 10

   F.   The Act Will Affect Thousands of Websites and Online Providers. ........... 15

III.   ARGUMENT ...................................................................16

   A.   Standards for a TRO or Preliminary Injunction. ............................................. 16

   B.   Backpage.com Has A Strong Likelihood of Success on the Merits............ 17

   C.   Backpage.com, Other Online Services, and the Public Will Suffer
      Irreparable Harm If the Act Is Not Immediately Enjoined. ......................... 38

   D.   Granting Injunctive Relief Is In the Public Interest......................................... 39

   E.   The Balance of the Equities Strongly Favors Injunctive Relief. ................... 39

IV.   CONCLUSION.................................................................40

i

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*A.S. Goldmen & Co. v. N.J. Bureau of Sec.*,
163 F.3d 780 (3d Cir. 1999) ...............................................................36

*Ace Am. Ins. Co. v. Wachovia Ins. Agency Inc.*,
2008 WL 4165746 (D.N.J. Sept. 4, 2008) ..........................................16

*ACLU v. Johnson*,
194 F.3d 1149 (10th Cir. 1999) ..........................................................37

*ACLU v. Mukasey*,
534 F.3d 181 (3d Cir. 2008) ...............................................................34

*ACLU v. Reno*,
217 F.3d 162 (3d Cir. 2000) ..........................................................16, 38

*Am. Booksellers Found. v. Dean*,
342 F.3d 96 (2d Cir. 2003) ............................................................36, 37

*Am. Civil Liberties Union v. Ashcroft*,
322 F.3d 240 (3d Cir. 2003) ..........................................................16, 33

*Am. Libraries Ass'n v. Pataki*,
969 F. Supp. 160 (S.D.N.Y.1997) .......................................................37

*Ashcroft v. ACLU*,
542 U.S. 656 (2004)...............................................................27, 28, 34

*Ashcroft v. Free Speech Coalition*,
535 U.S. 234 (2002)...........................................................................30

*Baca v. Moreno Valley Unified Sch. Dist.*,
936 F. Supp. 719 (C.D. Cal. 1996) .....................................................39

*Backpage.com, LLC v. Cooper*,
2013 WL 1249063 (M.D. Tenn. Mar. 27, 2013) .................................10

*Backpage.com, LLC v. Cooper*,
— F. Supp. 2d —, 2013 WL 1558785 (M.D. Tenn. Jan. 3, 2013)..............passim

*Backpage.com, LLC v. McKenna*,
881 F. Supp. 2d 1262 (W.D. Wash. 2012) ...................................................passim

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ..........................................................................21

*Bartnicki v. Vopper*,
532 U.S. 514 (2001)...........................................................................................29

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) ....................................................................18, 26

*Ben Ezra, Weinstein, & Co. v. Am. Online Inc.*,
206 F.3d 980 (10th Cir. 2000) ..........................................................................18

*Brown v. Entm't Merchs. Ass'n*,
131 S. Ct. 2729 (2011)................................................................................28, 29

*Cent. Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n*,
447 U.S. 557 (1980)...........................................................................................33

*Chicago Lawyers' Comm. for Civil Rights Under the Law, Inc. v. Craigslist, Inc.*,
519 F.3d 666 (7th Cir. 2008) ......................................................................21, 26

*Ctr. for Democracy & Tech. v. Pappert*,
337 F. Supp. 2d 606 (E.D. Pa. 2004) ...............................................................36

*Cyberspace Commc'ns Inc. v. Engler*,
142 F. Supp. 2d 827 (E.D. Mich. 2001) ...........................................................37

*Dimeo v. Max*,
433 F. Supp. 2d 523 (E.D. Pa. 2006)................................................................19

*Elrod v. Burns*,
427 U.S. 347 (1976)...........................................................................................38

*Fair Hous. Council v. Roommates.com*,
  521 F.3d 1157 (9th Cir. 2008) ............................................................... 19

*First Puerto Rican Festival of N.J., Inc. v. City of Vineland*,
  108 F. Supp. 2d 392 (D.N.J. 1998) ....................................................... 39

*Free Speech Coalition, Inc. v. Attorney Gen.*,
  677 F.3d 519 (3d Cir. 2012) .................................................................. 31

*Green v. Am. Online, Inc.*,
  318 F.3d 465 (3d Cir. 2003) .................................................................. 19

*Healy v. Beer Inst.*,
  491 U.S. 324 (1989) ............................................................................... 35

*J.O. ex rel. C.O. v. Orange Twp. Bd. of Educ.*,
  287 F.3d 267 (3d Cir. 2002) .................................................................. 16

*Johnson v. Arden*,
  614 F.3d 785 (8th Cir. 2010) ................................................................ 19

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
  710 F.3d 99 (3d Cir. 2013) .................................................................... 39

*LCN Enters., Inc. v. City of Asbury Park*,
  197 F. Supp. 2d 141 (D.N.J. 2002) ....................................................... 17

*Liparota v. United States*,
  471 U.S. 419 (1985) ............................................................................... 27

*M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC*,
  809 F. Supp. 2d 1041 (E.D. Mo. 2011) ................................................ 20

*Members of City Council v. Taxpayers for Vincent*,
  466 U.S. 789 (1984) ............................................................................... 30

*Miller v. Mitchell*,
  598 F.3d 139 (3d Cir. 2010) .................................................................. 16

*Mishkin v. New York*,
   383 U.S. 502 (1966)................................................................24

*Moore v. Asbury Park. Bd. of Educ.*,
   2005 WL 2033687 (D.N.J. Aug. 23, 2005) ......................................39

*Morissette v. United States*,
   342 U.S. 246 (1952)................................................................27

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
   591 F.3d 250 (4th Cir. 2009) ......................................................18

*New York v. Ferber*,
   458 U.S. 747 (1982)............................................................23, 26

*Novins v. Cannon*,
   2010 WL 1688695 (D.N.J. Apr. 27, 2010) ......................................21

*Pike v. Bruce Church, Inc.*,
   397 U.S. 137 (1970)................................................................38

*PSINet, Inc. v. Chapman*,
   362 F.3d 227 (4th Cir. 2004) ......................................................36

*Reno v. ACLU*,
   521 U.S. 844 (1997)........................................................31, 33, 34

*S.O.C., Inc. v. Cnty. of Clark*,
   152 F.3d 1136 (9th Cir. 1998) ......................................................32

*Saxe v. State Coll. Area Sch. Dist.*,
   240 F.3d 200 (3d Cir. 2001) ......................................................30

*Se. Booksellers Ass'n v. McMaster*,
   282 F. Supp. 2d 389 (D.S.C. 2003) ..............................................37

*Smith v. California*,
   361 U.S. 147 (1960)........................................................22, 23

*Staples v. United States*,
   511 U.S. 600 (1994)...................................................................................26, 27

*Startzell v. City of Phila.*,
   533 F.3d 183 (3d Cir. 2008) .............................................................28

*United States v. Playboy Entm't Grp.*,
   529 U.S. 803 (2000)...........................................................................28

*United States v. U.S. Gypsum Co.*,
   438 U.S. 422 (1978)......................................................................26, 27

*United States v. United States Dist. Ct.*,
   858 F.2d 534 (9th Cir. 1988) .............................................................24

*United States v. Williams*,
   553 U.S. 285 (2008)...........................................................................34

*United States v. X-Citement Video, Inc.*,
   513 U.S. 64 (1994)................................................................24, 26, 27

*United States v. X-Citement Video, Inc.*,
   982 F.2d 1285 (9th Cir. 1992) ...........................................................24

*Video Software Dealers Ass'n v. Webster*,
   968 F.2d 684 (8th Cir. 1992) .............................................................24

*Voicenet Commcn's, Inc. v. Corbett*,
   2006 WL 2506318 (E.D. Pa. Aug. 30, 2006) ....................................20

*Vt. Right to Life Comm., Inc. v. Sorrell*,
   221 F.3d 376 (2d Cir. 2000) .............................................................35

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989)...........................................................................28

*Zeran v. Am. Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997) .......................................18, 19, 20, 21

