THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

BACKPAGE.COM, LLC,

            Plaintiff,

      v.

JOHN JAY HOFFMAN,  et al.,

            Defendants.

HON. DENNIS M. CAVANAUGH, U.S.D.J

Civil Action No. 13-3952

THE INTERNET ARCHIVE,

            Plaintiff,

      v.

JOHN JAY HOFFMAN, et. al.,

            Defendants.

Civil Action No. 13-3953

---

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION

JOHN J. HOFFMAN
Acting Attorney General of New Jersey
R.J. Hughes Justice Complex, P.O. Box 112
Trenton, New Jersey 08625-0112
Attorney for Defendants
(609) 984-9666
Stuart.Feinblatt@lps.state.nj.us

Stuart M. Feinblatt
Assistant Attorney General
    Of Counsel and On the Brief

Eric S. Pasternack
Susan M. Scott
Ashlea D. Thomas
Deputy Attorneys General
    On the Brief

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................. 1

STATEMENT OF FACTS ................................................................. 3

ARGUMENT ............................................................................... 9

PLAINTIFFS CANNOT MAKE THE EXTRAORDINARY
SHOWING TO JUSTIFY THE IMPOSITION OF A PRELIMINARY
OR PERMANENT INJUNCTION ENJOINING THE STATE FROM
ENFORCING THE ACT ................................................................. 9

    A.  Plaintiffs have failed to establish a reasonable likelihood of
        success on the merits because the challenged provision is not
        preempted by the Communications Decency Act and the Act
        does not violate the First or Fourteenth Amendments or the
        Commerce Clause ................................................................. 10

        I.    The CDA does not preempt the Act because the New
              Jersey criminal statute can exist in tandem with § 230,
              and the two statutes do not conflict ................................. 10

        II.   The Act does not violate the First or Fourteenth
              Amendments because it regulates unprotected speech
              and, as a content neutral regulation, it satisfies
              intermediate scrutiny ................................................... 18

              a.    Summary of the Argument .................................... 18

              b.    The Act does not violate the First and Fourteenth
                    Amendments because it does not create a strict
                    liability crime ...................................................... 20

              c.    The Act does not violate the First Amendment
                    because it prohibits the publication, display, or
                    dissemination of an illegal transaction, which is
                    not protected by the First Amendment ................. 23

d.   The Act is subject to and satisfies intermediate
scrutiny analysis ............................................................. 25

1.   The Act is content neutral ...................................... 25

2.   The Act is subject to intermediate scrutiny
analysis ................................................................. 28

e.   The Act is not unconstitutionally vague because it
provides sufficient clarity and precise guidance as
to what conduct is prohibited under the Act......................... 36

III.   The Act does not violate the Commerce Clause because
it seeks to further a legitimate local public interest
without imposing an excessive burden on interstate
commerce....................................................................... 38

B.   Plaintiffs have not established any legal harm, let alone
imminent irreparable harm ........................................................ 42

C.   The public interest overwhelmingly favors enforcement of the
challenged provision ................................................................. 43

D.   The balancing of the equities falls in favor of denying Plaintiffs'
request for a temporary restraining order and protecting New
Jersey's children from sexual abuse and exploitation............................. 43

CONCLUSION ....................................................................................... 44

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003). ...................................................... 33

*Am. Express Travel Related Servs. v. Sidamon-Eristoff*,
   669 F.3d 359 (3d Cir. 2012)........................................................................ 40

*Arizona v. United States*, ___ U.S. ___, 132 S. Ct. 2492 (2012). ................... 11, 16

*AT&T v. Winback*, 42 F.3d 1421 (3d Cir. 1994). ....................................................... 10

*Backpage.com, LLC v. Cooper*,
   2013 U.S. Dist. LEXIS 55100 (M.D. Tenn. 2013)....................................... passim

*Backpage.com, LLC v. McKenna*,
   881 F. Supp. 2d 1262 (W.D. Wa. 2012). ...................................................... passim

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003)................................................ 12, 16

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973). ................................................. 30, 32

*Brown v. Entm't Merchs. Ass'n*, 131 S.Ct. 2729 (2011)......................................... 29

*C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994). ..................... 40

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994)............................................................ 29

*Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*,
   462 F.3d 249 (3d Cir. 2006)..................................................................... 38, 40

*Conchatta Inc. v. Miller*, 458 F.3d 258 (3d Cir. 2006). ......................................... 28

*Connection Distrib. Co. v. Holder*, 557 F.3d 321 (6th Cir. 2009)................. passim

*Doe v. GTE Corp.*, 347 F.3d 655 (7th Cir. 2003)..................................................... 13

*Doe v. Sexsearch.com*, 551 F.3d 412 (6th Cir. 2008). ............................................ 13

*Eccles v. Peoples Bank of Lakewood Vill.*, 333 *U.S.* 426 (1948)..............................9

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157, 1175 (9th Cir. 2008). .........................................16, 17

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989)...........................................29

*Frank's GMC Truck Ctr., Inc. v. General Motors Corp.*,
    847 F.2d 100 (3d Cir. 1988)...................................................9

*Free Speech Coalition, Inc. v. AG of the United States*,
    677 F.3d 519 (3d Cir. 2012)...........................................26, 27, 28

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949)...................................23

*Great Atl. Pac. Tea Co. v Cottrell*, 424 U.S. 366 (1976)........................................38

*Hatch v. Superior Court*, 94 Cal. Rptr. 2d 453 (Cal. Ct. App. 2000) ....................42

*Healy v. Beer Institute*, 491 U.S. 324 (1989). ..........................................40

*Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010)...................25, 26, 28

*Humphrey*, 608 F.3d 955 (6th Cir. 2010). ...........................................21

*In re Arthur Treacher's Franchisee Litigation*,
    689 F.2d 1137 (3d Cir. 1982)................................................10

*Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004). ............................9

*Krasner*, 841 F. Supp. 649 (M.D. Pa. 1993). ..........................................22

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992)...........................................10

*Members of City Council of Los Angeles v. Taxpayers for Vincent*,
    466 U.S. 789 (1984)........................................................30

*Morton v. Beyer*, 822 F.2d 364 (3d Cir. 1987)...........................................9

*New York v. Ferber*, 458 U.S. 747 (1982)..........................................................passim

People v. Foley, 731 N.E.2d 123 (N.Y. 2000). ........................................ 42

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)....................................... 38

*Pittsburg Press Co. v. Pittsburg Comm'n. On Human Relations*,
    413 U.S. 376 (1973)................................................................... 23, 24

*Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986)............................ 26

*Seese v. Volkswagenwerk A. G.*, 648 F.2d 833 (3d Cir. 1981)................. 20

*State v. Gandhi*, 201 N.J. 161 (2009). ...................................................... 21

*United States v. Deverso*, 518 F.3d 1250 (11th Cir. 2008). ..................... 21

*United States v. Fletcher*, 634 F.3d 395 (7th Cir. 2011)........................... 21

*United States v. Humble*, 714 F. Supp. 794 (E.D.La. 1989). ................... 31

*United States v. Knox*, 977 F.2d 815 (3d Cir. 1992). ........................... 22, 30

*United States v. Malloy*, 568 F.3d 166 (4th Cir. 2009). ........................... 22

*United States v. United States District Court*,
    858 F.2d 534 (9th Cir. 1988). ...................................................... 22

*United States v. Wicker*, 933 F.2d 284 (5th Cir. 1991). ........................... 31

*United States v. Williams*, 444 F.3d 1286 (11th Cir. 2006). ..................... 24

*United States v. Williams*, 553 U.S. 285 (2008).................................passim

*United States v. Wilson*,
    2010 U.S. Dist. LEXIS 75149 (S.D. Fla. July 27, 2010). ................... 31

*Voicenet Commcn's, Inc. v. Corbett*,
    2010 U.S. Dist. LEXIS 95619 (E.D. Pa. Sept. 13, 2010). ................... 14

*Voicenet Communications, Inc. v. Corbett*,
   2006 U.S. Dist. LEXIS 61916 (E.D. Pa. Aug. 30, 2006). ................................... 14

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989). ................................ 26, 28, 36

*West Coast Truck Lines, Inc., v. Arcata Cmty. Recycling Ctr., Inc.*,
   846 F.2d 1239 (9th Cir.). ................................................................. 13

