# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BACKPAGE.COM, LLC, | Civil Action No.: 2:13-cv-03952 DMC-JAD |
| Plaintiff, | |
| v. | |
| JOHN JAY HOFFMAN, Acting Attorney General of the State of New Jersey; *et al.*, | |
| Defendants, in their official capacities. | |
| THE INTERNET ARCHIVE, | Civil Action No.: 2:13-cv-03953 DMC |
| Plaintiff, | |
| v. | |
| JOHN JAY HOFFMAN, Acting Attorney General of the State of New Jersey; *et al.*, | |
| Defendants, in their official capacities. | |

**PLAINTIFF THE INTERNET ARCHIVE'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR ISSUANCE OF A PRELIMINARY INJUNCTION TO PREVENT ENFORCEMENT OF P.L. 2013, c.51 § 12(b)(1)**

Frank L. Corrado (SBN 022221983)
fcorrado@capelegal.com
BARRY, CORRADO & GRASSI, PC
2700 Pacific Avenue
Wildwood, NJ 08260
Telephone: (609) 729-1333
Fax: (609) 522-4927

Matthew Zimmerman (admitted *pro hac vice*)
mattz@eff.org
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Fax: (415) 436-9993

*Attorneys for Plaintiff the Internet Archive*

## TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................1

II.  ARGUMENT ......................................................................................................1

  A.   Section 12(b)(1) Targets Both Direct and Indirect Publishers of Proscribed Third-Party Content, Regardless of Actual Knowledge. ..........................................1

  B.   The Internet Archive Has Standing to Challenge Section 12(b)(1) of the Act. .......3

    1.   The Internet Archive Has Standing Because the Law Targets Its Conduct. ...........................................................................3

    2.   Independently, the Internet Archive Has Standing to Challenge the Statute's Vagueness and Overbreadth. .........................................................5

  C.   The Internet Archive Has Met the Preliminary Injunction Requirements. ..............6

    1.   The Internet Archive Will Likely Succeed on the Merits Because CDA 230 Preempts Section 12(b)(1) of the New Jersey Act. ............................6

      (a)   The Act is Inconsistent With the Explicit Protections of CDA 230; Its Supposed Consistency with Other Sections of the Communications Decency Act is Irrelevant. ..................................6

      (b)   Section 230(c)(1) Immunity Applies to State Criminal Liability. ...........................................................................9

      (c)   The Attorney General's Arguments Contradict His Own Efforts to Amend CDA 230. .........................................10

    2.   The Internet Archive Will Likely Succeed on the Merits Because Section 12(b)(1) Violates the First and Fourteenth Amendment. ............11

      (a)   The Act is Unconstitutionally Vague. ..........................................11

      (b)   The Act is Unconstitutionally Overbroad. ...................................12

      (c)   The Act is Subject To, and Fails, Strict Scrutiny. ........................14

    3.   The Internet Archive is Likely to Succeed on the Merits Because Section 12(b)(1) Violates the Commerce Clause. .....................14

    4.   The Public Interest Factors Weigh in Favor of the Issuance of the Preliminary Injunction. ..............................................................15

III. CONCLUSION ...................................................................................................15

i

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*ACLU v. Mukasey,*
    534 F.3d 181 (3d Cir. 2008) ......................................................................... 11

*Ashcroft v. American Civil Liberties Union,*
    535 U.S. 564 (2002)...................................................................................... 14

*Backpage.com v. Cooper,*
    No. 3:12-cv-00654, 2013 WL 1558785 (M.D. Tenn. Jan 3, 2013) ....................... 6, 8

*Backpage.com, LLC v. McKenna,*
    881 F. Supp. 2d 1262 (W.D. Wash. 2012)................................................ 8, 9, 11, 12

*Batzel v. Smith,*
    333 F.3d 1018 (9th Cir. 2003) .......................................................................... 8

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973).......................................................................................... 6

*Citizens United for Free Speech II v. Long Beach Tp. Bd. Of Com'rs,*
    802 F. Supp. 1223 (D. N.J. 1992) ..................................................................... 15

*Doe v. GTE Corp.,*
    347 F.3d 655 (7th Cir. 2003) .......................................................................... 10

*Doe v. Sexsearch.com,*
    551 F.3d 412 (6th Cir. 2008) .......................................................................... 10

*Dombrowski v. Pfister,*
    380 U.S. 479 (1965).......................................................................................... 6

*Elrod v. Burns,*
    427 U.S. 347 (1976)........................................................................................ 15

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC,*
    521 F.3d 1157 (9th Cir. 2008) ....................................................................... 7, 8

*Farina v. Nokia Inc.,*
    625 F.3d 97 (3d Cir. 2010) ............................................................................... 7

*Free Speech Coalition, Inc. v. Attorney General of the United States,*
    677 F.3d 519 (3d Cir. 2012) ........................................................................... 14

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972)........................................................................................ 11

