FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BACKPAGE.COM, LLC., | **Hon. Dennis M. Cavanaugh** |
| Plaintiff, | **OPINION** |
| v. | Civil Action No. 13-cv-03952 (DMC) (JAD) |
| JOHN JAY HOFFMAN, Acting Attorney General of the State of New Jersey; *et al.*, | |
| Defendants, | |

THE INTERNET ARCHIVE,

        Plaintiff,

v.

JOHN JAY HOFFMAN, Acting Attorney General of the State of New Jersey; *et al.*,

        Defendant.

DENNIS M. CAVANAUGH, U.S.D.J.:

    This matter comes before the Court upon Motion for a Temporary Restraining Order and Preliminary Injunction by Plaintiffs Backpage.com, LLC and The Internet Archive ("Plaintiffs"). On August 9, 2013, a hearing was held and oral argument was heard. Based on the following and for the reasons expressed herein and on the record, Plaintiff's Motions are **granted.**

1

# I.    BACKGROUND[1]

## A. The Parties

Backpage.com operates the second largest online classified ad service available nationwide. Backpage.com hosts millions of users' posts each month in numerous categories (e.g., buy/sell/trade, automotive, rentals, real estate, jobs, forums, dating, adult and services) and subcategories. In 2010, when Craigslist.org eliminated its adult services section entirely, adult ads migrated to other Craigslist categories and other websites, notably Backpage.com.

Backpage.com states that it works to prevent misuse of its website, providing in its Terms of Use that users may not offer illegal services and prohibiting content that in any way relates to child exploitation. The site also uses both automatic and manual filtration methods to sort through ads, claiming that over the course of a month Backpage.com blocks over 750,000 inappropriate posts.

The Internet Archive, unlike Backpage.com, is not a host for third party postings. The Internet Archive is a 501(c)(3) non-profit that was founded to build an Internet library. It offers permanent access for researchers, historians, scholars, people with disabilities, and the general public to historical collections that exist in digital format. The vast majority of the material in the Internet Archive's collection is material authored by third parties. In an effort to create an archive of the Internet, the Internet Archive regularly gathers "snapshots" of content on the Internet through its "crawling" and indexing processes. It currently maintains over 300 billion web pages archived from 1996 to (nearly) the present from websites around the world, including archives of third-party content posted to web sites like Backpage.com and Craigslist.org.

## B. Previous States Find Similar Statutes Unconstitutional

In January 2012, Washington state legislators introduced a bill to address "advertising

---

[1] The Court takes this section from the parties' pleadings.

commercial sexual abuse of a minor." After being enacted by the Washington legislature and signed into law by Washington's governor, the law was set to go into effect on June 7, 2012. See WASH. REV. CODE ANN. § 9.68A.104 (2012).

On June 4, 2012, Backpage.com filed suit in the U.S. District Court for the Western District of Washington, seeking a temporary restraining order ("TRO"), preliminary and permanent injunctive relief, and a declaration that the new law was unconstitutional and violated the Communications Decency Act of 1996, 47 U.S.C. § 230 ("CDA"). The Court granted Backpage.com's request for a TRO the next day. After full briefing and argument, on July 27, 2012, the Court entered a preliminary injunction, enjoining enforcement of the law on all six of the grounds asserted by Backpage.com and the Internet Archive (which joined as a co-plaintiff)—the same challenges raised here. See Backpage.com, LLC v. McKenna, 881 F. Supp. 1262 (W.D. Wash. 2012).

Thereafter, the defendants in McKenna (the Washington AG and the county prosecutors) conceded they would not continue to defend the law, and on December 10, 2012, stipulated to a final judgment permanently enjoining its enforcement and awarding Backpage.com attorneys' fees. The Washington AG also agreed to work with the state legislature to repeal the Washington statute, and the legislature has since enacted a measure to repeal the law effective July 28, 2013.

In May 2012, the two houses of the Tennessee general assembly respectively passed similar legislation creating the felony crime of "advertising commercial sex with a minor." The legislation closely tracked the first draft of the Washington law. The governor signed the legislation on May 21, 2012, making it a felony to "knowingly sell[ ] or offer[ ] to sell an advertisement that would appear to a reasonable person to be for the purpose of engaging in what would be a commercial sex act … with a minor." See Tenn. Code Ann. § 39-13-315. The

Tennessee law was scheduled to take effect July 1, 2012.