## OTHER CASES

*People v. Gourlay*,
   2009 WL 529216 (Mich. Ct. App. Mar. 3, 2009).................................................20

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,
   1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) .................................................18

## FEDERAL STATUTES

28 U.S.C. § 1746.................................................................................................30

47 U.S.C. § 230.............................................................................................passim

## OTHER STATUTES

Conn. Gen. Stat. § 53a-196i................................................................................12

N.J.S.A. § 2C:7-2................................................................................................14

N.J.S.A. § 2C:11-3..............................................................................................14

N.J.S.A. § 2C:13-1..............................................................................................14

N.J.S.A. § 2C:13-8..............................................................................................14

N.J.S.A. § 2C:13-10......................................................................................passim

N.J.S.A. § 2C:14-2..............................................................................................14

N.J.S.A. § 2C:24-4..............................................................................................29

N.J.S.A. § 2C:34-1..............................................................................................32

N.J.S.A. § 2C:43-1..............................................................................................14

N.J.S.A. § 2C:43-6..............................................................................................14

Tenn. Code Ann. § 39-13-315 ..............................................................................9

Wash. Rev. Code Ann. § 9.68A.104.............................................................8

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Amend. I ....................................................................passim

U.S. Const. Article I, § 8, cl. 3..............................................................35

Pursuant to Fed. R. Civ. P. 65 and L.Civ.R. 65.1, Plaintiff Backpage.com, LLC ("Backpage.com") requests immediate injunctive relief to prevent enforcement of a new state law, N.J.S.A. § 2C:13-10, which otherwise will take effect July 1, 2013.  Plaintiff respectfully asks the Court to issue a temporary restraining order, followed by a preliminary injunction after any further briefing and hearing as the Court directs.

Local Rule 65.1 allows the Court to issue a TRO and an order to show cause why a preliminary injunction should not issue on an *ex parte* basis and without notice to Defendants.  In fact, Backpage.com has given notice to Defendants, in a June 4, 2013 letter to then-Attorney General Jeffrey S. Chiesa, and by email or fax to Acting Attorney General John Jay Hoffman and to each of the county prosecuting attorneys concurrent with the filing of this motion.  Declaration of Ambika K. Doran ("Doran Decl.") ¶ 3 & Ex. B.  As shown below, emergency relief is necessary here under Fed. R. Civ. P. 65(b) to preserve constitutional and federal statutory rights protecting free speech.  Accordingly, Backpage.com requests that the Court immediately enter a TRO enjoining enforcement of N.J.S.A. § 2C:13-10 for a period of 14 days or longer (as the Court deems appropriate or the parties agree) and issue an order to show cause why a preliminary injunction should not issue, allowing for briefing and argument by the parties while the TRO remains in effect.

## I.   INTRODUCTION

Absent relief from this Court, beginning July 1, online service providers across the nation will be at risk of prosecution and severe criminal penalties in New Jersey under a new state law, N.J.S.A. § 2C:13-10 (the "Act").[1]  Although legislators named the new offense "advertising commercial sexual abuse of a minor," in purpose and effect the Act seeks to eliminate adult-oriented Internet advertising.  The law poses an unconstitutional threat of strict criminal liability not only to classified ad websites (such as Backpage.com), but also to *any* site that allows third parties to post images online (*e.g.*, social networking sites and dating sites) as well as any provider involved in disseminating content found to offend the law (*e.g.*, search engines, web archives and Internet service providers).

The Act makes it a first-degree offense—the most serious crime under state law—to knowingly publish, disseminate, or display or to "directly or indirectly" cause content to be published, disseminated or displayed, if it contains a "depiction of a minor" and any "explicit or implicit offer" of sex for "something of value."  It is *not* a defense that a defendant did not know the age of the person depicted, and a defendant may not rely on representations by or the apparent age of the person depicted.  Instead, websites and other online providers must request and maintain records of identification from users.  Because the Act's penalties are so severe (up

---

[1] The Act was passed as P.L. 2013, c.51 § 12, but will be codified as N.J.S.A. § 2C:13-10.  It is attached as Exhibit A to the Doran Decl.

to 20 years' imprisonment, a minimum $25,000 fine, and mandatory sex offender registration) and its identification requirements so impractical, online providers will likely block vast amounts of speech protected by the First Amendment.

The Act is copied from an earlier Washington State law passed last year and is also similar to a Tennessee statute, which likewise was based on a version of the Washington law.  Both the Washington and Tennessee laws also targeted Backpage.com, just as New Jersey legislators acknowledged they were doing. However, federal courts in Washington and Tennessee struck down those statutes as unconstitutional and preempted:  *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012); *Backpage.com, LLC v. Cooper*, — F. Supp. 2d —, 2013 WL 1558785 (M.D. Tenn. Jan. 3, 2013).  The New Jersey legislature apparently misunderstood or did not consider these decisions in passing the Act.

The Act is antithetical to free speech and would require online service providers to become the government's censors of the Internet.  This Court should immediately and permanently enjoin its enforcement for at least four reasons—the same reasons the Washington and Tennessee federal courts struck down the similarly-flawed laws in those states.

*First*, the Act violates the Communications Decency Act of 1996 ("CDA"), 47 U.S.C. § 230.  Expressly intended to foster free and robust speech on the Internet, Section 230 prohibits treating an online service provider as "the publisher

or speaker of any information" submitted by third-party users, and forbids imposing liability under any inconsistent state law.  47 U.S.C. §§ 230(c)(1), (e)(3).

*Second*, the Act's imposition of strict criminal liability on speech violates the First Amendment and due process.  A state may not impose criminal liability on distributors of expressive materials without proof of scienter.  More specifically, a defendant may not be held criminally liable for distributing materials containing depictions of minors absent proof of the defendant's knowledge that the persons depicted are minors, but the Act seeks to do just that.

*Third*, the Act contravenes the First Amendment because it is a content-based restriction on speech that is neither narrowly tailored nor the least speech-restrictive means of addressing the State's purpose.  The law is vastly overbroad both because of the countless parties it subjects to criminal liability (*e.g.*, websites, social media providers, search engines, ISPs) and because of the scope of protected speech it would chill (essentially all third-party content and even private emails, posts or texts).  The Act criminalizes posts that contain any "implicit" offer of sex for "something of value," a standard so vague that no person of ordinary intelligence can determine what conduct is criminal.  Its requirement that websites obtain and retain identification will deter adults from engaging in protected speech.  Even assuming the State's aim was to prevent commercial sexual exploitation of minors, the Act is far from the least restrictive means to do so.

*Finally*, the Act violates the Commerce Clause, because it seeks to regulate conduct outside of and unconnected to New Jersey.  It is not the states' role to regulate interstate commerce, particularly on the Internet, as Congress reinforced by enacting Section 230.

## II.   BACKGROUND

### A.   State AGs' Crusade Against Adult-Oriented Internet Advertising.

In 2008, a group of 43 state attorneys general began a crusade against online adult-oriented advertising.  They focused initially on Craigslist, which responded first by taking steps to prevent misuse of the "erotic services" category on its site and later by renaming the category "adult services."  *See* Doran Decl." ¶¶ 4-5 & Exs. C, D.  Unsatisfied with these steps, a subgroup of 17 AGs demanded that Craigslist remove its adult services section entirely.  *Id.* ¶ 6 & Ex. E.  Craigslist relented to the pressure, and in 2010 dropped its adult services category.  *Id.*

Soon afterward, adult ads migrated to other Craigslist categories and other websites, including Backpage.com, which operates the second largest online classified ad service available nationwide.  Declaration of Carl Ferrer ("Ferrer Decl.") ¶ 2.  Backpage.com hosts millions of user posts each month in numerous categories (*e.g.*, buy/sell/trade, automotive, rentals, real estate, jobs, forums, dating, adult and services) and subcategories.  *Id.* ¶ 5 & Ex. A.