*Winter v. NRDC, Inc.,* 555 U.S. 7 (2008) ................................................... 9

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997). ................................. 16

**Statutes**

18 U.S.C. § 1591. ................................................................................. 15

18 U.S.C. § 215 ................................................................................... 31

18 U.S.C. § 2257. .................................................................... 26, 27, 34, 35

47 U.S.C. § 231. .................................................................................. 34

N.J. Stat Ann. § 2C:13-10 .......................................................... 3, 7, 33, 39

N.J. Stat. Ann. § 2C:2-2 .................................................................. 7, 20

N.J. Stat. Ann. § 2C:34-1a ..................................................................... 8

N.J. Stat. Ann. § 2C:34-1b ..................................................................... 8

## PRELIMINARY STATEMENT

The State of New Jersey has passed an important law that makes it a crime to knowingly publish, disseminate or display advertisements for the commercial sexual abuse of minors. It is undisputed that such advertising is a key method by which human traffickers make minors available for commercial sex acts. Plaintiffs do not challenge the enforcement of the law to the extent it applies to those persons who knowingly purchase the advertising but assert that for a variety of practical and legal reasons, the law cannot be enforced against those who publish such advertisements in electronic media. As demonstrated in this brief, Plaintiffs' arguments should be rejected in all respects.

Despite Backpage.com's claimed efforts to self-police advertisements for commercial sex involving minors, Defendants' supporting papers demonstrate without doubt that the company's adult and dating advertising sections are filled with advertisements that involve prostitution.

The statute being challenged does not impose liability if a website negligently missed an advertisement prohibited under the statute during its review process. Rather, the statute only applies if it can be shown that the website provider knowingly published an advertisement soliciting the illegal act of prostitution and that the advertisement contained a depiction of a minor. This is an appropriate and

acceptable use of the State's police powers to reduce sexual abuse of minors, prostitution, and promotion of prostitution.

The Communications Decency Act ("CDA") does not preempt the New Jersey statute as the CDA, by its express terms, only preempts state law that is inconsistent with the federal law. As demonstrated herein, New Jersey's statute is consistent with the legislative intent of Congress, the statutory language of the federal statute, and related federal criminal laws. Enforcement of the State's statute will further the purposes of the CDA.

Second, the State's statute does not violate the First and Fourteenth Amendments. Plaintiffs' position rests on a fundamental mischaracterization of the New Jersey Act. The statute does not impose strict liability but rather requires proof of knowingly culpability as to all material elements of the crime. Although knowingly culpability does not apply to the age of the minor depicted in the advertisements, the First Amendment does not require a mistake of age defense. Moreover, the challenged statute does not regulate speech protected by the First Amendment because it only prohibits offers to engage in illegal transactions -- commercial sex or prostitution with minors. To the extent the statute incidentally regulates protected speech, the statute is content neutral and is not underinclusive, over broad, or vague.

Finally, the statute does not violate the dormant Commerce Clause because it narrowly targets a small group of actors who promote commercial sex acts

to take place in this State and does not impose an excessive burden on interstate commerce.

Having failed to meet their burden of demonstrating the probability of success on the merits, Plaintiffs necessarily cannot satisfy the remaining requirements for the issuance of a preliminary injunction. Accordingly, the Court should vacate the temporary restraining order entered on June 28, 2013, and allow the State to enforce this important statute.

## STATEMENT OF FACTS

**A.     Human Trafficking and Sexual Exploitation of Children in New Jersey through the Internet**

Human trafficking, particularly the trafficking of minors for commercial sex abuse, is unquestionably a horrible evil. It is a form of modern-day slavery and a violation of fundamental human rights. There are reportedly more than 12 million victims of human trafficking, although it is estimated that this figure could actually be as high as 27 million. N.J. Stat Ann. § 2C:13-10a(1). According to the National Center for Missing and Exploited Children, 100,000 human trafficking victims are American children with an average age of 13 years old. N.J. Stat Ann. § 2C:13-10a(2). New Jersey first criminalized human trafficking in 2005. See N.J. Stat. Ann. § 2C:13-8.

The internet has become the preferred means of advertising the availability of children for sex. Such advertising can be purchased or published more

quickly than in traditional media, allowing pimps to move victims quickly to different locations.  Declaration of Lisa A. Shea ("Shea Decl."), ¶3.  Criminal investigations across the country have uncovered dozens of instances in which human traffickers have used Backpage.com to sexually exploit minors.  See letter dated September 16, 2011 from the National Association of Attorneys General to Backpage.com (Attached as Exhibit G to Declaration of Ambika K. Doran ("Doran Decl.")).  Backpage.com and similar websites have become a hub for these reprehensible illegal activities. *Id.*

**B.  Backpage.com's Role in Facilitating Prostitution Involving Minors**

Plaintiff Backpage.com runs an online classified advertising service located at www.backpage.com.  The Chief Operating Officer for Backpage.com estimates that his company is the second largest online classified advertising service in the country.  Declaration of Carl Ferrer ("Ferrer Decl"), ¶2.  Backpage.com offers its services in all fifty states and the District of Columbia.   Ferrer Decl, ¶3. Backpage.com's users post millions of classified ads on their website each month, including more than 2.9 million ads in May 2013.  Ferrer Decl, ¶4.

The advertisements posted on Backpage.com's website are categorized first by state, city or region of the state.  They are then categorized by topic such as local places, community, buy/sale/trade, automotive, musician, rentals, real estate, jobs, dating, adult and services.  The adult advertisement section in turn is broken down into several subcategories, namely escorts, body rubs, strippers and strip clubs,

dom and fettish, TS (transsexual), male escorts, phone websites, and adult jobs.  Ferrer Decl., Exh. A.

Backpage.com charges approximately $1-17 for users to post ads in the adult category.  Ferrer Decl, ¶6.  Backpage.com's annual revenue from its adult services section was approximately $22.7 million in 2011.  Doran Decl., Exh. G. According to a 2012 article from the Wall Street Journal, this represents approximately 79% of U.S. online advertising for categories typically described as massage or escort services.  Shea Decl, Exh. B.

Backpage.com has represented in court papers that it takes several steps to prevent misuse of its website, including offers by users for illegal services or exploitation of minors.  Among other things, Backpage.com asserts that its terms of use prohibit advertisements relating to prostitution and the sexual exploitation of minors, and that users seeking to post or view materials in the adult categories must verify that they are at least 18 years old, and agree not to post solicitations for commercial sex acts -- although they are not required to upload any documentation, such as drivers' licenses, that would confirm their age representations.  Ferrer Decl., ¶8-10.  Finally, Backpage.com claims that it takes "extensive, voluntary monitoring measures to prevent and remove improper user postings" by using automatic filters for advertisements containing some 38,000 terms and by conducting two levels of manual review of ads for the adult and dating categories.  Ferrer Decl., ¶13.

Although Backpage.com claims that it blocks over 750,000 posts each month (Ferrer Decl., ¶14), criminal investigations in New Jersey have uncovered advertisements on Backpage.com containing offers for prostitution that were obviously not blocked. Shea Decl., ¶4. A recent random review of advertisements on Backpage.com's New Jersey website, adult escort category, disclosed several advertisements that the investigator strongly believed were for prostitution. Many of the advertisements were accompanied by provocative photographs of scantily clad females whose age is unknown. No advertisements involving "legitimate" adult escort services were found. Shea Decl., ¶6.

### C.   New Jersey Acts to Stop Human Trafficking of Minors

Earlier this year, the Legislature passed comprehensive legislation addressing human trafficking designated as the "Human Trafficking Prevention, Protection and Treatment Act," P.L. 2013, c. 51. This legislation represents a wide-ranging update and strengthening of existing state law to prevent human trafficking in New Jersey. For example, the legislation created the Commission on Human Trafficking that, among other things, is tasked with recommending legislation to improve existing laws concerning human trafficking and victim assistance programs, established a "Human Trafficking Survivor's Assistance Fund," and increased the criminal sanctions for those who traffic individuals.