*Hillsborough Cnty. v. Automated Med. Labs., Inc.,*
    471 U.S. 707 (1985).......................................................................................... 7

*Hohe v. Casey,*
    868 F.2d 69 (3d Cir. 1989) ............................................................................. 15

*Kolender v. Lawson*,
   461 U.S. 352 (1983) ............................................................................................ 11

*McCauley v. Univ. of the Virgin Islands*,
   618 F.3d 232 (3d Cir. 2010) ............................................................................... 6

*NAACP v. Button*,
   371 U.S. 415 (1963) ............................................................................................ 11

*Pike v. Bruce Church, Inc.*,
   397 U.S. 137 (1970) ............................................................................................ 15

*Reno v. ACLU*,
   521 U.S. 844 (1997) ................................................................................. 9, 11, 13

*Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*,
   467 U.S. 947 (1984) ............................................................................................ 6

*TRW v. Andrews*,
   534 U.S. 19 (2001) .............................................................................................. 11

*United States v. Playboy Ent. Group*,
   529 U.S. 803 (2000) ............................................................................................ 9

*United States v. Stevens*,
   559 U.S. 460 (2010) ...................................................................................... 12, 13

*United States v. Williams*,
   533 U.S. 285 (2008) ...................................................................................... 6, 12

*Virginia v. Am. Booksellers Ass'n*,
   484 U.S. 383 (1988) ............................................................................................ 6

*Zeran v. America Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997) .............................................................................. 8

### STATE CASES

*Milgram v. Orbitz Worldwide, Inc*.,
   419 N.J. Super. 305, 16 A.3d 1113 (Ch. Div. 2010) ......................................... 8

*State v. Moore*,
   330 N.J. Super. 535 (App. Div.), certif. den., 165 N.J. 531 (2000) ................... 2

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,
   1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) .............................................. 7

### STATUTES

47 U.S.C. § 230 ................................................................................................. *passim*

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend I ...................................................................................... 1, 5, 6, 15

U.S. Const. amend XIV ........................................................................................ 11

## LEGISLATIVE MATERIALS

H.R.Rep. No. 104-458 (1996) (Conf. Rep.), *as reprinted in* 1996 U.S.C.C.A.N. 10 .................... 7

## STATE STATUTES

N.J. Stat. Ann. § 2C:2-2(b)(2) ............................................................................ 2

N.J. P.L. 2013, c. 51 § 12(b)(1) ........................................................................... *passim*

Wash. Rev. Code § 9.68A.104 ............................................................................. 9

## OTHER AUTHORITIES

Claire Cain Miller, *Craigslist Pulls 'Censored' Label From Sex Ads Area*, NEW YORK TIMES,
September 9, 2010 (12:27 pm) ....................................................................... 4

NEW JERSEY STAR-LEDGER, *Largest Sex-Trafficking Bust in U.S. history Nets 70 N.J. Arrests*,
NJ.com, July 29, 2013 (9:57 pm) ................................................................... 10

## I.       INTRODUCTION

The Attorney General's Opposition ("Opp.") defends a far different law from the one the Legislature passed and plaintiffs challenge.  The Attorney General argues that Section 12(b)(1) "narrowly impacts a small group that knowingly publishes advertisements for commercial sex acts."  Opp. at 39.  But as enacted, Section 12(b)(1) makes criminals not just of direct publishers but of anyone who "causes directly or indirectly" proscribed advertisements "to be published, disseminated, or displayed."  Although the Attorney General might prefer to enforce a different law than the one at issue, his preferences (which may well change as his successors' priorities evolve) cannot eliminate the law's chilling effect on protected speech or otherwise render it compliant with federal law.

Section 12(b)(1) must be enjoined for the reasons stated by the Internet Archive in its opening brief: the Act is preempted by section 230 of the Communications Decency Act ("CDA 230"), impermissibly chills protected speech, is hopelessly vague and overbroad (as proven by the AG's own confusion over the law's scope), and violates the Commerce Clause.  None of defendants' arguments justifies a different result.

## II.      ARGUMENT

The Attorney General argues, unsuccessfully and contrary to the statute, that the Act is narrowly tailored so that it does not reach the Internet Archive based on its archiving and making available both recent and historical copies of content from around the Internet, including sites like Backpage.com and Craigslist.  He is incorrect.  The statute is far broader than he admits, encompassing not only the Internet Archive's activities both those of many other "indirect" actors who facilitate the creation and dissemination of speech online, in violation of Section 230 of the Communications Decency Act and the  First Amendment.

### A.       Section 12(b)(1) Targets Both Direct and Indirect Publishers of Proscribed Third-Party Content, Regardless of Actual Knowledge.