On June 27, 2012, Backpage.com brought suit to enjoin the law in the U.S. District Court of the Middle District of Tennessee. The defendants (the Tennessee AG and the district attorneys for each of the state's 31 judicial districts) stipulated they would not enforce the Tennessee law pending resolution of Backpage.com's challenges. After extended briefing and a hearing, the court entered a preliminary injunction on January 3, 2013. Like McKenna, the Tennessee federal court issued a thorough opinion, invalidating the Tennessee statute on all the grounds urged by Backpage.com. See Backpage.com, LLC v. Cooper, No. 3:12-cv-00654, 2013 WL 1558785 (M.D. Tenn. Jan. 3, 2013). The Court wrote:

> The Constitution tells us that—when freedom of speech hangs in the balance—the state may not use a butcher knife on a problem that requires a scalpel to fix. Nor may a state enforce a law that flatly conflicts with federal law. Yet, this appears to be what the Tennessee legislature has done in passing the law at issue.

Cooper, 2013 WL 1558785 at *1. As in Washington, the defendants in Cooper declined to further defend the Tennessee law after the court's preliminary injunction order. On March 19, 2013, the court granted Backpage.com's unopposed motion to convert the preliminary injunction into a permanent injunction and entered final judgment invalidating the Tennessee law.

C. New Jersey's Human Trafficking Prevention, Protection and Treatment Act

S. 2239, entitled the "Human Trafficking Prevention, Protection, and Treatment Act," was introduced in the New Jersey Senate on October 4, 2012. The same bill was introduced a week later in the Assembly, designated A. 3352. The bill included a section creating the offense of "advertising commercial sexual abuse of a minor." The Senate passed A. 3352 on March 18, 2013, and the bill passed in the Assembly three days later. Governor Christie signed the bill on May 6, 2013. The first degree advertising crime created by the Act is codified at N.J.S.A. § 2C:13-10.

4

The Act's legislative history states that it "is modeled after a recently enacted Washington state law," as well a Connecticut bill "that created criminal offenses related to advertising commercial sexual abuse of a minor." As passed and signed into law by the Governor, the material provisions of the Act for purposes of this motion are:

b. A person commits the offense of advertising commercial sexual abuse of a minor if:

(1) the person knowingly publishes, disseminates, or displays, or causes directly or indirectly, to be published, disseminated, or displayed, any advertisement for a commercial sex act, which is to take place in this State and which includes the depiction of a minor; or

(2) the person knowingly purchases advertising in this State for a commercial sex act which includes the depiction of a minor

c. A person who commits the offense of advertising commercial sexual abuse of a minor as established in subsection b. of this section is guilty of a crime of the first degree. Notwithstanding the provisions of N.J.S.2C:43-3, the fine imposed for an offense under this section shall be a fine of at least $25,000 …

e. For the purposes of this section:

"Advertisement for a commercial sex act' means any advertisement or offer in electronic or print media, including the Internet, which includes either an explicit or implicit offer for a commercial sex act to occur in this State.

"Commercial sex act" means any act of sexual contact or sexual penetration, as defined in N.J.S.2C:14-1, or any prohibited sexual act, as defined in N.J.S.2C:24-4, for which something of value is given or received by any person.

"Depiction" means any photograph or material containing a photograph or reproduction of a photograph.

"Minor" means a person who is under 18 years of age.

"Photograph" means a print, negative, slide, digital image, motion picture, or videotape, and includes anything tangible or intangible produced by photographing.

f. It shall not be a defense to a violation of this section that the defendant:

(1) did not know the age of the minor depicted in the advertisement; or

(2) claims to know the age of the person depicted, unless there is appropriate proof of age obtained and produced in accordance with subsections g. and h. of this section

g. It shall be a defense to a violation of this section that the defendant made a reasonable, bona fide attempt to ascertain the true age of the minor depicted in the advertisement by requiring, prior to publication, dissemination, or display of the advertisement, production of a driver's license, marriage license, birth certificate,

5

or other governmental or educational identification card or paper of the minor depicted in the advertisement and did not rely solely on oral or written representations of the minor's age, or the apparent age of the minor as depicted. The defendant shall prove the defense established in this subsection by a preponderance of the evidence.

h. The defendant shall maintain and, upon request, produce a record of the identification used to verify the age of the person depicted in the advertisement.