Less than a week after Craigslist eliminated its adult services category, 21 AGs wrote Backpage.com to insist that it "like craigslist [should] shut[] down the adult services section of its website."  Doran Decl. ¶ 7 & Ex. F.  In September 2011, the National Association of Attorneys General also targeted Backpage.com, sending and publicly releasing a letter to the company that leveled derogatory accusations and requested extensive information "in lieu of a subpoena."  *Id.* ¶ 8 & Ex. G.  (New Jersey's AG, Paula Dow, signed the letter.)  Backpage.com attempted to cooperate with the AGs but has resisted the demand to eliminate the adult category, because it believes that censorship is not the solution to human trafficking and exploitation, but rather that responsible businesses—like Backpage.com—can help fight these problems.

## B. Backpage.com's Efforts to Police and Prevent Misuse of Its Website.

Backpage.com works to prevent misuse of its website, making clear that users may not offer illegal services and emphasizing that content in any way relating to child exploitation is prohibited.  Ferrer Decl. ¶ 8 & Ex. B (Terms of Use forbid posts related to "exchanging sexual favors for money or other valuable consideration" and "any material … that exploits minors"); Ex. C ("**Any post exploiting a minor in any way will be subject to criminal prosecution and will be reported to the Cybertipline for law enforcement.**" (emphasis in original)).  Users seeking to post or view material in the adult category must verify that they

are at least 18 years old. *Id.* ¶ 10.  The site asks users to report any post that may

relate to exploitation of minors or human trafficking and contains links to websites

of the National Center for Missing and Exploited Children ("NCMEC") and the

National Human Trafficking Resource Center. *Id.* ¶ 10 & Exs. D & E.

Backpage.com takes extensive measures to police user content for abuse and

illegal activity.  It automatically filters ads for some 38,000 terms and conducts

two levels of manual review with a staff of over 100 personnel. *Id.* ¶ 13.  Through

these reviews, Backpage.com blocks over 750,000 posts each month. *Id.* ¶ 14.  It

refers user ads that it suspects may relate to child exploitation to NCMEC (over

900 ads in May 2013 alone). *Id.*  Backpage.com also cooperates with law

enforcement by promptly responding to subpoenas and using technological tools to

supply evidence for investigations and prosecutions. *Id.* ¶ 15.

### C.   Washington Passed the First State Law Targeting Adult-Oriented Online Ads, and the Statute Was Permanently Enjoined.

In Washington, state legislators (working with the AG's office) introduced a

bill in January 2012 purporting to address "advertising commercial sexual abuse of

a minor."  Doran Decl. ¶ 9, Ex. H.  The Washington legislature enacted the bill,

notwithstanding express concerns that it might be declared invalid under the CDA

and the First Amendment. *Id.* ¶ 10, Ex. I (bill's sponsor stated, "We kept asking,

what does constitute a violation of freedom of speech …, what does constitute a

violation of the federal [CDA]?" and "I suppose there could be a case made that,

'Well, they're chilling our free speech.'").  Washington's governor signed the bill, and it was set to go into effect on June 7, 2012.  *Id.* ¶ 11, Ex. J (Wash. Rev. Code Ann. § 9.68A.104).

On June 4, 2012, Backpage.com filed suit in the U.S. District Court for the Western District of Washington, seeking a TRO, preliminary and permanent injunctive relief, and a declaration that the new law was unconstitutional and violated the CDA.  Doran Decl. ¶ 12.  The Court granted Backpage.com's request for a TRO the next day.  *Id.* ¶ 13, Ex. K.  After full briefing and argument, on July 27, 2012, the Court entered a preliminary injunction, enjoining enforcement of the law on all six of the grounds asserted by Backpage.com and the Internet Archive (which joined as a co-plaintiff)—the same challenges raised here:

- The Washington statute conflicted with, and was preempted by, Section 230 of the CDA.  *Id.* at 1273.

- The statute violated the First Amendment in four distinct respects: (1) it chilled protected speech by imposing criminal sanctions based on strict liability, *id.* at 1275-1278; (2) it was impermissibly vague, including with respect to when a publisher would be deemed to "know" that a third-party ad "implicitly offer[ed] sex" or was "indirectly" causing publication of an impermissible ad, *id.* at 1279; (3) it was overbroad, in that it criminalized "more than offers to engage in illegal transactions," *id.* at 1280-81; and (4) it was a content-based prohibition that was not narrowly tailored to meet the state's asserted interest.  *Id.* at 1283-84.

- The statute violated the Commerce Clause by impermissibly attempting to regulate conduct taking place outside the state and by unduly burdening interstate operations of the Internet.  *Id.* at 1285.

Thereafter, the defendants in *McKenna* (the Washington AG and the county prosecutors) conceded they would not continue to defend the law, and on December 10, 2012, stipulated to a final judgment permanently enjoining its enforcement and awarding Backpage.com attorneys' fees.  Doran Decl. ¶ 14 & Exs. L, M.  The Washington AG also agreed to work with the state legislature to repeal the Washington statute, and the legislature has since enacted a measure to repeal the law effective July 28, 2013.  *Id.* ¶ 14 & Ex. N.

### D.   Tennessee Passed A Similar Law, Which Also Was Enjoined.

In May 2012, the two houses of the Tennessee general assembly respectively passed legislation creating the felony crime of "advertising commercial sex with a minor."  *Id. ¶* 16, Ex. O.  The legislation closely tracked the first draft of the Washington law.  *Id.* ¶ 9, Ex. H.  The governor signed the legislation on May 21, 2012, *id.* ¶ 17, Ex. P, making it a felony to "knowingly sell[ ] or offer[ ] to sell an advertisement that would appear to a reasonable person to be for the purpose of engaging in what would be a commercial sex act … with a minor."  Tenn. Code Ann. § 39-13-315.  The Tennessee law was scheduled to take effect July 1, 2012.

On June 27, 2012, Backpage.com brought suit to enjoin the law in the U.S. District Court of the Middle District of Tennessee.  Doran Decl. ¶ 18.  The defendants (the Tennessee AG and the district attorneys for each of the state's 31 judicial districts) stipulated they would not enforce the Tennessee law pending

resolution of Backpage.com's challenges.  *Id.* Ex. Q ¶¶ 4, 5.  After extended briefing and a hearing, the court entered a preliminary injunction on January 3, 2013.  Like *McKenna*, the Tennessee federal court issued a thorough opinion, invalidating the Tennessee statute on all the grounds urged by Backpage.com. *Cooper*, 2013 WL 1558785.  The court wrote:

> The Constitution tells us that—when freedom of speech hangs in the balance—the state may not use a butcher knife on a problem that requires a scalpel to fix.  Nor may a state enforce a law that flatly conflicts with federal law.  Yet, this appears to be what the Tennessee legislature has done in passing the law at issue.

*Id.* at *1.  As in Washington, the defendants in *Cooper* declined to further defend the Tennessee law after the court's preliminary injunction order.  On March 19, 2013, the court granted Backpage.com's unopposed motion to convert the preliminary injunction into a permanent injunction and entered final judgment invalidating the Tennessee law.  Doran Decl. ¶ 19, Exs. R & Ex. S (judgment); *Backpage.com, LLC v. Cooper*, 2013 WL 1249063 (M.D. Tenn. Mar. 27, 2013).

### E.     The New Jersey Act Mirrors the Invalidated Washington and Tennessee Laws.

S. 2239, entitled the "Human Trafficking Prevention, Protection, and Treatment Act," was introduced in the New Jersey Senate on October 4, 2012.  The same bill was introduced a week later in the Assembly, designated A. 3352.  Doran Decl. ¶ 20 & Ex. T.  The bill included a section creating the offense of "advertising commercial sexual abuse of a minor."  *Id.* § 11.  The Senate passed A. 3352 on

March 18, 2013, and the bill passed in the Assembly three days later.  *Id.* Ex. U.
The advertising provision was largely unchanged from the initial proposal.[2]
Governor Christie signed the bill on May 6, 2013.  *Id*. Ex. V.  The first degree
advertising crime created by the Act will be codified at N.J.S.A. § 2C:13-10.