At issue in this case is a specific provision of the legislation, N.J. Stat. Ann. § 2C:13-10b(1) (the "Act"), that provides criminal penalties for a person who "knowingly publishes, disseminates, or displays, or causes directly or indirectly, to be published, disseminated, or displayed, any advertisement for a commercial sex act, which is to take place in this State and which includes the depiction of a minor."[1] A "[c]ommercial sex act" is defined as "any act of sexual contact or sexual penetration, …, or any prohibited sexual act, …, for which something of value is given or received by any person." N.J. Stat. Ann. § 2C:13-10e. "'Advertisement for a commercial sex act' means any advertisement or offer in electronic or print media, including the Internet, which includes either an explicit or implicit offer for a commercial sex act to occur in this State." *Id.* It is not a defense that the actor did not know the age of the minor. N.J. Stat. Ann. § 2C:13-10f(1). A person who commits this offense is guilty of a first-degree crime. N.J. Stat. Ann. § 2C:13-10c.

In New Jersey, N.J. Stat. Ann. § 2C:2-2c(1) governs the interpretation and construction of criminal statutes with respect to culpability requirements. The "[p]rescribed culpability requirement applies to all material elements [set forth in the statute]." N.J. Stat. Ann. § 2C:2-2(c)(1). Accordingly, the knowingly culpability

---

[1] Pursuant to N.J. Stat. Ann. § 2C:13-10b(2), a "person [who] knowingly purchases advertising in this State for a commercial sex act which includes the depiction of a minor," also commits the offense of advertising commercial sexual abuse of a minor. However, Plaintiffs are not challenging the enforceability of this provision.

7

requirement necessarily also applies to "causes directly or indirectly, to be published, disseminated, or displayed."

It is undisputed that our law prohibits promoting prostitution, a commercial sex act, regardless of the age of the victim. N.J. Stat. Ann. § 2C:34-1b. Prostitution is defined as "sexual activity with another person in exchange for something of economic value, or the offer or acceptance of an offer to engage in sexual activity in exchange for something of economic value," in short, a commercial sex act. N.J. Stat. Ann. § 2C:34-1a(1). Moreover, sexual contact or sexual penetration with a minor is a crime. N.J. Stat. Ann. § 2C:14-2. Further, under N.J. Stat. Ann. § 2C:34-1b(3), it is a crime to "knowingly promote[] prostitution of a child under 18 whether or not the actor mistakenly believed that the child was 18 years of age or older, even if such mistaken belief was reasonable." As such, N.J. Stat. Ann. § 2C:34-1b(3) prohibits the knowing promotion of a commercial sex act with a minor. Therefore, the Act unquestionably regulates advertisements and offers to engage in illegal transactions. As discussed later in this brief, such advertisements and offers to engage in illegal transactions are not afforded protection under the First Amendment.

8

## ARGUMENT

### PLAINTIFFS CANNOT MAKE THE EXTRAORDINARY SHOWING TO JUSTIFY THE IMPOSITION OF A PRELIMINARY OR PERMANENT INJUNCTION ENJOINING THE STATE FROM ENFORCING THE ACT.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.,* 555 U.S. 7, 24 (2008); *see also Frank's GMC Truck Ctr., Inc. v. General Motors Corp.,* 847 F.2d 100, 102 (3d Cir. 1988). "Especially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative." *Eccles v. Peoples Bank of Lakewood Vill.,* 333 U.S. 426, 431 (1948).

Plaintiffs bear the burden of affirmatively demonstrating four conditions before this extraordinary relief is granted:

> (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.
>
> [*Kos Pharms., Inc. v. Andrx Corp.,* 369 F.3d 700, 708 (3d Cir. 2004).]

The first two conditions are mandatory. "To obtain a preliminary injunction, the moving party must demonstrate both a likelihood of success on the merits and the probability of irreparable harm if relief is not granted." *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir. 1987); *see also In re Arthur Treacher's Franchisee Litigation*, 689

F.2d 1137, 1143 (3d Cir. 1982) (commenting that "[a] failure to show a likelihood of success or a failure to demonstrate irreparable injury [] must necessarily result in the denial of a preliminary injunction."). When the remaining two factors are relevant, an applicant must demonstrate that "all four factors favor preliminary relief." *AT&T v. Winback*, 42 F.3d 1421, 1427 (3d Cir. 1994). Measured by these rigorous standards, Plaintiffs cannot establish a right to a preliminary injunction.[2]

> **A.     Plaintiffs have failed to establish a reasonable likelihood of success on the merits because the challenged provision is not preempted by the Communications Decency Act and the Act does not violate the First or Fourteenth Amendments or the Commerce Clause.**

> **I.     The CDA does not preempt the Act because the New Jersey criminal statute can exist in tandem with § 230, and the two statutes do not conflict.**

Upon close review, the Act is not preempted by the CDA because the Act is consistent with the legislative intent of Congress, the statutory language of the

---

[2] The Internet Archive has represented that it is a non-profit organization that offers access to researchers and others of historical collections of content from the internet including texts, audio, software, as well as archived web pages. Declaration of Brewster Kahle ("Kahle Decl."), ¶¶4-5. Internet Archive regularly gathers "snapshots" of content on the internet through its "crawling" and indexing processes. *Id.* at ¶7. It does not have the ability to screen the materials it archives. *Id.* at ¶9. Given its business model, Internet Archive does not fall within the scope of the Act because it is not in a position to knowingly publish ads of commercial sex acts containing depictions of minors. Moreover, given that it collects historical internet content, rather than current content, it also does not fall within the scope of the Act for this additional reason. Thus, it does not have standing because it cannot demonstrate actual or threatened injury as a result of the enforcement of the Act. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

CDA, and related federal criminal laws regarding the sexual exploitation of children. Focusing almost entirely on § 230(c)(1) and relying on the earlier decisions in *Cooper* and *McKenna*, Plaintiffs argue that the Act is inconsistent with the CDA because internet website providers cannot be treated as publishers under the CDA. *See* Backpage.com Br., 22; IA Br., 10; *Backpage.com, LLC v. Cooper*, 2013 U.S. Dist. LEXIS 55100 (M.D. Tenn. 2013); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wa. 2012). But the decisions in *Cooper* and *McKenna* should not be followed. A court must look at the entire statute, including § 230(e)(3), and congressional intent to determine whether the Act conflicts with the intended purpose and application of the CDA.

Federal law can preempt state law in only three circumstances: first, when Congress expressly preempts state law; second, when state law attempts to regulate conduct in a field that Congress intended to govern exclusively; and third, when state law actually conflicts with federal law. *Arizona v. United States*, ___ U.S. ___, 132 S. Ct. 2492, 2500-01 (2012). In the CDA, Congress expressly acknowledged that § 230 could coexist with consistent state law: "Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section." 47 U.S.C. § 230(e)(3). Under this express pronouncement, the Act is not preempted by the CDA unless it is inconsistent with the CDA.

Congress passed the CDA in 1996 for several reasons, including to promote the unregulated development of free speech on the internet, to advance the development of e-commerce, and to encourage website providers and users to self-police the internet for offensive material. *Batzel v. Smith*, 333 F.3d 1018, 1027-28 (9th Cir. 2003). But Congress did not intend for § 230 immunity to extend to criminal prosecutions. The legislative history is clear, with Congress's expressed intent found in the Conference Report: § 230 provides "'Good Samaritan' protections from <u>civil liability</u> . . . ." H.R. Rep. No. 104-458, at 194 (1996) (attached hereto as Ex. A); *see also id.* ("[T]he House amendment protects from <u>civil liability</u> those providers and users of interactive computer services for actions to restrict or enable restriction of access to objectionable online material."); *id.* ("these protections from <u>civil liability</u> apply to so-called 'cancelbotting'") (all emphases added). Indeed, Congress never suggested in the Conference Report that the CDA would provide immunity from <u>criminal</u> prosecutions, yet Congress mentioned protection from <u>civil</u> liability three separate times in that same Conference Report. H.R. Rep. No. 104-458, at 194. Courts that have held otherwise -- including the decisions in *Cooper* and *McKenna* -- have improperly expanded congressional intent too far.