Section 12(b)(1) broadly defines the crime of "advertising commercial sexual abuse of a minor" to include the following conduct: "the person knowingly publishes, disseminates, or displays, or cause directly or indirectly, to be published, disseminated, or displayed, any

1

advertisement for a commercial sex act, which is to take place in this State and which includes a depiction of a minor."  P.L. 2013, c. 51 § 12(b)(1).  By the statute's plain language, it applies to those entities, such as search engines, ISPs, domain name registrars, and others who in hosting or directing Internet speech—whether through links, thumbnails, screenshots, summaries, or simply providing access to specific Internet content generally—indirectly "cause the advertisements to be disseminated and/or displayed."  Because it explicitly extends criminal liability to a broad range of entities instead of narrowly aimed at those directly involved in the underlying criminal behavior, the Act must apply to those such as the Internet Archive and content aggregators who, both directly and indirectly, disseminate and display content created by others.  However, the Attorney General disregards the phrase "disseminates, or displays, or cause directly or indirectly, to be published, disseminated, or displayed."  His assertions that "the Act does not apply to all internet actors; rather the section of the Act at issue narrowly impacts a small group that knowingly publishes advertisements for commercial sex acts to take place in New Jersey" and "It does not target the vast universe of websites and other internet service operators, such as search engines or general internet service providers" are thus incorrect.  Opp. at 39.

Most of the Attorney General's arguments defending the Act also rely on the assertion that the Act requires "knowing" publication of advertisements offering sex in exchange for something of value.  But even if the Attorney General is correct that New Jersey criminal law defaults to a knowledge standard when no *mens rea* is indicated, that standard does not require actual knowledge:  under New Jersey law, a person acts "knowingly" with respect to his conduct or circumstances if "he is aware of a high probability of their existence."  N.J. Stat. Ann. § 2C:2-2(b)(2).  *See, e.g., State v. Moore*, 330 N.J. Super. 535, 544 (App. Div.), certif. den., 165 N.J. 531 (2000).  The Act, as written, thus applies not only to those entities who actually and specifically know of the presence of the advertisements but also to those entities who are merely aware that the third-party content they are disseminating has a high probability of containing such advertisements.  The Attorney General's assertion that only entities with "the ability to screen the materials" they disseminate will be subject to the law (Opp. at 10 n.2) is thus illusory.  The "high degree of awareness" standard will be met if the disseminator has received

information that alerts it to the probable existence of the materials:  for example, an e-mail notice to the website operator, the Attorney General's Opposition brief, or any of the materials listed in the table of authorities of the Rutgers clinics' *amicus* brief ("Amicus Br.") that document how pervasive such advertisements purportedly are on sites like Backpage.com and Facebook.

The Attorney General also misreads the plain language of the statute in asserting that the statute "does not impose liability if a website negligently missed an advertisement prohibited under the statute during its review process."  Opp. at 1.  The statute presumes knowledge of minority and makes a screening defense available only if "the defendant made a *reasonable*"— that is, non-negligent—"bona fide attempt to ascertain the true age of the minor depicted." P.L. 2013, c. 51 § 12(g) (emphasis added).  Although the Attorney General might believe a negligence standard is not appropriate, that is the standard the Legislature adopted.

### B.      The Internet Archive Has Standing to Challenge Section 12(b)(1) of the Act.

Both the Attorney General and *amici* argue that the Internet Archive lacks standing to pursue this lawsuit.  They are incorrect.  The Act directly targets websites like the Internet Archive, and the Archive can thus readily claim both actual and threatened injury, under both ordinary standing requirements and the more relaxed requirements applied when First Amendment rights are at issue.

#### 1.      The Internet Archive Has Standing Because the Law Targets Its Conduct.

The Internet Archive's mission is to create an Internet library, striving to "prevent the Internet and other 'born-digital' materials from disappearing into the past." Declaration of Brewster Kahle ("Kahle Decl.") at ¶ 4.  The Internet Archive regularly gathers copies of Internet content, through its "crawling" and indexing processes, that are made accessible to the world. *Id*. at ¶ 6.  The Internet Archive crawls and archives about 100 million web pages per day and currently maintains over 300 *billion* web pages archived from 1996 to nearly the present.  *Id*. at ¶ 7.  As part of this process, it inevitably "indirectly" "causes to be disseminated" potentially actionable content—including advertisements for commercial sex acts—posted to websites like Backpage.com and Facebook over which it has no control.  P.L. 2013, c.51 § 12(b)(1); Kahle

Decl. at ¶ 7.  Because the Internet Archive "does not have the resources, personnel, or ability to maintain records about the age of individuals appearing in content that it archives," Kahle Decl. at ¶ 9, the New Jersey statute would pressure the Archive to restrict access to lawful speech in an attempt to comply with the law.