N.J.S.A. § 2C:13-10.

The Act thus makes the act of publishing, disseminating or displaying an offending online post "directly or indirectly" a "crime of the first degree. The penalties for the advertising offense are imprisonment for 10-20 years, N.J.S.A. §§ 2C:43-1, 2C:43-6, a minimum $25,000 fine, N.J.S.A. § 2C:13-10(c); P.L. 2013, c.51 § 3(d)(1) (amending N.J.S.A. § 2C:13-8), and the requirement that a convicted defendant must register as a sex offender, P.L. 2013, c.51 prior § 12(b)(2), amending N.J.S.A. § 2C:7-2.

D. Procedural History

Plaintiff Backpage.com filed a Verified Complaint to Declare Invalid and Enjoin Enforcement of N.J.S.A. § 2C:13-10, along with a supporting Motion for a Temporary Restraining Order and Preliminary Injunction on June 26, 2013. (ECF No. 1, "Backpage.com Br."). Plaintiff Internet Archive filed the same motions on the same day. (Civ. No. 13-3953, ECF No. 1, "Internet Archive Br."). Defendant filed an Opposition Brief to Plaintiffs' Motions on July 19, 2013 (ECF No. 19, "Def. Opp'n Br.").  On June 28, 2013, a hearing was held before this Court, where a temporary injunction was issued prior to a full hearing to be held on August 9, 2013. All parties were heard on August 9, 2013, and the Court issued its ruling from the bench, reserving further discussion for this Opinion.

## II.   STANDARD OF REVIEW

Injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co., 290 F.3d 578, 586 (3d Cir. 2002) (quotation and citation omitted); Kos Pharm. Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004); see also Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994). "A decision to grant or deny a preliminary injunction is within the sound discretion of the district court." Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc., 2010 WL 2428561 (D.N.J. June 9, 2010) (citing Oakley, Inc. v, Sunglass Hut Int'l, 316 F.3d 1331, 1339 (Fed. Cir. 2003)); see also Spartacus, Inc. v. Borough of McKees Rocks, 694 F.2d 947, 949 (3d Cir. 1982). In determining whether a preliminary injunction should be granted, a district court must consider four factors:

> (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting preliminary relief will be in the public interest.

Gerardi v. Pelullo, 16 F.3d 1363, 1373 (3d Cir. 1994); see also ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d  1471, 1477 n. 2 (3d Cir. 1996); Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 191-92 (3d Cir. 1990); CIBA-GEIGY Corp. v. Bolar Pharm. Co., Inc., 747 F.2d 844, 850 (3d Cir. 1984) cert. denied 471 U.S. 1137 (1985). Plaintiff bears the burden of showing that these factors weigh in favor of granting the injunction. Kos Pharm. Inc., 369 F.3d at 708. "Only if the movant produces evidence sufficient to convince the [court] that all four factors favor preliminary relief should the injunction issue." Opticians Ass'n of Am., 920 F.2d at 192; see also Nutrasweet Co. v. Vit-Mar Enter. Inc., 176 F.3d 151, 153 (3d Cir. 1999); AT&T Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994)

(citation omitted).

The Third Circuit has accorded particular weight to the first two of the Injunction Factors: irreparable harm and likelihood of success on the merits. Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 197 (3d. Cir. 1990) (quoting In re Arthur Treacher's Franchisee Litig., 689 F.2d 1137, 1143 (3d Cir. 1982) ("[W]e cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent.")); see also Scholastic Funding Grp., LLC v. Kimble, 2007 U.S. Dist. LEXIS 30333, at *28 (D.N.J. Apr. 24, 2007). Nonetheless, the district court should only award preliminary injunctive relief upon weighing all four factors. Am. Tel. & Tel. Co., 42 F.3d at 1427, (citing Duraco Prod, Inc. v. Joy Plastic Enter. Ltd., 40 F.3d 1431, 1438 (3d Cir. 1994).)