The Act's legislative history states that it "is modeled after a recently
enacted Washington state law," as well a Connecticut bill, "that created criminal
offenses related to advertising commercial sexual abuse of a minor."  Doran Decl.
Ex. W, p. 6.  Although the Washington law had already been *permanently* enjoined
by a federal court, members of the Senate Judiciary Committee were told,
erroneously, that an order striking down the law was on appeal to the Washington
Supreme Court.  *Id.*, Ex. X, p. 14.[3]  And in Connecticut, before enacting the bill
mentioned in the Act's legislative history, lawmakers *removed* a provision creating
criminal liability for websites or others publishing or disseminating ads, because of
concerns that the provision would impermissibly burden First Amendment rights.

---

[2] The advertising provision in the adopted legislation differs from the one in
A.3352 in only minor respects:  (1) the section was renumbered, from § 11 to § 12;
(2) the definition of "depiction" in subsection (e) was modified to require a
photographic depiction; and (3) the strict liability provision of subsection (f) was
expanded to add subsection (f)(2), as discussed below.  *Compare* Doran Ex. T,
§ 11, *with id.* Ex. V, § 12; *see also id.* Ex. U (bill history), and http://www.njleg.
state.nj.us/bills/billview.asp?BillNumber=A3352(legislative history).

[3] As noted above, Backpage.com challenged the Washington law in *federal* court,
prevailed on all grounds, and the defendants did *not* appeal.  In fact, the *McKenna*
order enjoining the Washington law had been reduced to final judgment and a
permanent injunction *before* the committee hearing.  Doran Decl. ¶ 14, Ex. M.

*Id*. Exs. Y & Z (Conn. Gen. Stat. § 53a-196i).  As enacted, the Connecticut law imposed criminal liability only on parties who *submitted* unlawful content, but not on websites or other publishers.  *Id.* Conn. Gen. Stat. § 53a-196i(4)(b).

Some New Jersey legislators did question the enforceability of the Act's advertising provision.  Two members of the Assembly Judiciary Committee abstained from an October 2012 committee vote on A. 3352, expressing concerns about the bill's constitutionality.  *Id*. Ex. AA, at 4, 5; Ex. BB.  Conversely, other lawmakers considered the Act's potential burdens on publishers to be a selling point.  One sponsor, candidly admitting she "would like to shut down the adult services [section of Backpage.com] completely," recognized the age verification requirement could be burdensome, but said, "if that's a burden, so be it quite frankly[.]"  *Id*. Ex. AA at p. 4 (comments of Assemblywoman Vainieri Huttle).

As passed and signed into law by the Governor, the material provisions of the Act for purposes of this motion are:

> b.    A person commits the offense of advertising commercial sexual abuse of a minor if:
>
>> (1) the person knowingly publishes, disseminates, or displays, or causes directly or indirectly, to be published, disseminated, or displayed, any advertisement for a commercial sex act, which is to take place in this State and which includes the depiction of a minor; or

12

(2) the person knowingly purchases advertising in this State for a commercial sex act which includes the depiction of a minor.[4]

c.      A person who commits the offense of advertising commercial sexual abuse of a minor as established in subsection b. of this section is guilty of a crime of the first degree.  Notwithstanding the provisions of N.J.S.2C:43-3, the fine imposed for an offense under this section shall be a fine of at least $25,000 …

e.      For the purposes of this section:

"Advertisement for a commercial sex act' means any advertisement or offer in electronic or print media, including the Internet, which includes either an explicit or implicit offer for a commercial sex act to occur in this State.

"Commercial sex act" means any act of sexual contact or sexual penetration, as defined in N.J.S.2C:14-1, or any prohibited sexual act, as defined in N.J.S.2C:24-4, for which something of value  is given or received by any person.

"Depiction" means any photograph or material containing a photograph or reproduction of a photograph.

"Minor" means a person who is under 18 years of age.

"Photograph" means a print, negative, slide, digital image, motion picture, or videotape, and includes anything tangible or intangible produced by photographing.

f.      It shall not be a defense to a violation of this section that the defendant:

(1) did not know the age of the minor depicted in the advertisement; or

(2) claims to know the age of the person depicted, unless there is appropriate proof of age obtained and produced in accordance with subsections g. and h. of this section.

---

[4] As discussed below, *see infra* n.7, Backpage.com does not challenge subsection b(2) of the Act, *i.e.*, the imposition of criminal penalties on individuals who post content on the Internet or elsewhere for illegal activities.

g.       It shall be a defense to a violation of this section that the defendant made a reasonable, bona fide attempt to ascertain the true age of the minor depicted in the advertisement by requiring, prior to publication, dissemination, or display of the advertisement, production of a driver's license, marriage license, birth certificate, or other governmental or educational identification card or paper of the minor depicted in the advertisement and did not rely solely on oral or written representations of the minor's age, or the apparent age of the minor as depicted. The defendant shall prove the defense established in this subsection by a preponderance of the evidence.

h.       The defendant shall maintain and, upon request, produce a record of the identification used to verify the age of the person depicted in the advertisement.

N.J.S.A. § 2C:13-10.

The Act thus makes the act of publishing, disseminating or displaying an offending online post "directly or indirectly" a "crime of the first degree"—the most serious crime under state law and the equivalent of a felony—thereby putting online service providers and other publishers in the same class as individuals guilty of murder, kidnapping and aggravated sexual assault.  *See* N.J.S.A. §§ 2C:11-3(b)(1); 2C:13-1(c); 2C:14-2(a).  The penalties for the advertising offense are imprisonment for 10-20 years, N.J.S.A. §§ 2C:43-1, 2C:43-6, a minimum $25,000 fine (the same as for human trafficking), N.J.S.A. § 2C:13-10(c); P.L. 2013, c.51 § 3(d)(1) (amending N.J.S.A. § 2C:13-8), and the requirement that a convicted defendant must register as a sex offender (in the same manner as individuals guilty of aggravated sexual assault or kidnapping a child for immoral purposes), P.L. 2013, c.51 prior § 12(b)(2), amending N.J.S.A. § 2C:7-2.

Absent relief from this Court, the Act will take effect July 1, 2013.  P.L. 2013, c.51 § 22.

### F.    The Act Will Affect Thousands of Websites and Online Providers.

The Act plainly targets Backpage.com and seeks to eliminate its adult advertising section, as its legislative findings state:  "Responding to political and public outcry, the Internet website craigslist.com removed its escort section, but another website with an escort section, backpage.com, has to date refused to do so."  N.J.S.A. § 2C:13-10(a)(5); *see also* Doran Decl. Ex. AA, at 4 (bill sponsor Huttle wanted to "shut down" the adult services section of Backpage.com).

But the Act will also apply to thousands of online providers other than Backpage.com.  These include social networking sites such as Facebook, Twitter, and YouTube; dating sites such as Match.com and Passion.com; information sites, forums, blogs, chat rooms, and sites that allow user comments and reviews such as Wikipedia and CitySearch; search engines such as Google, Bing, and Yahoo!; and Internet service providers such as AOL and Comcast.  For example, escort ads continue to appear on Craigslist and increasingly on other sites such as Facebook.  *Id..* ¶ 29, Ex. CC.  A study conducted in New York City found that 61% of sex workers used Craigslist, while 83% had Facebook pages.  *Id.* Exs. DD, EE.  As one commentator put it, "Keeping these ads from popping up online is like trying to keep frogs in a bucket."  *Id.* Ex. CC.

15

### III.   ARGUMENT

**A.    Standards for a TRO or Preliminary Injunction.**

The purpose of a temporary restraining order is "preservation of the status quo while the merits of the cause are explored through litigation." *J.O. ex rel. C.O. v. Orange Twp. Bd. of Educ.*, 287 F.3d 267, 273 (3d Cir. 2002) (internal quotation omitted).  The standards for issuing a TRO are the same as for a preliminary injunction:  "(1) a likelihood of success on the merits; (2) [the plaintiff] will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief." *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010) (preliminary injunction); *Ace Am. Ins. Co. v. Wachovia Ins. Agency Inc.*, 2008 WL 4165746 (D.N.J. Sept. 4, 2008) (TRO).  "In a First Amendment challenge, a plaintiff who meets the first prong of the test for a preliminary injunction will almost certainly meet the second, since irreparable injury normally arises out of the deprivation of speech rights." *ACLU v. Reno*, 217 F.3d 162, 180 (3d Cir. 2000) (citation omitted), *vacated on other grounds sub nom Ashcroft v. ACLU*, 535 U.S. 564 (2002); *accord Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 250-51 (3d Cir. 2003) (in a First Amendment challenge, "[t]he most significant and, indeed, the dispositive prong of the preliminary injunction analysis is … reasonable

probability of succeeding on the merits"); *LCN Enters., Inc. v. City of Asbury Park*, 197 F. Supp. 2d 141, 153 (D.N.J. 2002).