Notably, § 230(c)(2) is entitled "Civil liability," which strongly suggests that those provisions apply only in a civil context. And the title of § 230(e)(1) reads, "No effect on criminal law," which suggests a limited application of the statute. *See*

*West Coast Truck Lines, Inc., v. Arcata Cmty. Recycling Ctr., Inc.*, 846 F.2d 1239, 1243 (9th Cir.) ("Although titles cannot expand the meaning of a statute, they may be helpful in interpreting ambiguities within the context of the statute."). Indeed, at least two courts have questioned the applicability of CDA immunity to criminal prosecutions. *See Doe v. Sexsearch.com*, 551 F.3d 412, 415 (6th Cir. 2008) (while reserving a ruling on scope of CDA, refusing to adopt district court's CDA interpretation that would have read § 230 so broadly as to abrogate all civil or criminal state or common-law causes of actions brought against interactive internet services); *Doe v. GTE Corp.*, 347 F.3d 655, 660 (7th Cir. 2003) ("Why should a law designed to eliminate ISPs' liability to the creators of offensive material end up defeating claims by the victims of tortious or <u>criminal</u> conduct?") (emphasis added).

Furthermore, the majority of the cases cited by Plaintiffs involve an interpretation of CDA immunity for civil liability. *See*, *e.g.*, Backpage.com Br., 18-19; IA Br., 10-12. Besides *McKenna* and *Cooper*, two other cases cited simply repeat what § 230(e)(3) provides and Defendants do not challenge: that no cause of action may be brought under an <u>inconsistent</u> state law. Notably, in *People v. Gourlay*, the court found that because the state criminal statute required an intentional action directed at a child, the application of that statute was consistent with the CDA, and therefore not preempted by the CDA. 2009 Mich. App. LEXIS 461 at *12-13 (Mich. Ct. App. Mar. 3, 2009). Second, the court found that a jury instruction regarding § 230

13

immunity was not necessary to avoid a conviction for a separate offense when the defendant distributed child sexually abusive material as both a service provider and a content user. *Id.* at *13-17. And in *Voicenet Communications, Inc. v. Corbett*, which involved a civil claim stemming from the execution of a search warrant enforcing a state criminal law, the court found that the "CDA provides internet service providers immunity from <u>inconsistent</u> state criminal laws[.]" 2006 U.S. Dist. LEXIS 61916, *2, *5-6, *14 (E.D. Pa. Aug. 30, 2006) (emphasis added). Denying only defendants' motion to dismiss, the court did not decide whether the state statute was consistent with the CDA at that early stage in the proceedings. *Id.* at *11-15; *see also Voicenet Commcn's, Inc. v. Corbett*, 2010 U.S. Dist. LEXIS 95619, *51 (E.D. Pa. Sept. 13, 2010) (granting defendants' motion for summary judgment on plaintiffs' request for declaration that they fulfilled the requirements of CDA immunity because plaintiffs presented no current case or controversy). Of course, while neither *Gourlay* nor *Voicenet* are controlling authority, neither is *McKenna* nor *Cooper*. A careful look at the statute, legislative history, and case law reveals that Congress focused on providing immunity from defamation and libel actions, not immunizing a website provider from consistent state laws that impose criminal liability for advertising prostitution.

Moreover, the Act complies with, and in fact, promotes, the important CDA policy to "ensure vigorous enforcement of Federal criminal laws to deter and

14

punish trafficking in obscenity, stalking, and harassment by means of a computer." 47 U.S.C. § 230(b)(5).  The CDA expressly excludes federal criminal laws from its reach. 47 U.S.C. § 230(e)(1).  Through this exemption, Congress suggested that it did not believe that certain criminal prosecutions would threaten the continued development of the internet as a forum for ideas.  To the contrary, a website provider <u>may</u> be prosecuted under federal criminal law for offenses involving the sex trafficking of children.  18 U.S.C. § 1591.  Just as § 1591 aims to curb any profiting from the trafficking of children, the Act also seeks to curb the advertising of trafficking for that same profit.  *See* 22 U.S.C. § 7101.  As such, by criminalizing conduct related to unprotected speech, the New Jersey statute is akin to those federal laws that do not fall within the immunity provisions of the CDA.  Indeed, the New Jersey Legislature specifically intended to eliminate the sex trafficking of minors "in conformity with federal laws prohibiting the sexual exploitation of children." N.J. Stat. Ann. § 2C:13-10a(8).

The CDA only requires that a state law be <u>consistent</u> with the CDA to avoid preemption, not identical.  47 U.S.C. § 230(e)(3).  And the state law must be consistent with the entire CDA, not just § 230(c)(1).  The entirety of § 230 must be read and interpreted in harmony with the intent of Congress to "preserve the free-flowing nature of Internet speech and commerce without unduly prejudicing the enforcement of other important state and federal laws." *Fair Hous. Council of San*

*Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008).  Such

a reading reveals immunity under the CDA does not apply to criminal prosecutions.

      Not only is the Act consistent with federal criminal law, the statute's

culpability requirement that the State prove knowledge of the content of the

advertisement promotes that careful balance that Congress struck between

encouraging internet speech, promoting voluntary self-monitoring, and regulating

criminal activity.  Indeed, while recognizing the importance of the free exchange of

information over the internet, Congress never envisioned leaving the internet entirely

unregulated.  *See Batzel*, 333 F.3d at 1026 ("The primary goal of the Act was to

control the exposure of minors to indecent material.") (emphasis added) (citing Pub.

L. No. 104-104, Title V (1996); H.R. Rep. No. 104-458, at 81-91; S. Rep. No. 104-

230, at 187-193 (1996); S. Rep. No. 104-23, at 9 (1995)) .  Rather, Congress sought

only to keep government interference to a minimum.  *See Zeran v. Am. Online, Inc.*,

129 F.3d 327, 330 (4th Cir. 1997).

      Consistent with these goals, Congress could never have intended to

immunize a website provider who willfully ignores an advertisement for

prostitution, a form of unprotected speech.  *See Arizona*, 132 S. Ct. at 2501 (quoting

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)) ("[C]ourts should assume

that 'the historic police powers of the States' are not superseded 'unless that was the

clear and manifest purpose of Congress.'").  To prove a violation of the Act, the state

must show that the website provider <u>knew</u> that the advertisement solicits or offers the illegal act of prostitution. Thus, it is not the effort to screen that creates liability, but the website provider's affirmative choice to ignore a post that it knew contained an advertisement for prostitution.

The courts that have extended § 230 immunity to willful criminal acts have incorrectly interpreted Congress's intent as providing websites with absolute immunity.  Consider the situation where a user posts an advertisement to hire a hit man to kill their spouse.  When the website provider views the solicitation for murder and the words and content are unambiguous, Congress surely did not intend to encourage that provider to consciously ignore that criminal advertisement.  The CDA was "not meant to create a lawless no-man's-land on the Internet." *Fair Housing*, 521 F.3d at 1164.

The application of the material elements of this Act separates the Act from the statutes considered in *McKenna* and *Cooper*.  In *McKenna*, the court found the Washington statute inconsistent with, and thus preempted by, the CDA after focusing on only one element of the entire state statute -- that the service provider knowingly published, disseminated, displayed, or caused to be published, disseminated, or displayed, the advertisement.  *McKenna*, 881 F. Supp. 2d at 1273. But a website provider cannot be held liable under New Jersey law for simply knowing that the advertisement is published; the provider must also know that the

17

advertisement involves a solicitation or offer of prostitution.  Given that heightened culpability, website providers have no reason to modify their efforts to monitor content.  Furthermore, the Tennessee statute evaluated in *Cooper* imposed criminal liability on service providers "for selling or offering to sell advertisements," a requirement absent from the New Jersey statute.  *Cooper*, 2013 U.S. Dist. LEXIS 55100 at *14.  Thus, when analyzing the consistency between the Act and the CDA, this Court should not follow the decisions in *McKenna* and *Cooper*.

Because the Act can exist in tandem with § 230, and the two statutes do not conflict, the Act is not preempted by the CDA.[3]

## II.   The Act does not violate the First or Fourteenth Amendments because it regulates unprotected speech and, as a content neutral regulation, it satisfies intermediate scrutiny.