The Attorney General's assertion that the Internet Archive lacks standing because "it does not have the ability to screen the materials it archives" fails for two reasons.  Opp. at 10, n.2.  First, as explained above, the law makes criminals out of all of those who "directly or indirectly" cause the advertisements to be "published, disseminated or displayed" regardless of whether they have the practical ability to screen the materials, as long as they had a high degree of awareness that such materials exist.  Second, the Attorney General's assertion is false.  The Internet Archive *can* screen content:  it "preserves for itself the ability to remove content at its own volition and occasionally does so," Kahle Decl. at ¶ 14, although it "does not have the resources . . . to screen *the totality* of the materials it archives," Kahle Decl. at ¶ 9 (emphasis added).  To minimize potential criminal liability, the Internet Archive could engage in wholesale blocking of all or portions of Backpage.com, Facebook, or other sites where, according to the Attorney General and *amici*, the advertisements in question are known to be pervasive.  It could also routinely take down content that others (such as the Attorney General or *amici*) assert— without any confirmation of illegality—is unlawful under this statute (or any other statute, for that matter).  Either option would inevitably block a substantial amount of constitutionally protected speech.  And more to the point, these options would not eliminate potential criminal liability because liability is not limited to easily-searchable content; instead, liability extends to anyone who "indirectly" causes to be disseminated content of a specific type whatever its origin and however it is labeled.[1]

---

[1] Craigslist, previously targeted by state attorneys general for its hosting of an "adult services" section on which some users posted illegal content, has repeatedly made similar observations that illegal content is not always so labeled.  Claire Cain Miller, *Craigslist Pulls 'Censored' Label From Sex Ads Area*, New York Times, September 9, 2010 (12:27 pm), available at http://bits.blogs.nytimes.com/2010/09/09/craigslist-pulls-censored-label-from-sex-ads-area/ (last visited on August 2, 2013).

*Amici*'s argument that the Internet Archive lacks standing because "it does not profit from trafficking in any way" must similarly be rejected.  Amicus Br. at 21.  The statute only requires that the advertisement itself be "commercial."  P.L. 2013, c.51 § 12(b)(1).  *See also* Opening Brief at 18 (noting that as defined, "commercial" also encompasses "something of value").  The Act does not require that one who disseminates an advertisement, whether directly or indirectly, has any commercial interest in doing so.

The Attorney General further contends that the Internet Archive is not targeted by the Act because the Archive only "collects historical internet content, rather than current content."  Opp. at 10 n.2.  That argument also fails for two reasons.  First, the Act contains no requirement that the advertisement be "current"; it applies to "any advertisement or offer . . . which includes either an explicit or implicit offer for a commercial sex act to occur in this State," thus covering all "offers," except perhaps those that have explicitly expired or have been withdrawn. P.L. 2013, c.51 § 12(e).  Second, the Attorney General incorrectly speculates that the Internet Archive's content is not "current."  However, the Internet Archive's content is and will continue to be increasingly contemporaneous.  As of the filing of this brief, the Internet Archive has archived content from Backpage.com that is approximately two weeks old … and that is still listed as a "live" advertisement on Backpage.com itself.  *See, e.g.,* Backpage.com "Central Jersey Furniture for Sale" page with content posted from July 17 and 18, 2013) http://web.archive.org/web/20130719163627/http://centraljersey.backpage.com/FurnitureForSale (last visited August 4, 2013); compare to current Backpage.com listing at http://centraljersey.backpage.com/FurnitureForSale (last visited August 4, 2013).

## 2.    Independently, the Internet Archive Has Standing to Challenge the Statute's Vagueness and Overbreadth.

The Internet Archive also has standing to challenge the Act as unconstitutionally vague and overbroad, even if the Legislature did not intend to target the Internet Archive and similar publishers.  When First Amendment freedoms are at stake, standing requirements are relaxed:  a plaintiff may challenge the unconstitutionality of a statute as vague or overbroad "on the assumption that the statute's very existence may cause others not before the court to refrain from

constitutionally protected speech or expression." *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 238 (3d Cir. 2010) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). *See also United States v. Williams*, 533 U.S. 285, 292 (2008) (holding the same with respect to vagueness); *Dombrowski v. Pfister*, 380 U.S. 479, 486–87 (1965) ("We have fashioned this exception to the usual rules governing standing because of the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute of sweeping and improper application."). As the court held in *Backpage.com v. Cooper*, in "the First Amendment Context . . . the injury-in-fact requirement is automatically met, if 'the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution.'" No. 3:12-cv-00654, 2013 WL 1558785 at 7 (M.D. Tenn. Jan 3, 2013) (quoting *Virginia v. Am. Booksellers Ass'n,* 484 U.S. 383 (1988). at 392).[2] Those concerns exist here.

    **C.**    **The Internet Archive Has Met the Preliminary Injunction Requirements.**

The Attorney General's argument regarding the application Section 230 of the Communications Decency Act—that the New Jersey statute is "consistent" with the CDA—conflicts with CDA 230's plain language and would require that this Court ignore every court to have previously opined on the matter. Moreover, as demonstrated by the Attorney General's selective application of portions of the statute and disregard others, the Act is hopelessly vague and overbroad. The Court must preliminarily enjoin it.