## III.   DISCUSSION

Plaintiffs Backpage.com and the Internet Archive bring this action to preliminary and permanently enjoin Section 12 (b)(1) of N.J. Stat. Ann. 2C:13-10 ("the Act"). Federal courts in Tennessee and Washington have entered permanent injunctions prohibiting those states from enforcing statutes that are identical to the Act in all material respects. In both cases, the Courts held that the statutes were unconstitutional and unenforceable on the same grounds that Plaintiffs advance here. See McKenna, 881 F. Supp. 2d 1262 (W.D. Wash. 2012); Cooper, 2013 WL 1558785 (M.D. Tenn. Jan. 3, 2013).

In determining whether a preliminary injunction should be granted, a district court must consider four factors:

> (1) Whether the movant has shown a reasonable probability of success on the merits;
> (2) Whether the movant will be irreparably injured by denial of the relief;
> (3) Whether granting preliminary relief will result in even greater harm to the nonmoving party; and

(4) Whether granting preliminary relief will be in the public interest.

Gerardi v. Pelullo, 16 F.3d 1363, 1373 (3d Cir. 1994).

Here, Plaintiffs have shown a likelihood of success on the merits, especially when taking into account the findings of both the Washington and Tennessee Courts. Plaintiffs have also adequately satisfied the remaining elements require to secure a preliminary injunction.

The Court will first turn to the merits of the Plaintiffs' claims.

**A.  The Act is likely preempted by Section 230 of the Communications Decency Act**

Plaintiffs first argue that the Act is both expressly preempted and conflict preempted by Section 230 of the CDA.  Plaintiffs allege the Act violates their rights under 47 U.S.C. § 230(e)(3) because enforcement of the new law would treat Plaintiffs, providers of an interactive computer service, as the publisher or speaker of information provided by another information content provider. Defendants argue that the Act is not preempted by the CDA because the CDA does not preempt state criminal laws and that the Act is consistent with "federal criminal laws regarding the sexual exploitation of children." (Def.'s Opp'n, 11, 12).  Essentially, Defendants urge this Court to find fault in the reasoning of both the McKenna Court and the Cooper Court and decline to follow their holdings. (Id.). The Court is not persuaded by Defendants arguments and finds that it is likely that Plaintiffs would prevail on the merits of their preemption claim.

There are three circumstances in which Congress has the power to preempt state law. First, Congress may expressly preempt inconsistent state laws. Arizona v. United States, 132 S. Ct. 2492, 2500-01 (2012) ("There is no doubt that Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision."). Second, "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." Id. (citing Gade v.

9

National Solid Wastes Management Ass'n, 505 U.S. 88, 115 (1992). Third, under the doctrine of conflict preemption, state laws are preempted when they conflict with federal law. Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000). "This includes cases where compliance with both federal and state regulations is a physical impossibility and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Arizona v. U.S., 132 S.Ct. at 2501 (internal quotations and citations omitted).

Here, Plaintiffs are likely to succeed on their claim that the Act is preempted both because it is likely expressly preempted and because it likely conflicts with federal law. Under Section 230, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). It goes on to state that "no liability may be imposed under any State or local law that is inconsistent with" Section 230. Id. § 230(e)(3). Finally, Section 230 states that providers may not be held liable for "any action voluntarily taken in good faith to restrict access to or availability" of material that is "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." Id. § 230(c)(2).

In enacting the CDA, "Congress decided not to treat providers of interactive computer services like other information providers such as newspapers, magazines or television and radio stations, all of which may be held liable for publishing or distributing obscene or defamatory material written or prepared by others." Batzel v. Smith, 333 F.3d 1018, 1026 (9th Cir.2003) (internal citation omitted). Congress enacted Section 230 to achieve two goals. First, "Congress wanted to encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce." Id. at 1027. Second, Congress wanted to

10

"encourage interactive computer services and users of such services to self-police the Internet for obscenity and other offensive material." Id. at 1028.