Here, Backpage.com is likely to succeed on its claims that the Act is unconstitutional and violates Section 230, as two other federal courts have found substantially similar statutes invalid.  Defendants (collectively, "the State") cannot justify the chilling effect on speech the Act will cause.  Irreparable harm—to Backpage.com, countless other online service providers, and the public as a whole—can be presumed, and in any event, is patent based on the Act's harsh criminal penalties.  The public interest strongly favors granting injunctive relief to prevent even a temporary deprivation of free speech rights.

**B.      Backpage.com Has A Strong Likelihood of Success on the Merits.**

**1.      Section 230 of the CDA Preempts the Act.**

Section 230 of the CDA unequivocally bars state laws that impose liability on interactive computer services based on third-party content.  This is precisely what the Act would do, and so it contravenes Section 230 and is preempted.  *See McKenna*, 881 F. Supp. 2d at 1273 (Washington law preempted by Section 230); *Cooper*, 2013 WL 1558785 at *16 (Tennessee law preempted by Section 230).

Under Section 230, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  It goes on to state that "no

liability may be imposed under any State or local law that is inconsistent with" Section 230.  *Id.* § 230(e)(3).  Finally, Section 230 dictates that providers may not be held liable for "any action voluntarily taken in good faith to restrict access to or availability" of material that is "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable."  *Id.* § 230(c)(2).

Congress enacted Section 230 to achieve two fundamental goals.  "First, Congress wanted to encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce."  *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003); *see also Ben Ezra, Weinstein, & Co. v. Am. Online Inc.*, 206 F.3d 980, 985 n.3 (10th Cir. 2000) (Section 230 is meant "to promote freedom of speech").  To this end, Congress decided to "bar state-law plaintiffs from holding interactive computer service providers legally responsible for information created and developed by third parties," *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009), because if providers could be liable for such content, they would severely restrict information available on the Internet, *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997).

Second, Congress sought to encourage online service providers to "self-police" to preclude offensive or unlawful content by providing immunity for such voluntary efforts.  *Batzel*, 333 F.3d at 1028.  Congress made clear that Section 230 was meant to overrule *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL

323710, at *4 (N.Y. Sup. Ct. May 24, 1995), in which a trial court held that, because Prodigy voluntarily deleted some offensive online messages, it became liable as a publisher for defamatory content in messages it did not delete.  Congress enacted Section 230 to eliminate the "grim choice" such a rule would present to online providers, *i.e.*, those that voluntarily filter content would be responsible for all posts, while "providers that bury their heads in the sand and ignore problematic posts would altogether escape liability." *Fair Housing Council of San Fernando Valley v. Roommates.com LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc); *see also Batzel*, 333 F.3d at 1029 ("If efforts to review and omit third-party defamatory, obscene or inappropriate material make a computer service provider or user liable for posted speech, then website operators and Internet service providers are likely to abandon efforts to eliminate such material from their site[s].") (citation omitted).

"The majority of federal circuits have interpreted the CDA to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010).  As the Third Circuit has held, Section 230 "bars 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content.'"  *Green v. Am. Online, Inc.*, 318 F.3d 465, 471 (3d Cir. 2003) (quoting *Zeran*, 129 F.3d at 331); *see also Dimeo v. Max*, 433

F. Supp. 2d 523, 528-31 (E.D. Pa. 2006) (dismissing defamation claim and noting that without Section 230, providers would have to either "employ an army of highly trained monitors … to screen … message[s] or … avoid such a massive headache and shut down"), *aff'd*, 248 Fed. App'x 280 (3d Cir 2007).  Section 230 immunity avoids the "obvious chilling effect" posed by the specter of liability based on third-party content.  *Zeran*, 129 F.3d at 331.

As *Cooper* and *McKenna* recognized in invalidating the Act's predecessors, the Washington and Tennessee statutes, Section 230's grant of immunity includes immunity from state criminal laws.  *See McKenna*, 881 F. Supp. 2d at 1274-75; *Cooper*, 2013 WL 1558785, at *12, *13-14.  This is plain from the language of Section 230: "[N]o liability may be imposed under *any* State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3) (emphasis added); *see also People v. Gourlay*, 2009 WL 529216, at *3 (Mich. Ct. App. Mar. 3, 2009) ("the phrase 'any State or local law' includes … criminal laws"); *Voicenet Commcn's, Inc. v. Corbett*, 2006 WL 2506318, at *4 (E.D. Pa. Aug. 30, 2006) (CDA's plain language provides "immunity from inconsistent state criminal laws").

All of the elements of Section 230 immunity are plainly established here (again, as *McKenna* and *Cooper* held).  First, websites are the quintessential "interactive computer services."  *See, e.g.*, *M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1049 (E.D. Mo. 2011) (Backpage.com

meets statutory definition); *Chicago Lawyers' Comm. for Civil Rights Under the Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671 (7th Cir. 2008) (same for Craigslist); *Novins v. Cannon*, 2010 WL 1688695, at *2 (D.N.J. Apr. 27, 2010) (Section 230 protects websites "to which other individuals can freely post content.").  Second, by making it a crime to cause any publication, dissemination, or display of third-party content, the Act treats websites as the publishers of that information.  *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101-02 (9th Cir. 2009) ("what matters is not the name of the cause of action … [but] whether [it] inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another").  The Act thus would impermissibly hold online service providers "liable for [their] exercise of a publisher's traditional editorial functions."  *Zeran*, 129 F.3d at 330.  Third, the Act targets content created by third parties, for which websites like Backpage.com are mere conduits.  *Chicago Lawyers' Comm.*, 519 F.3d at 671.

The Act disregards the realities of the Internet.  Internet businesses are different from brick-and-mortar ones.  Online providers do not have physical offices in every location in which their services are available; since many services are global, this would be impossible.  Many online services in the "direct or indirect" chain of disseminating third-party content subject to Act (*e.g.*, search engines, websites that link to other sites, ISPs) will never have contact with the

content providers and thus have no way to identify or obtain identification from them.  Requiring individuals to provide identification for each posting would be so burdensome, expensive and impractical or impossible that websites in all likelihood will preclude all postings that come close to the proscriptions of the Act.

In sum, the Act fundamentally contradicts section 230 and the Internet freedom it protects.  As the *Cooper* court noted in striking down the Tennessee statute, "rather than encouraging unfettered speech, the law imposes significant penalties for certain ads," and would mean that for "an online classified service such as Backpage.com, preventing liability could amount to screening millions of advertisements[.]"  2013 WL 1558785, at *13.  And, as the *McKenna* court wrote: "by imposing liability on online service providers who do not pre-screen content or who 'know' that third party content may violate state law, the statute drastically shifts the unique balance that Congress created with respect to the liability of online service providers that host third party content."  881 F. Supp. 2d at 1274.

The Act contravenes and is preempted by Section 230, and should be invalidated and enjoined on this basis, without more.

**2.    The Act Violates the First and Fourteenth Amendments Because It Eliminates Scienter.**

The Supreme Court has long held that under the First Amendment, a state cannot impose criminal responsibility on a defendant for distributing expressive materials without proof of scienter.  In *Smith v. California*, 361 U.S. 147 (1960),

the Supreme Court struck down a Los Angeles ordinance making it a crime for booksellers to possess obscene books.  The Court noted that *mens rea* is a fundamental tenet of Anglo-American criminal jurisprudence, and the power to create strict liability criminal offenses is limited, especially in the First Amendment context.  *Id.* at 150.  Even though the First Amendment does not protect obscene speech, the Court concluded that a bookseller could not be held criminally liable without proof of scienter concerning the contents of a book:

> It has been well observed of a statute construed as dispensing with any requirement of scienter that: 'Every bookseller would be placed under an obligation to make himself aware of the contents of every book in his shop.  It would be altogether unreasonable to demand so near an approach to omniscience.'  And the bookseller's burden would become the public's burden….The bookseller's limitation in the amount of reading material with which he could familiarize himself, and his timidity in the face of his absolute criminal liability, thus would tend to restrict the public's access to forms of the printed word which the State could not constitutionally suppress directly.