### a.  Summary of the Argument.

The Act regulates the publication, dissemination and display of advertisements to engage in illegal transactions. Such advertisements are illegal and not protected by the First Amendment. Therefore, the knowing publication, display, or

---

[3] Because the two Plaintiffs have challenged N.J. Stat. Ann. § 2C:13-10b(1) under the CDA, which applies only to internet content, and they only operate on the internet, both Plaintiffs lack standing to challenge the New Jersey statute's constitutionality as applied to print media.  Moreover, the Act also applies to print media; for example, the pamphleteer who distributes paper advertisements for prostitution on the street corner.  Because the CDA applies only to internet services, print advertisers cannot benefit from CDA immunity. For that reason, even if this Court finds that the CDA preempts some aspects of the Act, it must only enjoin criminal prosecutions relating to electronic media, not print media.

dissemination of such illegal and unprotected speech is likewise unprotected by the First Amendment. Plaintiffs cannot hide behind the veil of publication and assert First Amendment protection over their third-party publication, display, or dissemination of advertisements to engage in illegal transactions.

Plaintiffs erroneously argue that the Act is unconstitutional because it does not contain a scienter requirement. Their argument is premised on an incorrect construction of the Act. Pursuant to New Jersey law as to the interpretation of criminal statutes and the actual wording of the statute itself, the knowingly culpability requirement applies to all material elements set forth in the Act. Although the Act does not afford a mistake of age defense, the Constitution does not require it.

To the extent that the Act has an incidental impact on protected speech, as speculated by Plaintiffs, the Act does not run afoul of the First Amendment because it is subject to intermediate scrutiny and passes constitutional muster. The Act advances the substantial government interest of preventing the sexual exploitation of children by quashing the advertising market, led by Backpage.com, which peddles advertisements for sex with minors, thereby facilitating the human trafficking of children. Additionally, the Act is not underinclusive because it advances this substantial government interest. Moreover, the Act is not overbroad because it requires that an actor knowingly engage in the prohibited conduct and it only regulates an illegal activity; it does not implicate lawful speech, such as dating posts, personal

ads, and social networking, absent a knowing offer for a commercial sex act and a depiction of a minor. Nor is the Act unconstitutionally vague because the "knowingly" scienter requirement provides sufficient clarity to inform a person of ordinary intelligence of what conduct is prohibited under the Act and provides sufficient guidance for a fact finder to determine whether an actor has violated its provisions.

### b. The Act does not violate the First and Fourteenth Amendments because it does not create a strict liability crime.

Plaintiffs argue that the Act violates the First Amendment because the statute does not include a scienter requirement. (Backpage.com Br., 24-25; IA Br., 14-15). However, Plaintiffs' argument fails because, regardless of how the District Courts in *Cooper* and *McKenna* construed their state's statutes, the "knowingly" culpability requirement applies to each element of the statute in New Jersey.

This Court is required to "bow to the interpretation of the highest court of a state as 'the final arbitor of what is state law.'" *Seese v. Volkswagenwerk A. G.*, 648 F.2d 833 (3d Cir. 1981). N.J. Stat. Ann. § 2C:2-2(c)(1), which governs the interpretation and construction of the culpability requirements found in the State's criminal statutes, provides that the "[p]rescribed culpability requirement applies to all material elements" set forth in a statute "unless a contrary purpose plainly appears."

*See also State v. Gandhi*, 201 N.J. 161 (2009) (observing that a "statute's culpability requirement generally applies to all elements of a crime.").

As such, Plaintiffs' conjectural risk is just wrong; the "knowingly" culpability requirement precludes their suggestion that one third-party post would result in criminal prosecutions of all search engines that identify the site in response to queries, blogs, forums, social networking sites, or individuals' emails that link to the website; or internet service providers. (Backpage.com Br., 31). The Act requires such publication, dissemination, or display, be made knowingly, a critical component missing from their parade of horribles.

Plaintiff Backpage.com further contends that the statute is unconstitutional because it does not provide for a mistake of age defense. (Backpage.com Br., 25). However, "the Constitution does not mandate a mistake of age defense . . . ." *United States v. Deverso*, 518 F.3d 1250, 1257-58 (11th Cir. 2008). While the District Courts in *Cooper* and *McKenna* concluded that the First Amendment requires such a defense, this Court should follow the majority rule that no such defense is constitutionally required. *See United States v. Fletcher*, 634 F.3d 395, 403 (7th Cir. 2011) ("[r]ecognizing a mistake-of-age defense would clearly be at odds" with the objective of "protecting children from sexual exploitation"); *United States v. Humphrey*, 608 F.3d 955, 962 (6th Cir. 2010) ("First Amendment concerns, when balanced against the 'surpassing importance of the government's interest in

safeguarding the physical and psychological wellbeing of childrens' do not oblige us to engraft a reasonable mistake of age defense onto § 2251(a)"); *United States v. Malloy*, 568 F.3d 166, 176 (4th Cir. 2009) (the First Amendment does not require reasonable mistake of age defense); *but see United States v. United States District Court*, 858 F.2d 534, 540 (9th Cir. 1988).

The District Court in *McKenna* was bound by the Ninth's Circuit's decision in *United States v. United States District Court,* 858 F.2d at 540. In contrast, this Court is not obligated by such a precedent because the Third Circuit reserved determination of whether a mistake of age defense is required in this Circuit for another day. *United States v. Knox*, 977 F.2d 815, 825 n.7 (3d Cir. 1992). Neither "precedent nor common sense" require the imposition of such a defense here, which "offers little benefit at great cost." *Krasner*, 841 F. Supp. 649, 656 n.5 (M.D. Pa. 1993). Therefore, this Court should be persuaded by the Fourth, Sixth, Seventh, and Eleventh Circuits, and find that the Constitution does not require a reasonable mistake of age defense.

Nonetheless, if this Court determines that a reasonable mistake of age defense is required, the Act would only impose strict liability on the depiction of a minor after an actor has already knowingly engaged in the criminal activity; i.e., the advertisement of a commercial sex act, which is not protected by the First Amendment.

22

### c. The Act does not violate the First Amendment because it prohibits the publication, display, or dissemination of an illegal transaction, which is not protected by the First Amendment.

The Act does not regulate speech protected by the First Amendment because it only prohibits the advertisement of an illegal transaction -- that being, prostitution, the promotion of prostitution, sex with minors, and commercial sex acts depicting minors. Therefore, by attempting to close the advertising market for child sex trafficking, the Act serves a purpose unrelated to the content of any protected speech.

"Offers to engage in illegal transactions are categorically excluded from First Amendment protection[,]" as are the publication of such offers. *United States v. Williams*, 553 U.S. 285, 297 (2008) (citing *Pittsburg Press Co. v. Pittsburg Comm'n. On Human Relations*, 413 U.S. 376, 388 (1973) (holding that newspaper could be forbidden from publishing want ad proposing sale of narcotics or soliciting prostitutes and that speech may be banned even when illegality is less overt); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949). In *Williams*, a state statute criminalized offers to provide or requests to obtain child pornography and obscenity involving actual children. *Id.* The Eleventh Circuit, like the District Courts in *Cooper* and *McKenna*, incorrectly held that because the statute "is not limited to commercial speech but extends also to non-commercial promotion, presentation, distribution, and solicitation," it is a content-based restriction requiring strict scrutiny analysis. *Id.* at

297-98 (citing *United States v. Williams*, 444 F.3d 1286, 1298 (11th Cir. 2006)). The

Supreme Court, however, found that the Eleventh Circuit was mistaken. *Id.* at 298.

       The Supreme Court explained that the categorical exclusion of offers to

engage in illegal transactions is not based on its status as commercial speech, but

rather on the principle that such offers "have no social value and thus, like obscenity,

enjoy no First Amendment protection[.]" *Id.* Therefore, offers to engage in illegal

transactions, "whether as part of a commercial exchange or not, are similarly

undeserving of First Amendment protection." *Id.* The Supreme Court, accordingly,

determined that the Eleventh Circuit erred by engaging in strict scrutiny analysis of

the statute in *Williams*, *id.* at 299, the same error committed by the District Courts in

*Cooper* and *McKenna*.

       Under New Jersey law, prostitution, the promotion of prostitution, and

sex acts involving minors are illegal. By prohibiting the distribution of advertisement

for such activities, the Act mirrors the statute in *Williams* and the ordinance in

*Pittsburgh Press Company*. Therefore, the advertisement for a commercial sex act

with a depiction of a minor -- i.e., an offer to engage in an illegal transaction -- is

categorically excluded from First Amendment protection.