    **1.**    **The Internet Archive Will Likely Succeed on the Merits Because CDA 230 Preempts Section 12(b)(1) of the New Jersey Act.**

    (a)    **The Act is Inconsistent With the Explicit Protections of CDA 230; Its Supposed Consistency with Other Sections of the Communications Decency Act is Irrelevant.**

Section 230 of the Communications Decency Act bars Internet service provider liability based on user-created content: "No provider or user of an interactive computer service shall be

---

[2] For these same reasons, *amici*'s argument that the Internet Archive lacks "prudential standing" must also be rejected. *See* Amicus Br. at 23-24. The prudential limitations asserted by *amici* do not apply in the First Amendment context. *See, e.g., Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956-57 (1984) (citing *Broadrick*, 413 U.S. at 612).

treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).  This protection applies across the board and bars enforcement of any state law, civil or criminal, that is not "consistent with this section." 47 U.S.C. § 230(e)(3).  Contrary to the Attorney General's assertions, the New Jersey statute is not consistent with CDA 230 and is therefore preempted.  *See Farina v. Nokia Inc.,* 625 F.3d 97, 115 (3d Cir. 2010) (quoting *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)) ("Conflict preemption nullifies state law inasmuch as it conflicts with federal law, either where compliance with both laws is impossible or where state law erects an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'").

A principal goal of the Communications Decency Act—and of CDA 230's dual immunity protections for Internet intermediaries[3]—was to eliminate the disincentive for Internet users and service providers to screen objectionable material from their services. 47 U.S.C. § 230(b)(4).  However, Congress did so as part of a larger legislative package that preserved and protected the Internet's dynamic nature.  Congress established powerful structural protections to guide the Internet's development:  service providers would be clearly protected from liability (in a minimally-regulatory and uniform national manner) based on most user behavior, but if service providers wanted to voluntarily remove objectionable content, they could do so without fear of legal consequences.[4]  The protections that immunized service providers

---

[3] 47 U.S.C. § 230(c)(2) separately immunizes service providers from liability based on restricting access to "objectionable" material, a protection that operates independently from subsection (c)(1)'s immunization of service providers for third-party content hosted or distributed by service providers.  Subsection (c)(2) is not relevant to the Internet Archive's affirmative case.

[4] The passage of CDA 230 was prompted in part by a troubling New York Supreme Court decision that would have made online service providers that voluntarily monitored their sites liable for unlawful content while service providers who made no effort to do so were immune from liability under the common law distributor/publisher distinction.  *See Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995).  *See also Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008).  According to the House of Representatives report on CDA 230, "[o]ne of the specific purposes of [Section 230] [was] to overrule . . . decisions which have treated such providers . . . as publishers or speakers of content that is not their own." H.R.Rep. No. 104-458 (1996) (Conf. Rep.), *as reprinted in* 1996 U.S.C.C.A.N. 10.

from liability based on their users' behavior are enshrined in CDA 230, and it is those protections—the only ones in the "section"—with which state law must be consistent.

As articulated by the Attorney General, the intent and substance of the Act—to place liability on those who have the capacity to screen objectionable material but do not—is exactly the opposite of Congress's intent in enacting CDA 230's immunity provisions. *See, e.g.,* Opp. at 16-18. This conflict would exist even if the law covered only willful and knowing dissemination, as the Attorney General contends, as long as someone else generated the content. *See Zeran v. America Online, Inc.*, 129 F.3d 327, 332-33 (4th Cir. 1997) (holding that forcing America Online (an ISP), upon notice of defamatory content, to "decide whether to publish, edit, or withdraw the posting," constituted "thrust[ing] [AOL] into the role of a traditional publisher" as "specifically proscribe[d]" in Section 230); *McKenna*, 881 F. Supp.2d at 1273 (citing *Batzel v. Smith*, 333 F.3d 1018, 1029 (9th Cir. 2003) ("SB 6251 is inconsistent with Section 230 because it criminalizes the 'knowing' publication, dissemination, or display of specified content . . . creat[ing] an incentive for online providers *not* to monitor the content that passes through its channels. This was precisely the situation that the CDA was enacted to remedy."); *Cooper*, 2130 WL 1558785 at 13 (holding that the Tennessee law's knowledge requirement "undermine[d] Congress's goal of encouraging self-policing").

That Section 12(b)(1) of the Act might proscribe only the dissemination of unprotected speech does not render it consistent with CDA 230. *See* Opp. at 15. The purpose of CDA 230 is to provide that immunity:  intermediaries don't need protection from liability for speech to which no liability can attach. *See Roommates.com*, 521 F.3d at 1163.[5]

The Attorney General's additional argument that the Act need only be "consistent with the entire CDA, not just 230(c)(1)," Opp. at 15, must be rejected for several reasons. First, it is textually incorrect. The preemption provision of section 230(e) measures consistency against

---

[5] The Attorney General argues that Congress "surely did not intend" to provide websites with immunity when, for example, "a user posts an advertisement to hire a hit man to kill their spouse." Opp. at 24. However, a New Jersey court, following several federal appellate decisions, found that CDA 230 does exactly that. *See Milgram v. Orbitz Worldwide, Inc*., 419 N.J. Super. 305, 317-18, 16 A.3d 1113, 1121 (Ch. Div. 2010).