The Act in question is likely inconsistent with and therefore expressly preempted by Section 230 as Section 230 prohibits "treat[ing]" a "provider or user of an interactive computer service" as the "publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230. Both Backpage and Internet Archive are providers of an interactive computer service within the meaning of CDA Section 230. See 47 U.S.C. § 230(f)(2) (defining an interactive computer service as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.). Section 12(b)(1) of the Act runs afoul of Section 230 by imposing liability on Plaintiffs for information created by third parties— namely ads for commercial sex acts depicting minors—so long as it "knows" that it is publishing, disseminating, displaying, or causing to be published, disseminated, or displayed such information. See Almeida v. Amazon.com, Inc., 456 F. 3d 1316, 1321 (11th Cir. 2006) (quoting Zeran v. Am. Online Inc., 129 F. 3d 327, 330 (4th Cir. 1997) ("The majority of federal circuits have interpreted [Section 230] to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.") (internal citations omitted) ; Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1101–02 (9th Cir. 2009) ( "[W]hat matters is not the name of the cause of action ... [but] whether [it] inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another.").

Additionally, the Act is inconsistent with Section 230 of the CDA because it criminalizes

the "knowing" publication, dissemination, or display of specified content. As Judge Martinez found in McKenna, "in doing so, it creates an incentive for online service providers *not* to monitor the content that passes through its channels. This was precisely the situation that the CDA was enacted to remedy." McKenna, 881 F. Supp. 2d at 1273 (internal citations omitted).

Even if the language of Section 230 did not expressly preempt the Act, the Act likely conflicts with the CDA because "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Arizona v. U.S., 132 S.Ct. at 2501.

## B. The Act likely violates the First Amendment

### a. The Act likely violates the First and Fourteenth Amendments because it imposes strict liability and eliminates scienter

While a state can bar unprotected speech, it cannot do so without a scienter requirement. See, e.g., Smith v. California, 361 U.S. 147, 153 (1959) (holding that a state obscenity statute could not constitutionally eliminate altogether a scienter requirement, and that, in order to be constitutionally applied to a book distributor, it must be shown that he had "knowledge of the contents of the book"). "[I]n order to prevent chilling expression protected by the First Amendment, statutes criminalizing obscenity must require proof of scienter." U.S. v. Cochran, 17 F. 3d 56, 59 (3d Cir. 1994).

The relevant language from the Act provides: "a person commits the offense of advertising commercial sexual abuse of a minor if: the person knowingly publishes, disseminates or displays, or causes directly or indirectly, to be published, disseminates or displayed any ad for a commercial sex act." Plaintiffs argue:

> a prosecutor need not show that a defendant did anything "knowingly" so long as she can establish that the defendant "cause[d] indirectly" third party content "to be published, disseminated or displayed." The Act does not require proof that a

12

> defendant knew (or even had reason to believe) that a person depicted in a posting was a minor – it expressly provides that this is *not* a defense. If a user posts content on a website containing a "depiction of a minor" and an "implicit offer" of sex for "something of value," every online service connected in any way to dissemination of that content is subject to criminal liability, whether its conduct was intentional or accidental, knowing or unknowing.

(Backpage.com's Br. 25). Defendant urges the Court to read the "knowing" culpability requirement into both clauses of the statute, relying on N.J. STAT. ANN. § 2C:2-2(c)(1), which provides that the "[p]rescribed culpability requirement applies to all material elements. When the law defining an offense prescribes the kind of culpability that is sufficient for the commission of an offense, without distinguishing among the material elements thereof, such provision shall apply to all the material elements of the offense, unless a contrary purpose plainly appears."

The Court disagrees with Defendant's reading of the language and agrees with both the McKenna and Cooper Courts' thorough analysis. A natural reading of the statute indicates that the adverb "knowingly" modifies the verbs that immediately follow it – here, "publishes, disseminates or displays" – and the attached clause creates liability, without the knowledge element being satisfied, if anyone "causes directly or indirectly, to be published, disseminated, or displayed" those same prohibited advertisements. As Judge Nixon stated: "context supports this reading. The subsequent affirmative defense provision confirms that no actual knowledge of the persons' age is necessary, stating that 'it is not a defendant that the defendant did not know the age of the minor depicted." Cooper, 2013 WL 155875 at *17.