*Id.* at 153-54 (footnote and internal citations omitted).

The Court reiterated this principle in *New York v. Ferber*, 458 U.S. 747 (1982), upholding a New York law criminalizing distribution of sexually explicit depictions of minors in large part because the statute did require scienter.  Again, even though such materials were not entitled to First Amendment protection, the Court cautioned that "criminal responsibility may not be imposed without some element of scienter on the part of the defendant."  *Id.* at 765 (citations omitted).

Thereafter, in *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994), the Court interpreted 18 U.S.C. § 2252 (prohibiting interstate transfer of child pornography).  The Ninth Circuit had held that the statute was facially unconstitutional because it did not contain any requirement that a defendant know that at least one performer in a production was under age 18.  *United States v. X-Citement Video, Inc.*, 982 F.2d 1285, 1291-92 (9th Cir. 1992).  The Supreme Court interpreted the law differently, holding that "the term 'knowingly' in § 2252 extends to both the sexually explicit nature of the material and to the age of the performer" because "a statute completely bereft of a scienter requirement as to the age of the performers would raise serious constitutional doubts."  513 U.S. at 78.

Under this authority, a state cannot impose "criminal sanctions on the basis of strict liability where doing so would seriously chill protected speech."  *United States v. United States Dist. Ct.*, 858 F.2d 534, 540 (9th Cir. 1988).  *See Mishkin v. New York*, 383 U.S. 502, 511 (1966) ("The Constitution requires proof of scienter to avoid the hazard of self-censorship of constitutionally protected material ....");  *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992) ("Statutes that impose criminal responsibility for dissemination of unprotected speech must contain a knowledge requirement.").

The Act directly violates this well-established law.  A prosecutor need not show that a defendant did anything "knowingly" so long as she can establish that

24

the defendant "cause[d] indirectly" third-party content "to be published,

disseminated, or displayed."[5]   The Act does not require proof that a defendant

knew (or even had reason to believe) that a person depicted in a posting was a

minor—it expressly provides that this is *not* a defense.   If a user posts content on a

website containing a "depiction of a minor" and an "implicit offer" of sex for

"something of value," every online service connected in any way to dissemination

of that content is subject to criminal liability, whether its conduct was intentional

or accidental, knowing or unknowing.   The State could, for example, prosecute

---

[5] It is no answer that the Act contains the word "knowingly" in one place, because
that refers only to the requirement that a defendant "knowingly publishes,
disseminates, or displays" *some content*, without regard to whether it knows the
content is unlawful or knows that it depicts a minor (as shown, lack of knowledge
of the age of someone depicted is *not* a defense).  *See* N.J.S.A. § 2C:13-10.b(1).
The term does not require scienter for the portion of the statute imposing criminal
liability on one who "causes directly or indirectly" offending content "to be
published, disseminated, or displayed."  This comports with the Act's legislative
history, interpreting the term "knowingly" to require no scienter as to the content
of an ad:

> "[K]nowingly'" describes publication rather than knowingly
> publishing something which you know contains a particular thing ….
> So I mean they would just, *you could put stuff on there and the*
> *publisher would never know what was there*.  And so it strikes me
> that especially with respect to the net, if you have a bulletin board, or
> something along those lines where someone sticks one of these
> things, you know that you published that site, and this is on it.  And
> so at least as I read the law, if I'm a judge interpreting it literally *the*
> *fact that you know it's published, even if you don't know what is*
> *published, is a crime*.  And that's, that's a little bit troubling.

Doran Decl. Ex. AA, pp. 4-5) (emphasis added).

Facebook if one of the billions of its user profiles and posts runs afoul of the law,

merely because its platform "causes … indirectly" the content's dissemination.

Permitting liability based on such attenuated "causation" amounts to strict liability:

> An interactive computer service "causes" postings only in the sense of providing a place where people can post…. If craigslist "causes" the discriminatory notices, then so do phone companies and courier services (and, for that matter, the firms that make the computers and software that owners use to post their notices online), yet no one could think that Microsoft and Dell are liable for "causing" discriminatory advertisements.

*Chicago Lawyers' Comm.*, 519 F.3d at 671-72.

Under *Smith*, *Ferber*, and *X-Citement Video*, the Act is unconstitutional

because it would severely chill Internet speech in the same way the Supreme Court

expressed concern about chilling the speech of booksellers and video stores in

those cases.  This is especially so because the Act indisputably dispenses with any

scienter requirement regarding the age of a person depicted in online posts, which

itself "runs afoul of the First Amendment."  *McKenna*, 881 F. Supp. 2d at 1277;

*see also Cooper*, 2013 WL 1558785, at *17-19.[6]

---

[6] Even setting aside First Amendment concerns, the Act violates due process principles for strict liability statutes generally.  While "strict liability offenses are not unknown to the criminal law and do not invariably offend constitutional requirements," they have a "disfavored status."  *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 437-38 (1978).  Statutes creating strict liability crimes are permissible only if (1) the penalty is slight; (2) a conviction does not result in substantial stigma; and (3) the statute regulates public welfare offenses applicable to inherently harmful or injurious items.  *Staples v. United States*, 511 U.S. 600, 619-20 (1994).

Fundamentally, the legislature's abandonment of scienter here contravenes the principle that a statute may not "criminalize a broad range of apparently innocent conduct." *Liparota v. United States*, 471 U.S. 419, 426 (1985) (interpreting statute making unlawful the unauthorized acquisition of food stamps to include scienter element). Because that is exactly what the Act does, it is unconstitutional.

### 3.     The Act Violates the First Amendment.

#### a.     The Act Cannot Survive Strict Scrutiny.

Content-based restrictions of speech, particularly those enforced by criminal penalties, are "a repressive force in the lives and thoughts of a free people." *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004). The First Amendment "demands that content-based restrictions on speech be presumed invalid, and that the Government bear the burden of showing their constitutionality." *Id.* (citations omitted). To

---

The Act's penalties of 20 years' imprisonment and a minimum $25,000 fine are certainly not slight. *See U.S. Gypsum*, 438 U.S. at 442 n.18 (3-year prison term and $100,000 fine too harsh for strict liability violations of the Sherman Act). A conviction and mandatory sex offender registration undoubtedly results in stigma. *See Morissette v. United States*, 342 U.S. 246, 260 (1952). Allowing individuals to post content on the Internet is not remotely close to the types of "public welfare" offenses the Supreme Court has acknowledged may be the subject of strict criminal liability. *See, e.g.*, *Staples*, 511 U.S. at 607 (strict liability allowed for conduct involving "dangerous or deleterious devices or products or obnoxious waste materials," *e.g.*, hand grenades and narcotics); *X-Citement Video*, 513 U.S. at 71-72 (people "do not harbor settled expectations that the contents of magazines and film are generally subject to stringent public regulation… First Amendment constraints presuppose the opposite view.").

rebut this presumption, the State must satisfy strict scrutiny, *i.e.*, show the law is "narrowly tailored to promote a compelling Government interest," and that no "less restrictive alternative would serve the Government's purpose." *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000). The State must prove the Act restricts speech "no further than necessary to achieve the goal, for it is important to ensure that legitimate speech is not chilled or punished." *Ashcroft v. ACLU*, 542 U.S. at 666. "It is rare that a regulation restricting speech because of its content will ever be permissible." *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011) (internal quotation omitted).

The Act is plainly content-based. *Startzell v. City of Phila.*, 533 F.3d 183, 197 (3d Cir. 2008) (where "the government has adopted a regulation of speech because of disagreement with the message it conveys," it is content-based) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). The Act is a "clear-cut example of a content-based restriction on speech, as it imposes liability for advertisements solely on the basis that they contain certain prescribed content." *Cooper*, 2013 WL 1558785, at *24.