       Moreover, the First Amendment does not immunize third-parties who

knowingly publish illegal and unprotected material. *See Pittsburgh Press Co.*, 413

U.S. at 388 (holding that newspaper could be forbidden from publishing want ad

proposing the sale of illegal transaction); *New York v. Ferber*, 458 U.S. 747, 774 (1982) (holding that conviction of bookstore proprietor for selling child pornography did not violate First Amendment); *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 325 (6th Cir. 2009) (holding that pornographic magazine publisher could be required to verify, with producer of pornography, model's age before publication of pornography). Therefore, the Act does not run afoul of the First Amendment by prohibiting publishers, such as Backpage.com, from knowingly displaying advertisements for commercial sex acts depicting minors.

### d.  The Act is subject to and satisfies intermediate scrutiny analysis.

Since the Act criminalizes only advertisements for illegal transactions, the First Amendment is not implicated, and in accordance with the Supreme Court's opinion in *Williams* it is unnecessary to address Plaintiffs' remaining First Amendment arguments. Nonetheless, the Act does not run afoul of the First Amendment as a content neutral regulation.

### 1.  The Act is content neutral.

Third Circuit precedent precludes this Court from finding that the Act is a content based regulation on speech and subject to the strict scrutiny test.  Rather, the Act is content neutral and subject to intermediate scrutiny.

"When determining whether a statute is content neutral, a principal consideration is 'whether the government has adopted a regulation of speech because

of disagreement with the message it conveys,' or instead, adopted that regulation for some other purpose collateral to the protected speech." *Free Speech Coalition, Inc. v. AG of the United States*, 677 F.3d 519, 533 (3d Cir. 2012) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Put another way, "'the government's purpose is the controlling consideration,' and '[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'" *Free Speech Coalition*, 677 F.3d at 533 (quoting *Ward*, 491 U.S. at 791-92) (emphasis added). *See also Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48 (1986) (finding that a zoning regulation for adult movie theaters was content neutral because it was promulgated to prevent crime and maintain property values not to suppress the expression of unpopular speech).

For example, Congress enacted 18 U.S.C. § 2257 to protect children from exploitation by pornographers by imposing an age "reporting and verification requirement" on primary and secondary producers of child pornography. *Free Speech Coalition*, 677 F.3d at 534; *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 325 (6th Cir. 2009). The Third Circuit held that § 2257 is content neutral because

> Congress singled out the types of depictions covered by the Statutes not because of their effect on audiences or any disagreement with their underlying message but because doing so was the only pragmatic way to enforce its ban on child pornography. Any impact by the States on Plaintiff's

26

protected speech is collateral to the Statutes' purpose of
protecting children from pornographers.

[*Free Speech Coalition*, 677 F.3d at 534.]

Thus, § 2257 served a purpose "unrelated to the content of Plaintiffs' protected
speech -- namely the protection of children against sexual exploitation and the
elimination of child pornography[,]" which does not render it content based. *Id.* In
reaching this conclusion, the Third Circuit observed that "[t]o demonstrate that a
restriction is content based and thus subject to strict scrutiny, Plaintiffs must show that
the Statutes single out speech for special treatment because of the effect that speech
will have on its audience." *Id.*

Plaintiffs argue that the Act is a content based restriction. (Backpage.com
Br., 27-28; IA Br., 18-19). They cannot prevail on that argument in this Circuit. Like
in *Free Speech Coalition*, the New Jersey Legislature passed the Act to protect
children from sexual exploitation; a purpose collateral to protected speech. Moreover,
the Legislature passed the Act because it was the only pragmatic way to enforce its
ban on the sexual abuse of minors, prostitution and the promotion of prostitution. For
those reasons, the Act is deemed content neutral because it serves a purpose unrelated
to the content of expression.

## 2. The Act is subject to intermediate scrutiny analysis.

Due to the Act's content neutral purpose, the Act is subject only to intermediate scrutiny analysis. *Free Speech Coalition*, 677 F.3d at 535; *see also Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2723 (2010); *Conchatta Inc. v. Miller*, 458 F.3d 258, 267 (3d Cir. 2006). To satisfy intermediate scrutiny analysis, a statute must: (1) advance a "substantial" governmental interest; (2) not "burden substantially more speech than is necessary"; and (3) leave open "ample alternative channels of communication." *Free Speech Coalition*, 677 F.3d at 535 (citing *Ward*, 491 U.S. at 791, 798-800). "A statute may satisfy intermediate scrutiny even though it is not the 'least restrictive or least intrusive' means of furthering the government's substantial interest." *Id.* (citing *Ward*, 491 U.S. at 798).

The Act readily satisfies intermediate scrutiny. It is undisputed that the Act advances a substantial governmental interest; the protection of children from sexual exploitation. *See, e.g.*, *Connection Distrib. Co.*, 557 F.3d at 329-30 ("No one disputes that the government's interest in protecting children is 'substantial.'"); *McKenna*, 881 F. Supp. 2d at 1283 (recognizing that there is a "compelling interest in curbing the exploitation of minors through prostitution.").

Plaintiff Backpage.com unconvincingly argues that the Act is underinclusive and does not advance a substantial government interest. (Backpage.com Br., 29-30). "Underinclusiveness raises serious doubts about whether

28

the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint. *" Brown v. Entm't Merchs. Ass'n*, 131 S.Ct. 2729, 2740 (2011). *See also City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994); *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989). Here, Plaintiff Backpage.com maintains that the Act is underinclusive on three grounds. (Backpage.com Br., 29-30). First, Plaintiff Backpage.com asserts that visual observation that a person is over eighteen or a sworn affidavit should be sufficient to provide a defense against a prosecution brought under the Act because driver's licenses, marriage licenses, birth certificates, and other governmental or educational identification can be forged or do not have photographs. However, as discussed *infra* at 34-35, identification requirements (1) eliminate subjective disputes about a person's apparent age; (2) permit distributors to confirm a person's age; (3) create a compliance system to assist law-enforcement officers; and (4) prevent children from attempting to pass themselves off as adults. *See Connection Distrib. Co.*, 557 F.3d at 329-30.

Second, Plaintiff Backpage.com argues that the Act is underinclusive since it only prohibits advertisements for commercial sex acts that contain a depiction of a minor. Once again, Plaintiff Backpage.com mistakenly assumes that the Act is a content based regulation. And since it is not, as discussed *supra*, the statute is not underinclusive even though it only criminalizes advertisements that contain depictions

of minors because the statute does not favor a particular speaker or viewpoint. *Brown*, 131 S.Ct. at 2740.

Third, Plaintiff Backpage.com contends that the Act is underinclusive because it only reaches persons or entities within the United States. Though the ability of website providers to move their operations overseas may diminish the effectiveness of the Act, this does not cast doubt about whether the government is in fact pursuing the interest it invokes -- the elimination of child sex trafficking.

The Act also satisfies the second prong of intermediate scrutiny because it was carefully drawn to prohibit only the publication, dissemination, or display of an illegal transaction. As set forth above, the Act does not regulate speech protected by the First Amendment since it prohibits the advertisement of an illegal transaction. *Williams*, 553 U.S. at 297. Nonetheless, Plaintiffs allege that the Act is overbroad. (Backpage.com Br., 30-34; IA Br., 17-19). The "overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615-16 (1973). "The 'mere fact that one can conceive of some impressible applications of a statute is not sufficient to render it susceptible to an overbreath challenge.'" *Williams*, 553 U.S. at 302-03 (quoting *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984) "Invalidating a statute as overbroad . . . is an exceptional

remedy and should be employed sparingly and only as a last resort . . . ." *Knox*, 977 F.2d at 823.

Plaintiff Backpage.com argues that the Act is overbroad since a "[c]ommercial sex act" covers transaction for "something of value" and is not expressly limited to only transactions of "economic" value. (Backpage.com Br., 32; IA Br., 18). "Something of value" applies to those offers to exchange sex for valuable things other than money, such as drugs. This language is identical to the federal sex trafficking statute, 18 U.S.C. § 1591(e)(3), which has been upheld on several grounds, including that the phrase "something of value" was not vague. *See United States v. Wilson,* 2010 U.S. Dist. LEXIS 75149, at *23-25 (S.D. Fla. July 27, 2010).