"this section"—that is, section 230—and not "this act." 47 U.S.C. § 230(e)(3). Second, it would be impossible to assess whether a law is consistent with the CDA in the manner suggested by the Attorney General, not only because the statute was passed for many reasons but also because numerous provisions of the law, including the limitations on the publication of "indecent" materials on the Internet, have been struck down as unconstitutional. *See Reno v. ACLU,* 521 U.S. 844 (1997); *United States v. Playboy Ent. Group*, 529 U.S. 803 (2000)). "Consistency" with the "section" can only be determined by evaluating whether the statute in question mandates or permits state behavior that is otherwise barred by the substantive requirements of CDA 230. This statute unquestionably conflicts with CDA 230's immunity protections.[6]

(b)     Section 230(c)(1) Immunity Applies to State Criminal Liability.

The Attorney General's argument that CDA 230 should only preempt state civil liability must also be rejected.   Section 230 expressly preempts "any State or local law." 47 U.S.C. § 230(e)(3).   And although Congress included a specific exemption for federal criminal laws, it did not include a parallel exemption for state criminal laws.  47 U.S.C. § 230(e)(1).  *See, e.g., Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1275 (W.D. Wash. 2012).

No court has ever adopted the Attorney General's proffered interpretation. The cases cited by the Attorney General as "question[ing] the applicability of CDA immunity to criminal prosecutions" did no such thing.  Opp. at 13.  Indeed, both cases involved civil disputes.[7]  *See*

---

[6] The Attorney General says the New Jersey statute differs from those enjoined in Washington and Tennessee because New Jersey requires knowledge that an advertisement contain a "solicitation or offer of prostitution."  Opp. at 17-18.  However, the relevant sections of the Washington and New Jersey acts are structurally identical.  Wash. Rev. Code § 9.68A.104 (West 2012) (imposing liability on any person who "knowingly publishes, disseminates, or displays, or causes directly or indirectly to be published, disseminated, or displayed, any advertisement for a commercial sex act . . . that includes the depiction of a minor").  *See McKenna*, 881 F. Supp.2d at 1276-77.

[7] The Attorney General argues that subsection 230(c)(2)'s title, "Civil liability," "strongly suggests that those provisions apply only in a civil context."  Opp. at 12.  But the Internet Archive challenges the Act under subsection 230 (c)(1), not (c)(2).  If the whole of section *(footnote continued on following page)*

*Doe v. Sexsearch.com*, 551 F.3d 412, 415 (6th Cir. 2008) ("We do not have before us any issue concerning the criminal liability of the parties."); *Doe v. GTE Corp.*, 347 F.3d 655, 660 (7th Cir. 2003) (questioning the application of CDA 230 to both civil and criminal liability as equally problematic).

> (c)   The Attorney General's Arguments Contradict His Own Efforts to Amend CDA 230.

The Attorney General's argument that the Act is not in conflict with CDA 230 is belied by his parallel efforts to convince Congress to amend that federal statute. As *amici* noted in its letter submitted to the Court on July 13, 2013, 49 state and territory attorneys general—including the defendant—asked Congress on July 23, 2013, to amend CDA 230 *precisely* because courts have repeatedly found that CDA 230 "prevents State and local law enforcement from prosecuting … companies" for hosting third party advertisements of the type at issue here. *See* Attachment to Penny Venetis letter of July 29, 2013. Specifically, Attorney General Hoffman and his fellow attorneys general ask Congress to amend CDA 230 so that it explicitly does not extend to "Federal or State criminal laws." *Id*. He concludes that "State and local law enforcement … must be granted the authority to investigate and prosecute those who facilitate these horrible crimes." *Id.*

The attorneys general letter is unfortunately misleading and incomplete in a number of respects, including suggesting that it cannot "investigate and prosecute those who promote prostitution and endanger our children," an assertion undermined by a joint state and federal crackdown that constituted the "largest sex-trafficking bust in U.S. history" that occurred only days after the letter was sent.[8] But whatever the merits of the defendant's proposed legislative change—and as discussed above, placing liability on intermediaries such as the Internet Archive

---

*(footnote continued from preceding page)*
230(c) were limited to civil liability, then there would have been no reason to confine the title "Civil liability" to subsection (c)(2).