### b. The Act likely cannot survive strict scrutiny because it is a content based restriction that is not narrowly tailored to serve the State's asserted interests and it is not the least restrictive alternative available to address the State's interests

Plaintiffs next argue the Act is invalid because it is a content based restriction that is not narrowly tailored to serve the State's asserted interests and it is not the least restrictive

13

alternative available to address the State's interests. Defendants argue that the Act does not regulate speech protected by the First Amendment because it only prohibits the advertisement of an illegal transaction. Furthermore, Defendants argue that the Act is content neutral and thus only subject to intermediate scrutiny.

A restriction on speech is content-based if it is not "justified without reference to the content of the regulated speech." Clark v. Cmty. for Creative Non–Violence, 468 U.S. 288, 293 (1984). In other words, a content-based restriction "focuses only on the content of the speech and the direct impact that speech has on its listeners," Boos v. Barry, 485 U.S. 312, 321 (1988), or is "designed or intended to suppress or restrict the expression of specific speakers," United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 812 (2000).

"Content-based prohibitions, enforced by severe criminal penalties, have the constant potential to be a repressive force in the lives and thoughts of a free people." Ashcroft v. Am. Civil Liberties Union, 542 U.S. 656, 660, (2004). "To guard against that threat the Constitution demands that content-based restrictions on speech be presumed invalid and that the Government bear the burden of showing their constitutionality." Id. (internal citations omitted). Content-based restrictions on speech receive the highest scrutiny by the courts, and "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." Playboy Entm't Grp., Inc., 529 U.S. at 818. A content-based limitation on speech will be upheld only where the state demonstrates that the limitation "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983).

This Court finds that the language of the Act in question is a clear cut example of a content based restriction on speech. The statute imposes liability "for advertisements solely on

the basis that they contain certain proscribed content: what appears to be the promotion of a sexual act with minors for something of value." Cooper, 2013 WL 1558785 at *24.

Additionally, the Act does not need meet strict scrutiny, such that it is narrowly tailored to promote a compelling government interest. Sable Commc'ns of Cal. Inc. v. FCC, 492 U.S. 115, 126 (1989). It is the Government's burden to demonstrate that the statute is constitutional. Ashcroft v. ACLU, 542 U.S. at 666.   Here, the Court finds that Defendants will likely fail to meet their burden, as they have failed to show that the statute is the least speech-restrictive solution to combat child sex trafficking in New Jersey.

### c.   The Act is likely both unconstitutionally overbroad and vague

Plaintiffs also argue the statute is both over broad as it criminalizes fully protected speech and unduly vague as it imposes severe criminal liability without providing reasonable notice of which speech is prohibited.

With regards to overbreadth, the Constitution "gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." Ashcroft v. Free Speech Coalition, 535 U.S. 234, 244 (2002).

Plaintiffs argue that the Act is overbroad in four ways. First, it is overbroad in terms of the parties subject to liability. Plaintiffs allege that the Act could hold multiple parties liable for just one third party post, pursuant to the "indirectly" causing language of the Act. Prosecutors could potentially "charge the website where [the ad] appeared; all search engines that identify the site in response to queries; any blogs, forums social networking sites, or individuals' emails that link to the website; and even ISPs that provide the services for users to access the Internet." (Backpage.com's Br. 31).

Next, Plaintiffs argue that the law is overbroad because of the enormous volume of

Internet content it burdens, arguing that any dating site, social networking cite or forum for communication could risk prosecution if it does not police or eliminate user postings.

Third, Plaintiffs claim the definition of "commercial sex act," i.e., a sexual act "for which something of value is given or received by any person" is overbroad as it is not limited to an economic exchange. The <u>McKenna</u> Court addressed this argument:

> Assuming that the undefined term "something of value" means anything that can be traded on a free market – including a bottle of wine, a nice dinner, or a promise to do the dishes – [the Washington statute]'s definition of "commercial sex act" encompasses vast swaths of legal, consensual, non-commercial sexual acidity.