The Act fails strict scrutiny because it is not narrowly tailored, and less restrictive alternatives exist to further the State's asserted purpose. *See id.*, 2013 WL 1558785, at *25, 26. Assuming the Act's purpose is to combat child sex trafficking, it is not narrowly or even rationally tailored to achieve that end. The

28

customary method for deterring unlawful conduct is to impose punishment on those who engage in it. *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001).  The State can enact criminal laws to punish persons who sexually exploit minors. *See, e.g.*, N.J.S.A. § 2C:24-4 (creating crime of endangering welfare of a child).[7]  Or, the State could seek to use technology and the Internet to combat child exploitation and sex trafficking in collaboration with Internet businesses, as the California AG has recently done.  Doran Decl., ¶ 32, Ex. FF.  Instead, the Act imposes Internet censorship in a manner that would eliminate a substantial swath of lawful speech— far from the least restrictive alternative available.

The Act is also underinclusive.  *See McKenna*, 881 F. Supp. 2d at 1284; *Cooper*, 2013 WL 1558785, at *25.  This "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 131 S. Ct. at 2740.  First, the Act's sole defense requires production of "a driver's license, marriage license, birth certificate, or other governmental or educational identification card or paper of the minor depicted in the advertisement."  Yet, many of these documents do not have photographs and even those that do (such as a driver's license) can be forged.  By contrast, visual observation that a person is well over 18 or a sworn affidavit or

---

[7] Indeed, Backpage.com does not challenge the portion of the Act that imposes criminal liability on persons who knowingly post online ads for sex trafficking of children (section b(2) of the Act).  N.J.S.A. § 2C:13-10.b(2).

declaration (either of which would be competent evidence in this Court, *see, e.g.*, 28 U.S.C. § 1746) is insufficient to avoid liability.  Similarly, even if a person posting content provides identification, the depiction in the post could be of someone else or the photo may later change.  Moreover, the Act only reaches ads containing a minor's "depiction," which is limited by definition to photographs. Thus, the law would not restrict ads that contain no photo, even if a post offered sex with a "15-year-old virgin."  The Act is also vastly underinclusive because it can only reach persons and entities within the United States.  Efforts to require censorship and impose criminal penalties such as the Act will increasingly drive website providers offshore, given the international reach of the Internet.  *See McKenna*, 881 F. Supp. 2d at 1284.

### b.     The Act Is Overbroad.

In addition, the Act violates the First Amendment because it is overbroad. The Constitution "gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere."  *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002).  A law is "unconstitutional on its face if it prohibits a substantial amount of protected expression."  *Id.*[8]  This is especially

---

[8] A law "is unconstitutional on its face on overbreadth grounds where there is 'a likelihood that the statute's very existence will inhibit free expression' by 'inhibiting the speech of third parties who are not before the Court.'"  *Saxe  v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 214 (3d Cir. 2001) (quoting *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 799 (1984)).  In evaluating an

so for criminal laws, because "criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Reno v. ACLU*, 521 U.S.  844, 872 (1997).

The Act is vastly overbroad in many respects.  First, it is overbroad in terms of the parties subject to criminal liability.  Any party that indirectly causes offending content to be published, disseminated, or displayed is subject to imprisonment, a $25,000 fine, and sex offender registration.  Thus, for just one third-party post, prosecutors could charge the website where it appeared; all search engines that identify the site in response to queries; any blogs, forums, social networking sites, or individuals' emails that link to the website; and even ISPs that provide the services for users to access the Internet.

The law is also overbroad because of the enormous volume of Internet content it burdens.  As Craigslist's experience teaches, escort ads can appear in many categories within a classified ad website, even if an adult category is eliminated.  Personals ads fall within the ambit of the Act, and so its burdens and risks also fall on dating and "hookup" websites (*e.g.*, Hookup.com, Passion.com,

---

overbreadth challenge, a "significant consideration" is "the likelihood and frequency of invalid applications of the statute compared to valid applications." *Free Speech Coalition, Inc. v. Attorney Gen.*, 677 F.3d 519, 538 (3d Cir. 2012). As both *McKenna* and *Cooper* found, statutes like the Act reach far beyond activities having any connection to sex trafficking of minors, and their existence threatens to inhibit, by threat of criminal liability, substantial protected speech. *McKenna*, 881 F. Supp. 2d at 1280-82; *Cooper*, 2013 WL 1558785, at *19-20.

Sugardaddy.com, and Adultfriendfinder.com, as well as Match.com and eHarmony).  The Act also encompasses profiles and posts on social networking sites (Facebook, MySpace, Twitter), and communications in chat rooms, forums, and individual emails or text messages.  In simple terms, any website or other online service that disseminates third-party content containing depictions of people and references to sex is at risk if it does not police or eliminate user postings.

Likewise overbroad is the definition of "commercial sex act" in the Act, *i.e.*, a sexual act "for which something of value is given or received by any person." The term "something of value" is not limited to an economic exchange, and thus is much broader than New Jersey statutory definitions of prostitution.[9]  Presumably all consensual sexual relationships involve an exchange of "something of value" between the participants—"including a bottle of wine, a nice dinner, or a promise to do the dishes"—even when no money is exchanged.  *McKenna*, 881 F. Supp. 2d at 1281.  Thus, many millions of sexually-oriented personals and dating ads would fall within the Act's prohibitions.[10]

---

[9] "Prostitution" is defined as engaging in sexual activity "in exchange for something of *economic* value[.]"  N.J.S.A. § 2C:34-1(a)(1) (emphasis added).

[10] Because the Act reaches personals ads, dating posts and much other user-submitted content, it cannot be viewed as affecting only commercial speech. When a statute seeks to regulate both commercial and non-commercial speech, it is subject to heightened scrutiny.  *S.O.C., Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1146-47 (9th Cir. 1998) (applying strict scrutiny to anti-leafleting law challenged by company promoting erotic dance establishment, on ground that law reached

The Act's requirement that online services obtain and retain identification from users posting content—the only defense available under the law—is also vastly overbroad.  As noted, the identification requirement is practically impossible and disregards the realities of the Internet.  *Cf. Reno*, 521 U.S. at 868-70 (regulation of the Internet must take into account the nature of the medium).  Even assuming an online service could or would require identification, it would mean that millions of adults would have to provide identification simply to date or meet someone, provide companionship as an escort, offer massage services, or engage in a consensual sexual relationship.  Because, admittedly, adult-oriented speech is more sensitive for many (or most) people, "many Web users [will be] simply unwilling to provide identification information."  *ACLU v. Ashcroft*, 322 F.3d 240, 259 (3d Cir. 2003) (striking down age-verification requirement in affirmative defense to law criminalizing transmission of material harmful to minors).

The availability of the age-verification affirmative defense under the Act is not enough to save it.  "Where a prosecution is a likely possibility, yet only an affirmative defense is available, speakers may self-censor rather than risk the perils

---

commercial speech that was inextricably intertwined with noncommercial expression).  Regardless, the Act cannot satisfy the third and fourth elements of the intermediate scrutiny analysis of *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980).  As discussed herein, the Act does not directly advance the State's ostensible purpose, and it restricts far more speech than necessary to achieve the State's end.  *See Cooper*, 2013 WL 1558785, at *26 (Tennessee act fails "even under a commercial speech standard").

of trial.  There is a potential for extraordinary harm and a serious chill upon

protected speech."  *Ashcroft v. ACLU*, 542 U.S. at 670-71.  Rather than permitting

and encouraging online providers to self-police user content, the Act will *force*

providers to censor millions of user-submitted posts daily (notwithstanding that

almost all are lawful) or to preclude user content altogether, because of the risk of

draconian penalties under the Act.

### c.    The Act Is Unconstitutionally Vague.

A statute is void for vagueness when it "fails to provide a person of ordinary

intelligence fair notice of what is prohibited, or is so standardless that it authorizes

or encourages seriously discriminatory enforcement."  *ACLU v. Mukasey*, 534 F.3d

181, 204 (3d Cir. 2008) (quoting *United States v. Williams*, 553 U.S. 285, 304

(2008)); *see also Reno*, 521 U.S. at 871-72 (vagueness raises "special First

Amendment concerns" when it has an "obvious chilling effect on free speech" and

threatens criminal penalties and discriminatory enforcement).