In addition, the Fifth Circuit considered and rejected a similar argument in a challenge to 18 U.S.C. § 215, which made it a crime to directly or indirectly, give, offer or promise "anything of value" to a bank officer. *United States v. Wicker*, 933 F.2d 284, 287-88 (5th Cir. 1991). Wicker argued that § 215 reaches "all sorts of legitimate business conduct and would criminalize even minor and accepted practices such as taking your banker to lunch." *Id*. The Fifth Circuit held the threat that legitimate business conduct would, under § 215, result in criminal prosecution "is insignificant when compared with the core conduct which § 215 was and is designed

to prohibit." *Wicker*, 933 F.2d at 288 (citing *United States v. Humble*, 714 F. Supp. 794, 797 (E.D.La. 1989)). As the Fifth Circuit observed, "any overbreadth problems that might exist . . . can 'be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be implied.'" *Id.* at 288 (citing *Broadrick*, 413 U.S. at 615-16).

Likewise, this Court should reject the overbreadth challenge asserted by Plaintiffs. The threat of prosecution under the Act is insignificant when compared to the all too real problem of sexual exploitation of children. Moreover, any overbreadth problems that arise, as a result, can be cured through case-by-case analysis.

Moreover, in *Ferber*, the Supreme Court held that a statute prohibiting the distribution of material depicting a sexual performance by a child under the age of sixteen was not overbroad. 458 U.S. at 774. As the Court explained, "[t]he distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to sexual abuse of children" because "the distribution network of child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled." *Id.* at 759. Indeed, the Court recognized that the legislature rightly believed that

> it is difficult, if not impossible, to halt the exploitation of children by pursuing only those who produce the photographs and movies. While the production of pornographic materials is a low-profile, clandestine industry, the need to market the resulting products requires a visible apparatus of distribution. The most expeditious if

> not the only practical method of law enforcement may be to
> dry up the market for this material by imposing severe
> criminal penalties on persons selling, advertising, or
> otherwise promoting the product.

[*Id.* at 759-60.]

The Court observed that "[t]he advertising and selling of child pornography provide an economic motive for and are thus an integral part of the production of such materials, an activity illegal throughout the Nation." *Id.* at 761.

Here, like in *Ferber*, the Legislature passed a statute designed to protect children from sexual exploitation. Although other statutes in New Jersey address this concern, the Legislature determined that the Act was necessary to close the advertising market which facilitates underage prostitution and the sexual exploitation of children. N.J. Stat. Ann. § 2C:13-10(a). So long as this industry peddling advertisements for sex with minors survives, there remains a key means of facilitating the sexual exploitation of children, and companies like Backpage.com will continue to profit from such exploitation. As such, the State may legitimately endeavor to quash the entire industry in all of its manifestations. *See Ferber*, 458 U.S. at 759.

The Act is not intended to and does not prohibit Plaintiffs from engaging in lawful commercial practices and expression. Though such is obvious from the text of the Act, Plaintiff Backpage.com argues that the statute's age verification requirement would chill protected speech. (Backpage.com Br., 33-34). However, Plaintiff Backpage.com's reliance on *ACLU v. Ashcroft* for this position is misplaced.

33

322 F.3d 240 (3d Cir. 2003). That case concerned a regulation that imposed penalties on individuals who knowingly published pornography on the internet that would be available to minors. *Id.* at 245 (citing 47 U.S.C. § 231(a)(1)). Thus, the *Ashcroft* statute concerned the regulation of pornography, which is protected by the First Amendment, whereas here, the Act does not regulate protected speech. *See Ashcroft,* 535 U.S. 564 (2002).

Instead, *Connection Distribution Company* is more applicable because that plaintiff, like Backpage.com, hosted a forum for individuals to post sexually explicit advertisements. In *Connection*, the publisher of a magazine containing sexually explicit advertisements submitted by readers, challenged the implementation of § 2257's age verification requirements, which required publishers, including Connection, to "examine, and retain a copy of, each model's or performer's photo identification[,]" and to make these records available for inspection by the government. *Connection Distrib. Co.*, 557 F.3d at 325. The Sixth Circuit explained that § 2257's verification requirement advances the government's "substantial" interest in protecting children:

> [I]t permits secondary producers [of pornography] (who rarely will know the performers) to ensure that the individuals depicted in their publications are of age; it prevents children from attempting to pass themselves off as adults; and it creates a compliance system in which law-enforcement officers not only can identify the performers depicted in magazines and movies and verify their ages but also can eliminate subjective disputes with producers over

whether a model's *apparent* age should have triggered an
age-verification check.

[*Id*. at 329-30.]

Connection Distribution Company, like Backpage.com, argued that the record-
keeping requirements placed an undue burden on the advertisers' interests in engaging
in anonymous speech. *Id*. at 330; Backpage.com Br., 33-34. However, as the Sixth
Circuit observed, the statute does not make the required records available to the
public. *Id*. at 330. The advertisers must only give the records to "Connection, to whom
each advertiser" will have already given deeply personal material. *Id*. The same is true
of the Act.  And to the extent the Act, like § 2257, requires the information collected
be made available to the government, the advertisers, like Backpage.com users, "have
no more to complain about than every taxpayer in the country." *Id*.  Therefore, like in
Connection, the Act's age verification requirement will not chill any protected speech.
Rather, it will advance the State's substantial interest in protecting children from
exploitation by: (1) ensuring that the advertiser and the publisher of advertisements for
commercial sex acts confirm that the individuals depicted therein are not minors; (2)
preventing children from passing themselves off as adults; and (3) by creating a
compliance system to enable law-enforcement officers to verify the ages of those
individuals depicted in commercial sex advertisements.

Finally, the Act satisfies the third prong of intermediate scrutiny because
it leaves open "ample alternative channels" of communication for Plaintiffs' users. *Id*.

at 332. In *Connection*, the Sixth Circuit found that § 2257 left "ample alternate channels" of communication open for Connection's advertisers" because the age verification requirement was "consistent with Connection's existing identification requirements." *Id.* at 332. As a result, the requirement was "unlikely to affect many adult advertisers" because it "merely ensure[d] that the advertisers are who they say there are -- in terms of name, address and age." *Id.* The same is true here. The Act only prohibits the advertisement of commercial sex acts depicting minors. Because the Act only "closes one narrow door" for Plaintiffs' users, the Act leaves open ample channels of communication because the users of Plaintiffs' websites may still engage in lawful, protected speech.

In sum, the Act advances a substantial governmental interest by attempting to close the market for underage prostitution, does not burden more speech than necessary to accomplish this goal, and it leaves open ample channels of communication for Plaintiffs' clientele. For these reasons, the Act satisfies intermediate scrutiny analysis.

### e. The Act is not unconstitutionally vague because it provides sufficient clarity and precise guidance as to what conduct is prohibited under the Act.

A statute is void for vagueness if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or it is so standardless that it authorizes or encourages seriously discriminatory enforcement." However, "'perfect clarity and

precise guidance have never been required even of regulations that restrict expressive activity.'" *Williams*, 553 U.S. at 304. (citing *Ward*, 491 U.S. at 794).

In *Williams*, the Supreme Court rejected the Eleventh Circuit's reliance on two hypotheticals of benign, innocuous speech, which they alleged would subject the speaker to criminal liability. *Id.* at 304-05. The Court found that no reasonable fact finder would conclude that the speaker in those examples had engaged in the prohibited speech. *Id.* Moreover, the Court in *Williams* found incorrect the proposition "that the mere fact that close cases can be envisioned renders a statute vague." *Id.* at 305-06. "Close cases can be imagined under virtually any statute" and they should be addressed by the requirement of proof beyond a reasonable doubt, rather than the vagueness doctrine. *Id.* at 306.

Plaintiffs argue that the terms "indirect," "something of value," and "implicit" render the statute unconstitutionally vague. (Backpage.com Br., 34-35; IA Br., 16-17). For example, The Internet Archive argues that the Act's "restriction of 'implicit' advertisements for sex will impact ads for other products and services[,] include[ing] advertisement for art, literature, and political discussion revolving around important social themes." (IA Br., 17). Just as the Supreme Court found in *Williams*, no reasonable fact finder would determine that a publisher of ads for art, literature, and political discussion were knowingly publishing an ad for commercial sex. In addition, in close cases, where the publication may contain an implicit ad for

commercial sex, that situation should be addressed by the proof beyond a reasonable doubt standard; not the vagueness doctrine. *Williams*, 553 U.S. at 306. Those close cases do not render the Act void for vagueness.