[8] *See* New Jersey Star-Ledger, *Largest Sex-Trafficking Bust in U.S. history Nets 70 N.J. Arrests*, NJ.com, July 29, 2013 (9:57 pm), available at
http://www.nj.com/news/index.ssf/2013/07/largest_sex-
trafficking_crackdown_in_us_history_nets_70_nj_arrests.html (last visited on August 4, 2013).

would be both costly and harmful to protected speech—the Attorney General *is* correct in that letter that CDA 230 bars state criminal law prosecutions of Internet providers based on what their users do.  His contrary argument in the Opposition is simply false.

> **2.    The Internet Archive Will Likely Succeed on the Merits Because Section 12(b)(1) Violates the First and  Fourteenth Amendment.**

> (a)    The Act is Unconstitutionally Vague.

The Attorney General also argues that the statute survives constitutional scrutiny.  It does not.   Section 12(b)(1) is unconstitutionally vague because it fails to define essential terms limiting criminal liability and leaves providers with precisely this uncertainty.  A statute will be found unconstitutionally vague if its language might apply to speakers who were not the Legislature's intended target, leaving those speakers "uncertain as to whether they [would] face prosecution under the statute, [and thus] chilling their speech."  *ACLU v. Mukasey,* 534 F.3d 181, 203 (3d Cir. 2008) (finding COPA unconstitutionally vague because it did not clearly limit its application to its intended target, commercial pornographers, leaving others uncertain as to whether the law would be applied to them).   Moreover, vagueness is "a matter of special concern" in the context of criminal statutes that regulate speech because its chilling effect extends beyond a particular case.  *McKenna*, 881 F. Supp.2d at 1279.  *See also NAACP v. Button*, 371 U.S. 415, 433 (1963); *Reno*, 521 U.S. at 871.

Assurances that the law will not actually be used to prosecute others despite the law's language do not cure vagueness.  Indeed, that potential for subjective implementation of the law by police and prosecutors is what chills speech.  *See Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) (holding that the void-for-vagueness doctrine forbids states from "delegat[ing] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis"); *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (holding that vague statutes can "encourage arbitrary and discriminatory enforcement").

The words "indirect," "implicit," and "offer" are vague.  Perhaps the strongest support for this argument is that the Attorney General can only make sense of the Act by ignoring these words, rather that proposing a meaning.  *See TRW v. Andrews*, 534 U.S. 19, 21 (2001) ("It is a

cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void or insignificant.") (internal quotations omitted). For example, the Attorney General does not attempt to define "offer"; he simply asserts that the law only applies to "current" advertisements. In *McKenna*, Judge Martinez found that plaintiffs were "likely to succeed in showing that such terms [as 'indirect,' 'direct,' 'implicit,' and 'offer'] rendered the statute unconstitutionally vague." *McKenna*, 881 F. Supp. 2d at 1279. And as the Washington statute did in *McKenna*, the New Jersey statute would force the Internet Archive to guess whether an ad constituted an "implicit" offer for commercial sex and whether, by indexing and archiving websites that host such ads, the Internet Archive—or any other range of actors who help provide access to the material in question—is "directly" or "indirectly" "causing to be disseminated" the material.

Defendants argue that "the mere fact that close cases can be envisioned" does not render a statute vague, since those cases can be addressed on a "case-by-case" basis. Opp. at 37 (quoting *Williams*, 553 U.S. at 304-06). However, the Act's problem is not uncertainty about how to prove a defined criminal act but uncertainty as to how to define the criminal act in the first place. *See Williams*, 553 U.S. at 306. The Act has language that must be given some meaning, and if the words are not defined in the statute or do not have a settled legal or contextual meanings, the statute will be unconstitutionally vague. *Id.* at 306.

(b)   The Act is Unconstitutionally Overbroad.

A statute is also unconstitutionally overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens,* 559 U.S. 460 (2010). Here, the Legislature wrote an overly expansive statute to address a very narrow range of conduct and must therefore be struck down.

The Attorney General's Opposition makes clear that the Act would indeed have a far greater number of unconstitutional than constitutional applications. Although the Legislature identified Backpage.com and similar sites that purportedly purposefully publish the types of advertisements in question, the Act does not contain any limiting language that would confine applications only to such publishers. Indeed, the Attorney General plainly does not suggest that

12

the motivation or implementation was narrow and limited, instead describing the Legislature's newly-passed anti-trafficking efforts as "comprehensive" and "wide-ranging."  Opp. at 6.  If the words the Legislature adopted are to have any meaning, the Act must also apply to a news publication that provides a link to a site containing such advertisements, thus "indirectly" disseminating them.  And in fact, the statute as written must also apply to declarant Lisa A. Shea who included copies of sample advertisements as exhibits to her declaration—a knowing dissemination—and to all those persons who assisted her, thereby "indirectly" "causing the advertisements" to be "published, disseminated and displayed."[9]  *See* Exhibit A to the Declaration of Lisa A. Shea ("Shea Declaration").  Moreover, there is no intent requirement in the plain language of the Act that would prevent it from being applied to an anti-trafficking advocacy organization that republished and disseminated examples of advertisements to illustrate just how heinous they are.