Finally, Plaintiffs argue that the Act's requirement that online services obtain and retain identification from users posting content – the only defense available under the law – is also vastly overbroad. Plaintiffs claim "the identification requirement is practically impossible and disregards the realities of the Internet." (Backpage.com's Br. 33-34). Further, "the Act's vague and expansive dictates, which impose unclear burdens on indirect actors, will likely lead to overbroad self-censorship in order to avoid potential criminal liability." (Internet Archive Br. 18).

Defendant argues that the statute is neither overbroad nor unduly vague because the Act regulates illegal advertisements and thus are not protected by the First Amendment. Specifically, Defendant argues that the Act is not overbroad because "it requires that an actor knowingly engage in the prohibited conduct and it only regulates an illegal activity." (Def.'s Opp'n 19). As shown above, a plain reading of the statutory language shows no "knowingly" culpability requirement for one who directly or indirectly causes the ad to be displayed or disseminated. Thus the Court is not convinced by Defendants' argument regarding overbreadth.

Similarly, the Court is not persuaded by Defendant's argument as to vagueness, as Defendant relies on the same strained reading of the "knowingly" culpability element into all

parts of the statute. Defendant argues that neither is the Act unconstitutionally vague "because the 'knowingly' scienter requirement provides sufficient clarity to inform a person of ordinary intelligence of what conduct is prohibited under the Act, and provides sufficient guidance for a fact finder to determine whether an actor has violated its provisions." (Id. 20). The Court disagrees.

As explained in McKenna, 881 F. Supp. 2d at 1278-80, and Cooper, 2013 WL 1558785, at *21-24, the Act is likely to be found to be unconstitutionally vague. Among the terms the New Jersey legislature has neglected to define are "indirect[]," "direct[]," "implicit," and "offer." Additionally the Act's definition of "advertisement for a commercial sex act," including any "implicit offer" of sex for "something of value," is also likely impermissibly vague. Describing criminal conduct as anything that is "implicit" is inherently vague, because it means "[n]ot directly expressed [and] existing [only] inferentially" and "fails to clearly mark the boundary between what is permissible and impermissible." Vt. Right to Life Comm., Inc. v. Sorrell, 221 F.3d 376, 387-88 (2d Cir. 2000) (invalidating state law on political ads that "implicitly" advocate success or defeat of candidate).

Plaintiffs present a number of situations that could be construed as an "implicit offer" of sex for "something of value:"

> If a woman posts on a dating website describing her sexual interests and that she is looking for a "generous man," would that constitute an "implicit offer" under the law? If a masseuse offers customers "complete satisfaction" or an escort intending nothing more than companionship promises "a night you'll never forget," would those be "implicit offers" contrary to the law? And again, presumably all consensual sex reflects an exchange of "something of value" between the participants, even if no money changes hands.

(Backpage.com's Br. 25). This central definition of the Act fails to give a person of ordinary intelligence notice of what the law prohibits. "[S]tandards of permissible statutory vagueness are

strict in the area of free expression .... Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." NAACP v. Button, 371 U.S. 415, 433 (1963). Thus, laws regulating speech are void for vagueness when they are so ambiguous that a reasonable person cannot tell what expression is forbidden and what is allowed. See, e.g., Smith v. Goguen, 415 U.S. 566, 569 (1974) (invalidating state law that prohibited treating a flag "contemptuously"); Baggett v. Bullitt, 377 U.S. 360, 362 (1964) (loyalty oath preventing "subversive person" from being employed in state was void for vagueness); Houston v. Hill, 482 U.S. 451 (1987) (striking down city ordinance that made it unlawful to interrupt police officers in the performance of their duties because the law "effectively grants the police the discretion to make arrests selectively on the basis of the content of the speech").

Thus this Court again agrees with the McKenna and Cooper Courts in finding that Plaintiffs are likely to succeed in showing that such terms render the statute unconstitutionally vague.

### C. **The Act likely violates the Commerce Clause**

Plaintiffs allege the Act violates the Commerce Clause because it attempts to regulate commercial transactions that take place wholly outside the State of New Jersey, and because it seeks to apply New Jersey law in a manner that constitutes an unreasonable and undue burden on interstate commerce that is excessive in relation to any local benefit conferred on the State of New Jersey and is likely to subject parties to inconsistent state regulations.