As explained in *McKenna*, 881 F. Supp. 2d at 1278-80, and *Cooper*, 2013

WL 1558785, at *21-24, the Act is unconstitutionally vague.  Its definition of

"advertisement for a commercial sex act," including any "implicit offer" of sex for

"something of value," is impermissibly vague.  Describing criminal conduct as

anything that is "implicit" is inherently vague, because it means "[n]ot directly

expressed [and] existing [only] inferentially" and "fails to clearly mark the

34

boundary between what is permissible and impermissible." *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 387-88 (2d Cir. 2000) (invalidating state law on political ads that "implicitly" advocate success or defeat of candidate). If a woman posts on a dating website describing her sexual interests and that she is looking for a "generous man," would that constitute an "implicit offer" under the law? If a masseuse offers customers "complete satisfaction" or an escort intending nothing more than companionship promises "a night you'll never forget," would those be "implicit offers" contrary to the law? And again, presumably all consensual sex reflects an exchange of "something of value" between the participants, even if no money changes hands. This central definition of the Act fails to give a person of ordinary intelligence notice of what the law prohibits.

The vagueness of the Act further assures that online services will respond by blocking content that might remotely approach the strictures of the law—once again severely chilling vast amounts of protected speech.

### 4.    The Act Violates the Commerce Clause.

Congress alone has the power to "regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. A "statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." *Healy v. Beer*

*Inst.*, 491 U.S. 324, 336 (1989); *see also A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 784-85 (3d Cir. 1999).  "Because the [I]nternet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate internet activities" without violating this rule.  *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003) (striking down law prohibiting transfer of sexually explicit materials to minors).  A state's efforts to regulate the Internet "highlights the likelihood that a single actor might be subject to haphazard, uncoordinated, and even outright inconsistent regulation …."  *PSINet, Inc. v. Chapman*, 362 F.3d 227, 240 (4th Cir. 2004) (quoting *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 168 (S.D.N.Y.1997)).

Nearly every federal court to consider the issue has held that individual states' efforts to regulate transmission of harmful material via the Internet are unconstitutional under the dormant Commerce Clause.  *See, e.g.*, *Ctr. for Democracy & Tech. v. Pappert*, 337 F. Supp. 2d 606, 662 (E.D. Pa. 2004) (invalidating Pennsylvania criminal law requiring ISPs to disable access to child pornography upon notice by the state).  The courts in *McKenna* and *Cooper* reached the same conclusion in holding that the Washington and Tennessee statutes

that are the precursors to the Act violated the Commerce Clause.  *McKenna*, 881 F.

Supp. 2d at 1285; *Cooper*, 2013 WL 1558785, at *28-32.[11]

State laws such as the Act (and the Washington and Tennessee laws)

improperly seek to control extraterritorial conduct in two ways.  First, "there is no

guarantee that a message" from one resident to another in the same state "will not

travel through other states en route."  *Johnson*, 194 F.3d at 1161.  Second, because

individuals have no way to limit their audience on the Internet, they are subject to

any restrictions created by any state.  *Am. Booksellers*, 342 F.3d at 103.  If

state-by-state Internet regulation were allowed, online providers would have to

conform their practices nationwide to the most restrictive state's requirements.

The Act applies to conduct anywhere.  Posts from users in New York,

Pennsylvania, California or Quebec could be subject to the Act, even if they are

not published in New Jersey.  A review on a travel website of a Las Vegas escort

service linked to a site concerning Atlantic City would subject the websites and

any online service that indirectly "caused" publication of the review to the Act's

penalties.  The New Jersey legislature has attempted to project its policy choices

onto residents of other states, creating an undue burden on interstate commerce and

---

[11] *See also ACLU v. Johnson*, 194 F.3d 1149, 1160-61 (10th Cir. 1999); *Se. Booksellers Ass'n v. McMaster*, 282 F. Supp. 2d 389, 396 (D.S.C. 2003); *Cyberspace Commc'ns Inc. v. Engler*, 142 F. Supp. 2d 827, 830-31 (E.D. Mich. 2001); *Am. Library Ass'n v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997).

putting online providers at risk of inconsistent state regulation.  This is impermissible and a separate ground for invalidating the Act.[12]

### C.    Backpage.com, Other Online Services, and the Public Will Suffer Irreparable Harm If the Act Is Not Immediately Enjoined.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also ACLU v. Reno*, 217 F.3d at 180.  Here, irreparable harm may be presumed if enforcement of the Act is not enjoined.  Moreover, ample evidence supports such a finding.  If the State were to seek to enforce the Act, Backpage.com and countless other online services and publishers will face the intractable choice of censoring third-party content to exclude anything potentially prohibited (a practical impossibility), or risk criminal charges and penalties.

For the same reasons, expedited treatment and an order to show cause are justified under L.Civ.R. 65.1.  As set out in Backpage.com's verified complaint and the declarations accompanying this motion, absent immediate injunctive relief, the Act will take effect next week and Defendants and Internet users nationwide will face serious criminal liability for engaging in protected speech.  Defendants have been notified of this action.  Doran Decl. ¶ 3 & Ex. B.

---

[12] Even if the Court were to find that the Act does not directly control out-of-state commerce, it is invalid because "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

**D.     Granting Injunctive Relief Is In the Public Interest.**

The public interest lies in upholding the First Amendment.  "[N]either the government nor the public generally can claim an interest in the enforcement of an unconstitutional law."  *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013).  As discussed above, the Act would burden vast amounts of protected speech, and so the public interest also strongly favors granting injunctive relief.

**E.     The Balance of the Equities Strongly Favors Injunctive Relief.**

The balance of equities favors injunctive relief.  If it takes effect, the Act will force online service providers to censor or eliminate content altogether.  On the other hand, delaying enforcement of the Act will not harm the State, which has at its disposal numerous other laws it can use to combat sexual exploitation of children and human trafficking, without infringing fundamental constitutional rights or the CDA.[13]

---

[13] No bond should be required to support the injunction, or, alternatively, any bond amount should be nominal.  The State cannot point to any economic loss it would suffer if the Act cannot be enforced and the status quo is preserved.  Moreover, courts regularly do not require bonds for injunctions based on constitutional challenges.  *See, e.g.*, *Moore v. Asbury Park. Bd. of Educ.*, 2005 WL 2033687, at *14 (D.N.J. Aug. 23, 2005); *First Puerto Rican Festival of N.J., Inc. v. City of Vineland*, 108 F. Supp. 2d 392, 396 (D.N.J. 1998) (waiving bond where injunction required to "vindicate … First Amendment rights, and the threat that protected speech may be quashed"); *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996).

## IV.   CONCLUSION

For the reasons stated above, the Court should grant Backpage.com's motion

for a temporary restraining order and issue an order to show cause, allowing full

briefing and argument while the TRO remains in effect, as to why a preliminary

injunction enjoining N.J.S.A. § 2C:13-10 should not issue.

Dated this 26th day of June, 2013.

McCusker, Anselmi, Rosen & Carvelli, P.C.

By   *s/ Bruce S. Rosen*
    Bruce S. Rosen
    210 Park Ave., Suite 301
    Florham Park, NJ  07932
    Telephone:  973-635-6300
    Fax:  973-456-0726
    E-mail:  brosen@marc-law.com

DAVIS WRIGHT TREMAINE LLP
Robert Balin
1633 Broadway
New York, NY 10019
Telephone:  (212) 489-8230
Facsimile:  (212) 489-8340
E-mail:  robbalin@dwt.com

DAVIS WRIGHT TREMAINE LLP
James C. Grant, *Pro hac vice* application to be filed
Eric M. Stahl, *Pro hac vice* application to be filed
Ambika K. Doran, *Pro hac vice* application to be filed
1201 Third Avenue, Suite 2200
Seattle, WA  98101
Telephone:  (206) 622-3150

*Attorneys for Plaintiff Backpage.com, LLC*