### III.   The Act does not violate the Commerce Clause because it seeks to further a legitimate local public interest without imposing an excessive burden on interstate commerce.

Plaintiffs have failed to show that the Act violates the dormant Commerce Clause by imposing a clearly excessive burden on interstate commerce. New Jersey retains "broad power to legislate protection for [its] citizens in matters of local concern such as public health." *Great Atl. Pac. Tea Co. v Cottrell*, 424 U.S. 366, 371 (1976) (quotations omitted).  To that end, "not every exercise of local power is invalid merely because it affects in some way the flow of commerce between the States." *Id.*

Where a State's regulatory measure does not discriminate against interstate commerce but regulates even-handedly to promote a legitimate local public interest, the regulation is valid under the Commerce Clause unless it imposes a clearly excessive burden on interstate commerce. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 462 F.3d 249, 263 (3d Cir. 2006).  The extent of that burden depends on the "nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike*, 397 U.S. at 142.

There can be no doubt that the eradication of the sex trafficking of children is a compelling local public interest. *Ferber*, 458 U.S. at 756-57. Indeed, the United States Supreme Court has recognized that "[t]he prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance." *Id.* at 757. Plaintiffs do not dispute this point. *See* Backpage.com Br., 35-38; IA Br., 20-21.

Furthermore, the Act narrowly targets those advertisements offering or soliciting a commercial sex act "which is to take place in [New Jersey]." N.J. Stat. Ann. § 2C:13-10b(1). Such a requirement is directed at conduct to occur in this State. This is true even when a person reads the advertisement in another State; the conduct being advertised must still be intended to take place in New Jersey. And the Act does not apply to all internet actors; rather, the section of the Act at issue narrowly impacts a small group that knowingly publishes advertisements for commercial sex acts to take place in New Jersey. It does not target the vast universe of websites and other internet service operators, such as search engines or general internet service providers. As discussed *supra*, even website providers that specifically accept payment or charges for advertisements are not responsible for those advertisements that are ambiguous.

Nothing about New Jersey's statute prevents other States from enacting a similar, or different, law to criminalize the advertising of child prostitution. If every State adopted the same legislation as New Jersey, each State would be responsible for

39

prosecuting the advertisements offering or soliciting a commercial sex act in their State. *See Am. Express Travel Related Servs. v. Sidamon-Eristoff*, 669 F.3d 359, 373 (3d Cir.), *cert. denied*, 133 S. Ct. 345 (2012). And because the Act does not impose any additional burden on website providers, New Jersey will bear the entire cost of the regulation. *See id.*

To the extent Plaintiffs also assert that the Act imposes a *per se* burden on interstate commerce, that argument also fails, largely for the reasons stated *supra*. A state regulation will survive a facial challenge under the dormant Commerce Clause unless the law "'discriminates against interstate commerce'" in its purpose or extraterritorial effect. *Cloverland-Green*, 462 F.3d at 261 (quoting *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994)). Because the Act contains a component that requires the advertised conduct to take place in New Jersey, it will not adversely affect commerce in other States or provide an advantage to in-state commerce to the detriment of out-of-state companies. *See id.* at 261-62. Again, nothing about the Act requires website providers to modify their screening practices. And the Act will not apply to any advertisement that involves conduct occurring in a location other than New Jersey. For those reasons, Plaintiffs' reliance on *Healy v. Beer Institute*, 491 U.S. 324 (1989), is misplaced. *See* Backpage.com Br., 35-36; IA Br., 20.

Notably, Backpage.com organizes its online classified advertisements by location.  Thus, Backpage.com provides the means for a user to proactively select the New Jersey folder before viewing advertisements for conduct to occur in this State. While some of those advertisements may have been posted from computers outside of New Jersey, only those advertisements soliciting or offering commercial sex in New Jersey fall within the scope the Act.

Plaintiffs' attempt to paint all internet regulations as violating the dormant Commerce Clause with one stroke also fails.  *See* (Backpage.com Br. 36; IA Br. 21-22).  In the CDA, Congress recognized that those federal regulations relating to internet providers would not preempt consistent state laws, which suggests that Congress did not believe that regulation of the internet demanded exclusively national treatment.   47 U.S.C. § 230(e)(3).   And proposed state regulations involving the possession and distribution of online child pornography can be distinguished from the Act.  Indeed, the Act does not in any way attempt to regulate the mere transmission of harmful material involving minors via the internet. Rather, the Act criminalizes the publication or display of an advertisement for the purposes of engaging in a sexual act with a minor.[4] Whereas a person may view or distribute an online pornographic image

---

[4] For that reason, the facts of this case are more akin to those cases distinguishing statutes that simply criminalize the transmission of indecent materials involving minors from those that criminalize the transmission of materials in order to initiate sex with a minor. Courts have found that the latter statutes do not deserve Commerce Clause protection because they regulate the underlying conduct of

from anywhere in the country, without regard to location, the New Jersey statute contains an explicit requirement that the posting advertise a commercial sex act in New Jersey.

Because the Act regulates only those advertisements contemplating commercial sex acts occurring in New Jersey, which does not impose an excessive burden on interstate commerce, Plaintiffs' challenge under the dormant Commerce Clause fails.

### B.   Plaintiffs have not established any legal harm, let alone imminent irreparable harm.

Plaintiffs cannot carry the burden of showing that they will suffer imminent irreparable harm unless the enforcement of the Act is enjoined.  As demonstrated above, the Act does not violate Plaintiffs' First Amendment rights or any other legal rights.  The Act in no way burdens protected speech.  Thus they have not demonstrated that they will suffer legal harm, let alone irreparable harm, if a preliminary injunction is not granted.

---

attempting to have sex with a minor. *See, e.g.*, *People v. Foley*, 731 N.E.2d 123, 133 (N.Y. 2000) ("We are hard pressed to ascertain any legitimate commerce that is derived from the intentional transmission of sexually graphic images to minors for the purpose of luring them into sexual activity."), *cert. denied*, 531 U.S. 875 (2000); *Hatch v. Superior Court*, 94 Cal. Rptr. 2d 453, 472 (Cal. Ct. App. 2000) (finding that the Commerce Clause does not protect the transmission of harmful materials to minors for the purposes of seduction).

**C.    The public interest overwhelmingly favors enforcement of the challenged provision.**

The public's interest will undoubtedly be served by enforcing a statute that protects its children from sexual abuse, endangerment, and exploitation on websites like Backpage.com. By contrast, the advertisements of commercial sex acts with minors that Plaintiffs seek to defend are not protected by the First Amendment. Therefore, the public interest in protecting children overwhelmingly favors enforcement of the Act.

**D.    The balancing of the equities falls in favor of denying Plaintiffs' request for a temporary restraining order and protecting New Jersey's children from sexual abuse and exploitation.**

"When a definable class of material . . . bears so heavily and pervasively on the welfare of children engaged in its production, . . . the balance of competing interests is clearly struck." *Ferber*, 458 U.S. at 764.  As the Legislature recognized in promulgating the Act, human trafficking is a significant and alarming problem that is facilitated by internet advertisements selling children for sex.  Therefore, any harm hypothesized by Plaintiffs as a result of what really amounts to their continued use of "extensive measures to police user content for abuse and illegal activity, . . . filter[ing] ads . . . and conduct[ing] two levels of manual reviews" to avoid the exploitation of children in advertisements for sex is unfounded.  More importantly, it pales in

comparison to the Act's very important role in preventing the very real and horrific

harms suffered by young victims of human trafficking.

## **CONCLUSION**

    For the foregoing reasons, Plaintiffs' request for a preliminary injunction

should be denied and the temporary restraining order dissolved.

        Respectfully submitted,

        JOHN J. HOFFMAN
        ACTING ATTORNEY GENERAL OF NEW JERSEY

By:    s/Stuart M. Feinblatt
        Stuart M. Feinblatt
        Assistant Attorney General

Dated: July 19, 2013