If these examples seem absurd, that is not because they conflict with the Act's language but because the statutory language strays so far from what the Attorney General at present believes the Legislature actually intended.  That fact proves the Act's overbreadth.  *See Stevens*, 130 U.S. at 1589 (finding a ban on depictions of animal cruelty overbroad because the statute was written so broadly it would also ban depictions of someone fishing without a license or hunting out of season, and other absurd examples of speech Congress clearly did not intend to target).  The Attorney General's suggestion that off-target applications be handled on a case-by-case basis misses the point.  The danger of an overbroad criminal statute is its chilling effect on protected speech.  *See Reno*, 521 U.S. at 872 ("The severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and

---

[9]  For that matter, liability under the statute would also extend to the Internet Archive for separately hosting archives as part of RECAP, an online initiative by which federal court documents are made freely available.  *See* RECAP home page at https://www.recapthelaw.org (last visited August 2, 2013); RECAP hosted archive of the materials in this case at http://ia600900.us.archive.org/15/items/gov.uscourts.njd.291315/gov.uscourts.njd.291315.docket .html.

images.").   Most speakers will choose to avoid a criminal prosecution rather than test the application of the law on a case-by-case basis.

(c)      The Act is Subject To, and Fails, Strict Scrutiny.

The Attorney General argues that the Act is a content-neutral statute subject to intermediate, rather than strict, scrutiny.  But the Act is clearly content-based.  A regulation is content-based if it restricts expression "because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002). The Act criminalizes dissemination of a specific category of content—"advertisements for commercial sex acts, which [are] to take place in this State and which include the depiction of a minor"— precisely because it deems the content of such advertisements to be harmful.  Section 12(b)(1) is, therefore, content-based.

A restriction may be considered content-neutral if the government's specific purpose is unrelated or collateral to the suppression of the speech at issue.  Opp. at 26 (citing *Free Speech Coalition, Inc. v. Attorney General of the United States*, 677 F.3d 519, 533 (3d Cir. 2012).  But that is not the case here.  The Act's purpose is to eliminate the speech itself so that the intended result of that speech—the commercial sex transaction the advertisement proposes—does not occur.   The Act thus singles out the speech because of its feared "effect on the intended audience" and not for any collateral reason.  *See Free Speech Coalition*, 677 F.3d at 534. It is thus content-based.

**3.      The Internet Archive is Likely to Succeed on the Merits Because Section 12(b)(1) Violates the Commerce Clause.**

The Act's broad application beyond its intended target also dooms the Attorney General's dormant Commerce Clause argument.  Although the Attorney General characterizes the Act as being "directed at conduct to occur in this State," the Act does not require that the dissemination of the advertisements occur within New Jersey.  The only link to New Jersey in the Act is that the advertisement must propose a sex act that will occur there.  But the Act does not require that the sex act ever occur or that any of the parties to the transaction ever have stepped foot in the state.  There is no Internet just for New Jersey.  Accordingly, the Act will place a clearly

14

excessive burden on Internet publishing.  *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  For the reasons started in Internet Archive's opening brief, the Act violates the Commerce Clause.

    **4.**  **The Public Interest Factors Weigh in Favor of the Issuance of the Preliminary Injunction.**

   As previously argued, the Internet Archive satisfies the additional factors required for a preliminary injunction.  Because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," the Internet Archive will suffer irreparable injury.  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  *See also, e.g., Hohe v. Casey*, 868 F.2d 69, 72-73 (3d Cir. 1989) (recognizing that a chilling effect on protected speech is an irreparable harm for the purposes of a preliminary injunction motion).  A preliminary injunction will not cause greater harm to the State than the Act will to protected speech.  It will preserve the status quo, since the law has not gone into effect.  Lastly, in cases involving First Amendment rights, as this Court has recognized, "the public interest tends to weigh in favor of enjoining undue restrictions on expression." *Citizens United for Free Speech II v. Long Beach Tp. Bd. Of Com'rs*, 802 F. Supp. 1223, 1238 (D. N.J. 1992).  By contrast, the Act would burden large swaths of constitutionally and statutorily protected speech and the underlying platforms for that speech, at a high cost and in derogation of the public interest.  The state asserts no equivalent countervailing reason to permit the Act's operation.

## III.  CONCLUSION

   For the reasons stated above, and for the reasons set forth in the Internet Archive's initial brief, this Court should issue the preliminary injunction.

Dated: August 5, 2013       Respectfully submitted,

           By:  /s/ Frank L. Corrado
            Frank L. Corrado
            BARRY, CORRADO & GRASSI, PC
            2700 Pacific Avenue
            Wildwood, NJ  08260
            Telephone:  609-729-1333
            Fax:  (609) 522-4927

            Matthew Zimmerman (admitted *pro hac vice*)

ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel:  (415) 436-9333
Fax: (415) 436-9993