The Commerce clause provides: "The Congress shall have Power ... To regulate Commerce ... among the several States...." U.S. Const., Art. I, § 8, cl. 3. The Supreme Court has long recognized that this affirmative grant of authority to Congress also encompasses an implicit

or "dormant" limitation on the authority of the States to enact legislation affecting interstate commerce. See, e.g., Healy v. Beer Institute, et al., 491 U.S. 324, 326, and n. 1 (1989), Hughes v. Oklahoma, 441 U.S. 322, 326, and n. 2 (1979); HP. Hood & Sons, Inc. v. DuMond, 336 U.S. 525, 534–35 (1949).

A state cannot regulate conduct that takes place exclusively outside the state. Healy, 491 U.S. at 336, 109 S.Ct. 2491. Where a state statute only has incidental effects on interstate commerce, the statute will be upheld "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest," where "its effects on interstate commerce are only incidental," and where the burden imposed on interstate commerce is not "clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

Here, while an ad may make an offer for a sex act to occur in New Jersey, it is entirely possible that the advertisement or the sex act itself in fact takes place out of state. Thus the Act seeks to regulate conduct that occurs wholly outside the state of New Jersey. Additionally, the out of state burden will be significant. As stated in McKenna,

> To escape liability, online service providers that post content that *might* be construed as containing "implicit" offers for sex (including aggregators like IA, social networking sites like Facebook.com, and dating sites like Match.com) will be required to collect government-issued identification, lest one of these offers relates to conduct occurring in Washington. Such a screening process would constitute a significant and costly change to the business operations of these corporations that have little to no connection with the State of Washington. Such a burden would be exponentially exacerbated if every state were permitted to legislate its own requirements. In contrast, Washington's interest in prosecuting wrongdoers is undermined by the practical obstacles to exercising jurisdiction over defendants whose criminal acts take place outside the state.

McKenna, 881 F. Supp. 2d at 1285 (W.D. Wash. 2012). This Court agrees. "Because the internet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate

internet activities without project[ing] its legislation into other States." <u>Am. Booksellers Found.</u> <u>v. Dean</u>, 342 F.3d 96, 103 (2d Cir. 2003). The Act is likely in violation of the dormant commerce clause, and thus cannot stand.

### D. **Plaintiffs have satisfied the remaining requirements for a preliminary injunction**

Having shown a likelihood of success on the merits, Plaintiffs have also adequately satisfied the remaining elements for securing a preliminary injunction: (2) Whether the movant will be irreparably injured by denial of the relief; (3) Whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) Whether granting preliminary relief will be in the public interest. <u>Gerardi</u> 16 F.3d at 1373.

First, "[t]he loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury." <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976). Absent injunctive relief, Plaintiffs may face serious criminal liability.

Second, the balance of equities weighs in Plaintiffs' favor. "No prosecutions have yet been undertaken under the law, so none will be disrupted if the injunction stands." <u>Ashcroft v.</u> <u>ACLU</u>, 542 U.S. at 671. While the injunction is upheld, New Jersey can enforce other laws banning prostitution and the exploitation of minors.

Third, an injunction is in the public interest. This is because, "[w]here a prosecution is a likely possibility, yet only an affirmative defense is available, speakers may self-censor rather than risk the perils of trial. There is a potential for extraordinary harm and a serious chill upon protected speech." <u>Id.</u> at 670-71. The Court acknowledges the great public interest in preventing and prosecuting human trafficking and child prostitution, but also understands the great necessity of upholding Constitutional protections.

## IV.   <u>CONCLUSION</u>

For the above reasons, the Court finds that a preliminary injunction is appropriate to enjoin the enactment of N.J. STAT. ANN. § 2C:13-10(b)(1). An appropriate Order follows this Opinion.

Dennis M. Cavanaugh, U.S.D.J.

Date:        August **20** , 2013
Original:    Clerk's Office
cc:          Hon. Joseph A. Dickson, U.S.M.J.
             All Counsel of Record
             File

21